IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------- X

MARK, *et al.*,

                    Plaintiffs,

          -against-                                    Docket No: 19-cv-2855 (TNM)

THE ISLAMIC REP. OF IRAN, *et al.*,

                    Defendants.

-------------------------------------------------------------------- X

## [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs respectfully submit the following Proposed Findings of Fact and Conclusions of Law in support of their Motion for Default Judgment against the Islamic Rep. of Iran ("Iran") and the Syrian Arab Rep. ("Syria") pursuant to 28 U.S.C. § 1608(e); and their request to refer the assessment of damages to a special master pursuant to 28 U.S.C. § 1605A(e).

## I.
## PROCEDURAL POSTURE

This is a civil action for damages pursuant to the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. § 1602 *et seq*. Plaintiffs are the victims and families of U.S. nationals injured in two separate terror attacks between 2015 and 2016. Plaintiffs filed this action on September 24, 2019 against Defendants Iran and Syria. (Dkt. 1). On December 19, 2019, the Mark, Batt and Hirschfeld plaintiffs were discontinued from the lawsuit. (Dkt. 4). Plaintiffs are not pursuing the claims of the Goldwaters, Gorfinkles and Jacobsons nor the claims of Ester and David Fishfeder. On December 22, 2019, Plaintiffs amended the Complaint so they could also seek pre-judgment interest. (Dkt. 6). Plaintiffs advance a cause of action under the FSIA, 28 U.S.C. § 1605A(c), as

well as intentional infliction of emotional distress, negligent infliction of emotional distress, assault, battery, a civil conspiracy, vicarious liability and aiding and abetting under Israeli law. (Dkt. 6 at ¶¶ 1-2, 90-102, 104-109, 111-115, 117-120, 122-124, 126-127, 129-130, 132-135).

None of the Defendants filed an answer or otherwise appeared. Plaintiffs moved for entry of default judgment by the Court against all Defendants. (Dkt. 20, 21). The Clerk noted the default of Defendants on February 5, 2021. (Dkt. 23, 24). In the context of a default setting under 28 U.S.C. § 1608(e), that provision requires a court to enter default judgment against a non-responding foreign state only where "the claimant establishes his claim or right to relief by evidence that is satisfactory to the court." 28 U.S.C. § 1608(e). Plaintiffs have presented evidence in the form of a sworn expert declaration of Arieh Dan Spitzen, Israel Defense Forces Colonel (ret.) regarding Hamas' responsibility for the two attacks in this case and the declarations of Dr. Patrick Clawson and Dr. Matthew Levitt regarding Iran's provision of material support to Hamas, as well as the declarations of Dr. Marius Deeb and Dr. Benedetta Berti regarding Syria's provision of material support to Hamas in *Force v. Islamic Rep. of Iran, et al.*, Dkt. 29-32, Civ No. 16-14688. (Dkt. 54). Plaintiffs further rely upon the declaration of Dr. Boaz Shnoor regarding the application of Israeli law which governs the damages claims of non-U.S. national family members of U.S.-national victims in *Force v. Islamic Rep. of Iran, et al.*, Dkt. 34, Civ No. 16-14688. Plaintiffs have also submitted sworn declarations from each Plaintiff regarding the attack as well as their damages and sworn declarations from Dr. Rael Strous, MD, a psychiatric expert regarding each Plaintiff's psychological and emotional damages, and sworn declarations from Dr. Alan Friedman, MD, a medical expert, regarding Eli Borochov's, Yoav Golan's and Rotem Shoshana Golan's physical injuries. (Dkt. 31-51, Dkt. 53, Exhibits B-D).

## II.
## FINDINGS OF FACT

### A.      The Terrorist Attacks

#### 1.      Hebron Terrorist Attack

On Friday, November 6, 2015, two terrorists from a Hamas cell,[1] brothers Akram Feisal

Muhammad Badawi and Nasr Feisal Muhammad Badawi, committed a shooting attack against

Israeli citizens at the courtyard of the Cave of the Patriarchs in Hebron.[2] The terrorists opened fire

upon a large group of Jewish worshippers gathered in the courtyard of the Cave of the Patriarchs

waiting to enter the building for the special Sabbath prayer.[3] (Spitzen Decl. ¶ 70) (Dkt. 54). The

terrorists used an SKS sniper carbine with telescopic sights, fitted with an improvised silencer that

---

[1] The court convicted the two men of membership in the Hamas organization. See the sentencing of Nasr Badawi, from November 17, 2017, Case 2551/16. He was convicted, under a plea bargain, of being a "member and operative in a military cell on behalf of the Hamas organization, which is an unauthorized association." See also the sentencing of Akram Badawi, from November 12, 2017, Case 3002/16. He was convicted, under a plea bargain, of being "a member of a military cell on behalf of the Hamas organization, in or near Hebron during the above period, which committed, together with his brother Nasr and with Ata Abu Rumuz, shooting attacks against the security forces and against Israeli civilians."

[2] The Cave of the Patriarchs in Hebron (in Arabic, Al-Haram al-Ibrahimi) is a religious site sacred to Judaism and to Islam, located in the eastern part of the city of Hebron. In the cave, according to Jewish tradition, are the graves of Adam and Eve; of the patriarchs of the Jewish nation— Abraham, Isaac, and Jacob— and of Sarah, Rebecca, and Leah. Since 1967, the Cave of the Patriarchs has served as a prayer site for Jews and Muslims, with a separation of prayer hours and prayer days and the various halls of the site.

[3] The "Life of Sarah" Sabbath is the sabbath on which the weekly Torah reading includes the passage from Genesis that describes the purchase by Abraham of the Cave of the Patriarchs. In recent years, that sabbath has been an occasion for thousands of Jews to make a pilgrimage to the Cave of the Patriarchs for prayer there. On that sabbath, the rule is that throngs of Jews may enter the place to pray and Muslims do not enter. (In the course of the year, there are special dates called "prayer exceptions" when only Muslims may pray, or only Jews, as befits the holidays and religious events of each religious community).

the terrorists made in order to render the source of fire difficult for the security forces to pinpoint. They fired from a home that belonged to their father, Feisal Muhammad Jum'ah Badawi. Akram Badawi fired a number of shots from the rifle wounding Eli Borochov and Micha Gedalia.

The cell members would conceal the rifle, with which they committed a relatively large number of shooting attacks and attempted attacks during that time, at the Al-Mujahideen Mosque in Hebron. They would remove it from its hiding place a number of hours in advance for a terror shooting, and then conceal it again at the mosque immediately after the attack. Their method in this case was the same. This practice of using the mosque (a place of prayer that enjoys a certain immunity, since the security authorities seldom search or even enter it) is familiar to us from the behavior of other Hamas cells.[4] (Spitzen Decl. ¶ 72) (Dkt. 54).

Nasr Badawi said in his statement to the police with respect to this terror attack that the purpose of the gunfire was to kill a Jew.[5] Akram Badawi said in his statement to the police that the purpose of the shooting attacks perpetrated by the Hamas cell was to murder and injure Israelis as

---

[4] For example, a senior Hamas operative in the area where he resided, Falah a-Nada, confessed when interrogated that he had hidden from the security forces at a mosque in the Ramallah area. Weapons have been found more than once in searches conducted by the security forces at mosques that have been identified as Hamas strongholds. The Hamas cell that murdered Rabbi Mark in July 2016 made a practice of passing messages by means of notes hidden in a Hebron mosque. In 2008, an IDF force uncovered a weapons cache that was hidden in a mosque in the Jebalia Refugee Camp. In 2003, a suicide bomber was prepared for his mission at a Jerusalem mosque, and there he was even fitted with the explosive belt that, when detonated, brought death to 23 people and injury to 115. Regarding the use of mosques by Hamas for terror purposes, see inter alia the report of March 1, 2009, from the Meir Amit Intelligence and Terrorism Information Center. https://www.terrorism-info.org.il/en/18308/

[5] A statement to the police by Nasr Badawi, from January 19, 2016, sheet 3, Police File 483748/2015.

revenge for the deaths of the Palestinian shahids (people who die for the sake of Allah).[6] (Spitzen Decl. ¶ 73) (Dkt. 54).

The terror attack in which Eli Borochov was injured belonged to a series of shooting attacks by that Hamas cell. The cell's terror attacks, since its founding in the last quarter of 2014, continued until when its members were exposed and arrested at the start of 2016. During the period of its activity the members of the Hamas cell committed nearly twenty shooting attacks and planned to commit attacks along other lines (such as abducting a Jewish settler and obtaining anti-tank weapons in order to commit a "quality" terror attack against military targets). (Spitzen Decl. ¶ 74) (Dkt. 54).

### Overview of the Hamas cell

The Hamas cell responsible for this terror attack was composed of four members who were convicted in court of membership in a terror cell of the Hamas organization. The members of the cell were Nasr Badawi[7] and Ata Abu Rumuz[8] (founders of the cell); Akram Badawi[9], the brother of Nasr, and the father of the brothers, Feisal Badawi[10]. The cell had a number of accomplices, including dealers in weapons and ammunition such as Maher Badawi, a brother of Nasr and Akram. (Spitzen Decl. ¶ 75) (Dkt. 54).

---

[6] A statement to the police by Akram Badawi, from February 7, 2016, sheet 4, Police File 483748/2015.

[7] The verdict in the case of Nasr Badawi from November 17, 2017, Case 2551/16.

[8] The verdict in the case of Ata Abu Rumuz from November 20, 2017, Case 3001/16.

[9] The verdict in the case of Akram Badawi from November 12, 2017, Case 3002/16.

[10] The verdict in the case of Feisal Badawi from April 4, 2017, Case 3027/16.

**Individual profiles of the cell members**

**Nasr Badawi:** Badawi, born in June 1992, was a resident of the Hebron/Abu Sneina neighborhood. His father, Feisal, is married to two women. Nasr Badawi worked until his arrest on January 9, 2016, at his father's stone processing plant. Nasr traded in weapons, and he was in contact with a number of dealers in Hebron from whom he bought weapons and ammunition. Nasr was trained in shooting and in caring for weapons, and he had access to ammunition and weapons through his continual contacts with weapons dealers.[11] (Spitzen Decl. ¶¶ 76, 77) (Dkt. 54).

Even before Nasr Badawi founded the Hamas terror cell, he was involved in violent activity against the IDF forces in Hebron, including the throwing of petrol bombs and stones and clashing with security forces in the field. That was the situation at the end of 2008 and the start of 2009 (at the time that the IDF mounted Operation Cast Lead against Hamas in Gaza). In 2009, Nasr Badawi was apprehended near the Cave of the Patriarchs while armed with two knives, and he was indicted.[12] Again, in the months of July and August 2014 (at the time that the IDF mounted Operation Protective Edge against Hamas in Gaza), similar activity continued against IDF forces.[13] In the wake of this IDF operation, Nasr Badawi and Ata Abu Rumuz decided to organize the Hamas terror cell. (Spitzen Decl. ¶ 78) (Dkt. 54).

Nasr Badawi's violent behavior targeted not only IDF soldiers but also a Palestinian resident of Hebron with whom he had a personal dispute. In his statement to the police, Nasr

---

[11] Regarding the network of ties with weapons dealers, the shooting with the weapon, and the concealment of the weapon, see Police File 483748/2015, Nasr Badawi's statement to the police from January 17, 2016, sheet 2, line 23; sheet 3, and sheet 4 to the end.

[12] Indictment against Nasr Badawi, Prosecution File 3883/09, Judea Military Court.

[13] Regarding his violent activity against the Israeli security forces in 2008 and in 2014, see Police File 483748/2015, statement of Nasr Badawi to the police from February 3, 2016.

Badawi stated that he had shot at the car of a Palestinian from Hebron because of a personal/financial dispute. The Palestinian had caused a weapon to be turned over from the Badawi family's possession to the Palestinian preventive security apparatus. Nasr Badawi had demanded financial compensation in recompense, which was given only after Nasr's warning shot.[14] (Spitzen Decl. ¶ 79) (Dkt. 54).

**Ata Sa'id Ya'qub Abu Rumuz:** Rumuz, born December 1989, was a resident of Hebron and co-founded with Nasr Badawi the Hamas cell that perpetrated the terror attack. He was arrested on September 9, 2016 and sentenced to 11 years of imprisonment[15] for activity as part of that cell. (Spitzen Decl. ¶ 81) (Dkt. 54).

When he founded the Hamas cell in 2014, after the IDF's Operation Protective Edge, Ata Abu Rumuz had already been imprisoned after conviction on security-related offenses. (Spitzen Decl. ¶ 82) (Dkt. 54). In 2007, he was accused of possessing an explosive device and of attempting to persuade another person to throw that device at IDF forces in Hebron.[16] He was convicted in that case, under a plea bargain, of attempting to lure another person to cause the death of IDF soldiers. The charge of holding military weaponry was dismissed under the plea bargain. Ata received an active sentence of 18 months of imprisonment plus 18 months suspended and a monetary fine.[17] (Spitzen Decl. ¶ 83) (Dkt. 54).

On March 15, 2011, Rumuz was indicted together with another person for attacking Border Policemen who were performing a security check at the entrance to the Cave of the Patriarchs in

---

[14] Police File 483748/2015, Nasr Badawi's statement to the police on January 26, 2016

[15] The verdict in the case of Ata Abu Rumuz from November 20, 2017, Case 3001/16.

[16] Case 2557/07, Indictment from April 1, 2007.

[17] Case 2557/07, Verdict from September 5, 2007.

Hebron.[18] In court, Rumuz and his confederate in the disorder attempted to claim that they were attacked by the policemen, a claim that was rejected by the court. (Spitzen Decl. ¶ 84) (Dkt. 54).

The Palestinian media (including various Hamas websites) mentioned another arrest of Rumuz, from November 2012.[19] An additional report of the arrest of a man named Ata Abu Rumuz at an IDF roadblock in Hebron on November 6, 2015[20], is consistent with Nasr Badawi's statement to the police in which he explains why the cell did not succeed in procuring an RPG launcher that it had planned to procure: "... but in the end we didn't buy the RPG and we didn't buy weapons because Ata was arrested and the connection with the man from the north was lost..."[21] (Spitzen Decl. ¶ 85) (Dkt. 54).

In addition to his arrests for action against public security and against the security forces of Israel, Rumuz participated in violent activity that included confrontations with IDF forces, stone-throwing, and throwing of petrol bombs in the years 2008 and 2014.[22] He perpetrated that activity together with Nasr Badawi, in addition to activity that he organized on behalf of the Hamas organization. (Spitzen Decl. ¶ 86) (Dkt. 54).

**Akram Feisal Muhammad Badawi:** Badawi was a resident of the Hebron/Abu Sneina neighborhood. He worked at his father's stone processing plant until his arrest on January 20, 2016. Per his statement to the police, he traded in weapons and in weapon parts and manufactured

---

[18] Cases 1982/11, 1981/11, Indictment from March 22, 2011, taken from Appeal Files 1521/11, 1520/11.

[19] *See* https://www.paldf.net/forum/showthread.php?t=1057543&page=14; https://gazaps.yoo7.com/t267-topic; https://tinyurl.com/pxhmhmde.

[20] http://www.al-ayyam.ps/pdfs/2015/11/07/p02.pdf/; http://www.alquds.com/articles/1446787118656463400/

[21] Nasr Badawi's statement to the police from February 3, 2016, sheet 4, line 104.

[22] Nasr Badawi's statement to the police from February 3, 2016, sheet 2, line 53.

improvised weapons. Akram is skilled in shooting and in caring for weapons and had access to ammunition and weapons through continual contacts with weapons dealers.[23] (Spitzen Decl. ¶¶ 87, 88) (Dkt. 54). Akram and his brother Nasr, who were involved in the wounding of Eli Borochov, were sentenced to life imprisonment. (Spitzen Decl. ¶ 89) (Dkt. 54).

**Feisal Muhammad Jum'ah Badawi:** Badawi was a resident of the Hebron/Abu Sneina neighborhood. Feisal has a plant for stone processing and owns a quarry in Hebron. (Spitzen Decl. ¶ 90) (Dkt. 54).

Feisal is the father of Akram and Nasr Badawi. He was a member of the Hamas cell which his two sons belonged to. He was a partner to the operational plans of the cell and promised to help fund the acquisition of weapons and ammunition for operations. He was arrested on March 8, 2016, after the arrest of the cell's other members. According to the indictment against him[24], he had weapons in his possession (an M16 and a Kalachnikov assault rifle) during the years before the cell's founding and he even sold and bought these weapons. At the time the cell was founded, those weapons were no longer in his possession. (Spitzen Decl. ¶ 91) (Dkt. 54).

**<u>The Hamas organization's responsibility for the terror attack</u>**

The Hamas organization, a cell of which committed the terror attack in which Eli Borochov was wounded, took responsibility for the terror attack, and identified the perpetrators who belonged to the cell as Hamas operatives from its operational terrorist wing the Izz a-Din al-

---

[23] Police File 483748 /2015 – statement of Akram Badawi to the police from February 7, 2016, in which he describes extensive trading in weaponry as well as a shooting that he perpetrated and a shooting that he permitted his minor son to perpetrate (outside the framework of the Hamas cell which he later joined). Sheet 5 line 132 to sheet 7, line 218.

[24] Case 3027/16, Indictment against Feisal Badawi from March 27, 2016, amended by plea bargain from April 4, 2017.

Qassam Brigades. Below are details of the connection between the Hamas organization and the cell from the following standpoints: the founding of the cell as a Hamas cell, the pattern of the cell's activities and the attempts to fund its operation as customary for Hamas cells, the persistence of its members, the planning of operations along lines typical of Hamas cells, the organizational affiliation of the cell members to Hamas and their activity under Hamas before being recruited to the cell according to their statement, the identification of the cell members who perpetrated the terror attack as Hamas members by the Israeli security services, and the identification of the cell members who perpetrated the terror attack as members of the operational terrorist wing of Hamas (the Izz a-Din al-Qassam Brigades) by the Hamas organization in its own publications on websites and in publications identified with the organization. (Spitzen Decl. ¶ 92) (Dkt. 54).

**<u>The founding of the Hamas cell</u>**

Roughly a week after the end of Operation Protective Edge, [25] the members of the Hamas cell, Nasr Badawi and Rumuz, met and decided to form a Hamas terror cell that would commit shooting attacks against Israeli targets.[26] (Spitzen Decl. ¶ 93) (Dkt. 54).

---

[25] In Operation Protective Edge, Israel took action against terrorist infrastructures in the Gaza Strip. The operation began on June 8, 2014 and was concluded on August 26, 2014. Thus, the cell was founded early in September 2014.

[26] See the indictment against Nasr Badawi in Prosecution File 1379/16, charge 16: "During the above period (the week after Operation 'Protective Edge' in 2014) in Hebron ... the accused approached Ata Abu Rumuz and spoke with him about the founding of a military cell under the Hamas organization for the purpose of perpetrating shooting attacks against the security forces. Ata assented to the suggestion of the accused. As part of the cell's activity, the two planned to perpetrate shooting attacks by means of the 'Carlo' submachine gun that was in the possession of the accused, and to procure further weapons for the perpetration of military operations." See also the sentencing of Nasr Badawi, Judea Military Court, Case 2551/16, Military Prosecutor v. Nasr Feisal Muhammad Badawi, November 12, 2017: Convicted April 4, 2017 of performing a service

In Badawi's statement to the police, Badawi linked the decision with the Hamas organization's readiness to a ceasefire with Israel, which he interpreted as a period of preparation for a further round of fighting against Israel—a round in which he wished to participate by organizing the cell.[27] In response to Nasr's request, Rumuz agreed to join the Hamas cell and was one of its founders.[28] According to Nasr Badawi's statements to the police, as well as the indictment against him, Nasr Badawi approached his father Feisal for assistance in obtaining weapons for the cell. The father agreed, but on condition that the weapons not be obtained by his son. The father became a member of the Hamas cell shortly after the cell's founding; and he was convicted, on the basis of his statement, of membership in a Hamas military cell.[29] The fourth member of the Hamas cell was Nasr Badawi's brother Akram, who participated in carrying out the terror attack in which Eli Borochov was wounded.[30] According to Nasr Badawi, he approached his

---

for an unauthorized association, of membership and activity in an unauthorized association, of 12 crimes attendant to the attempt to deliberately cause death, and more.

[27] Police File 483748/2015, the statement of Nasr Badawi to the police from February 3, 2016.

[28] The verdict and sentence in Case 3001/16, Ata Sa'id Ya'qub Abu Rumuz—See in the verdict for Ata Abu Rumuz from November 20, 2017: "...In summer 2014 Nasr Badawi approached him and suggested that he take part in founding a military cell that would be associated with the Hamas organization and whose purpose would be to perpetrate shooting attacks against the security forces. The defendant (Rumuz) assented. (Sentencing, page 3, lines 17–20).

[29] Case 3027/16 against Feisal Badawi, sentencing from April 4, 2017, with his conviction for membership in an unauthorized association on the basis of the third charge in the indictment against him: "... while doing the above, the accused was a member and operative in a military cell under the Hamas organization, which is an unauthorized association."

[30] Amended indictment, in an open plea bargain, against Akram Badawi, Prosecution File 1544/16, Police File 2794/16, charge 1: "... from the start of 2015... in Hebron... the accused was a member of a military cell under the Hamas organization which perpetrated shooting attacks against Israel's civilian security forces, this together with Ata Abu Rumuz and with his brother Nasr. As part of the cell's operations, they planned to perpetrate shooting (attacks), and to purchase

brother Akram to recruit him to the call at the start of 2015. Nasr asked Akram to obtain a sniper rifle for him, so that they could perpetrate a shooting and kill Israelis. Akram agreed to help and did obtain a rifle.[31] (Spitzen Decl. ¶ 94) (Dkt. 54).

### **Financing of the cell's operations**

Upon the founding of the cell by Nasr Badawi and Rumuz in September 2014, Nasr Badawi and Rumuz discussed possible sources of funding. The first requirement that came up[32] was funding for the purchase of weapons with the declared purpose of attacking Israeli targets, or otherwise obtaining weapons for that purpose. Rumuz suggested that they procure an M16 (a long-barreled rifle more suitable for mid-range targets), and Nasr Badawi approached his father with a request for funding of such a purchase. The father agreed on the condition that the purchase be performed not by Nasr but by others. In fact, according to Nasr, no such assistance was received from the father because the latter conditioned the granting of the assistance on the conclusion of a land deal which did not come about. (Spitzen Decl. ¶ 95) (Dkt. 54).

Rumuz told Nasr Badawi at the start of 2015 that he was in contact with a man from Gaza and that he was trying to obtain a weapon or to obtain funding for the purchase of weapons from that man. A week later, Rumuz reported that his contact asked him to burn the SIM card of the

---

further weapons in order to mount military action. The accused and his confederates, under the aegis of the cell, committed shooting attacks as follows"…

[31] Statement of Nasr Badawi to the police, from February 3, 2016, sheet 5, lines 158–164. Akram did obtain an improvised sniper rifle that was built around the barrel of an M16. This is not the weapon that the cell used for the terror attack in which Mr. Borochov was wounded.

[32] Police File 483748/2015, the statement of Nasr Badawi to the police from February 3, 2016.

phone he had used.[33] The contact's identity was not revealed in the material that was given for

Spitzen's inspection (The familiar pattern of operations raises reasonable suspicion that Rumuz

was indeed in contact with a military operative of Hamas in Gaza who also advised him on caution

lest the contact be revealed).[34] (Spitzen Decl. ¶ 96) (Dkt. 54).

The fact that the cell chose a pattern of operations including primarily shooting attacks at

Israeli targets, and in isolated cases even used explosive devices of their own manufacture, along

with the fact that the cell's members and their families traded in weapons and ammunition and

specialized in building weapons and manufacturing improvised explosive devices over the years—

those facts were the solution to the problem of funding, as weapons that the cell's members had

procured for illegal trading were what they used. Thus, for example, the members of the cell used

four different weapons over the period of the cell's activity, as they and their accomplices sold the

weapons they had used and replaced them with others.[35] The arsenal, the ammunition, and the

explosives at the cell's disposal, along with the skills of its members in the operation, maintenance,

---

[33] Police File 483748/2015, Nasr Badawi's statement to the police from February 3, 2016, sheet 3, lines 85–90.

[34] To the best of Spitzen's knowledge, Hamas headquarters in Gaza operated more than a few cells of the organization inside Judea and Samaria. In this regard, see for example the report from the Meir Amit Intelligence and Terror Information Center: https://www.terrorism-info.org.il//Data/articles/Art_20852/H_128_15_632639130.pdf/ and the following article: https://www.ynet.co.il/articles/0,7340,L-5566246,00.html/

A prominent example of this phenomenon is the Gaza-controlled Hamas cell in Hebron that kidnapped and murdered the three boys from Alon Shvut on June 12, 2014. It is certainly possible that this murder served as encouragement for the formation of the Hamas cell that injured the plaintiff, as the terrorists of both cells resided in the city of Hebron and information about the kidnapping attack against the boys, and about their murder, was spread and was known to all.

[35] Police file 483748/2015, Akram Badawi's statement to the police from September 7, 2016, sheets 4 to 6.

and construction of improvised weapons, made external sources of funding unnecessary in practice and afforded the Hamas cell flexibility in wreaking terror as long as it "merely" shot with light weapons and threw explosive devices at Israeli targets. However, because of insufficient funding, the cell failed in its plan to expand its operations to the procurement of powerful weapons such as RPGs and a launcher for them, or to perpetrate a kidnapping. (Spitzen Decl. ¶ 97) (Dkt. 54).

### Cell members' connection with Hamas before their recruitment to the cell

Four members of the cell were convicted in court of membership in Hamas: Nasr, Akram, and Feisal Badawi, and Rumuz. Three of them were identified with Hamas years before the cell was founded and they actively participated in activity under the organization's aegis and in activity supporting the Hamas organization. (Spitzen Decl. ¶ 98) (Dkt. 54).

From Nasr Badawi's statements to the police and the indictment that was filed against him,[36] it emerges that from 2012 onward, Nasr took part in a number of demonstrations and rallies in support of Hamas. In addition, he travelled from Hebron to the Al-Aqsa Mosque in Jerusalem and there too joined illegal marches of Hamas.[37] The acquaintance between Nasr Badawi and Rumuz began before the cell was founded on the basis of a common background of support for Hamas. Nasr Badawi assisted Rumuz in preparing a rally in support of Hamas in 2014. That rally

---

[36] Police File 483748/2015, Nasr Badawi's statement to the police from February 3, 2016, sheet 3, line 63, and the indictment against Nasr Badawi, Prosecution File 1379 and Police File 2794 – charge 10: Presence at a meeting of an unauthorized association: During Operation Protective Edge, he participated in a Hamas meeting.

[37] Police file 483748/2015, pp. 38–41, statement of Nasr Badawi to the police, from January 17, 2016, sheet 7, line 199, in which he related that he was photographed with Hamas flags in the background during his visit to Al-Aqsa. During identification of the photos that were downloaded from his mobile phone, he said regarding the photo that was presented to him: "A picture of me at the Al-Aqsa Mosque in Jerusalem, with Hamas flags behind me."

was instigated by Rumuz, and Nasr and Akram participated in preparations for it. The rally did not take place in the end, because it was prevented by IDF forces.[38] (Spitzen Decl. ¶ 99) (Dkt. 54).

Akram Badawi's links with the Hamas organization and his activity in the organization began as early as 2006. According to his statement to the police and the indictment against him[39], Akram Badawi participated in the Hamas campaign activity for the Palestinian Legislative Council elections as a member of the polling station committee on Hamas' behalf, and he confessed that he had participated in campaigning and had hung Hamas flags in Hebron. In addition, he participated in parades of support for Hamas in 2014 and assisted Rumuz in preparations for a pro-Hamas rally. (Spitzen Decl. ¶ 100) (Dkt. 54).

The statements of Nasr and Akram Badawi to the police, and the indictments against them both, point to activity by Rumuz in support of Hamas before he joined the cell.[40] (Spitzen Decl. ¶ 101) (Dkt. 54).

---

[38] Indictment against Akram Badawi, Prosecution File 1544/16, Police File 2794/16, sixth charge: Performing a service for an unauthorized association: In 2014, during Operation 'Protective Edge', "In Hebron... the defendant helped organize a rally on behalf of the Hamas organization in Hebron. As part of organizing the rally, the defendant prepared Hamas flags for hanging in the city's streets." In addition, Police File 483748/2015, Nasr Badawi's statement to the police from February 3, 2014, in which he told of his assistance to Rumuz in organizing the rally and of the entry into the Abu Sneina neighborhood of the IDF, which stopped the rally.

[39] Indictment against Akram Badawi, Prosecution File 1544/16, Police File 2794/16, first charge: Performing a service for an unauthorized association: In 2006, "In Hebron... the Defendant was responsible for a polling station on behalf of the Hamas organization in Hebron. Furthermore, on the day of elections the defendant hung Hamas flags across the city." In addition, Police File 483748/2015, Akram Badawi's statement to the police from February 7, 2016: ".... I have supported the Hamas organization since 2006, and in 2006 I participated in Hamas activity. I was responsible for a polling station at the elections on behalf of Hamas... and on the day of elections, I put up Hamas flags... About a year ago, I prepared flags for a Hamas march that was organized by Ata Abu Rumuz..."

[40] Spitzen has not received Rumuz' statement to the police.

Examination of the past of three cell members—Nasr and Akram Badawi, and Rumuz—indicate that even before the terror cell was founded, they engaged in "popular" activity in the Hamas: marching in parades, hanging flags, confronting the army, helping Hamas in the 2006 elections, etc. The cell members followed a typical "path" known to us from the activity of other Hamas cells. It starts by identifying with Hamas and taking part in demonstrations, parades, and confrontations waged against IDF soldiers, and it continues into armed terror. (Spitzen Decl. ¶ 102) (Dkt. 54).

### Activity of the Hamas cell

One of the characteristics of an organized terror cell is intensive, lengthy terrorist activity made possible by orderliness and planning in the cell's administration, together with attention to requirements and risks. (Spitzen Decl. ¶ 103) (Dkt. 54).

Such was the administration of the Hamas cell that committed the terror attack of November 6, 2015, in which Eli Borochov was injured. The cell was responsible for a considerable number of shooting attacks between its founding in September 2014 and the arrest of its members in early 2016. According to Nasr and Akram Badawi's statements to the police, and according to the indictments issued against the cell's members, the cell committed at least twenty shooting attacks against Israeli civilians and soldiers in the Hebron area. The preferred targets were Israelis present in the vicinity of the Cave of the Patriarchs. The cell would aim from two nearby buildings: from the home of Feisal Badawi (the father of Nasr and Akram) and from the roof of the home of Rumuz. Further shooting attacks by the cell were aimed at IDF positions in Hebron from the roofs of buildings and from other commanding positions. In two separate terror attacks committed on January 3, 2016, members of the cell shot and wounded a female soldier in the courtyard of the

Cave of the Patriarchs and a male soldier at an IDF position in Hebron. (Spitzen Decl. ¶ 104) (Dkt. 54).

Akram Badawi directly linked the first terror attack that he committed to the anniversary of the founding of Hamas, and he recounted: "With the approach of the anniversary of the founding of the Hamas honor movement, quiet descended on the place and the soldiers at the roadblock were joking and laughing... A single gunshot from 600 meters away, and a uniformed soldier fell to the ground..."[41] (Spitzen Decl. ¶ 105) (Dkt. 54).

The cell committed an unusual terror attack in December 2015. Nasr Badawi, together with two others—Muhammad Abu Rumuz and Musa Taha—planned and perpetrated a multiple terror attack that included throwing explosive devices and shooting at an IDF position. Nasr Badawi's plan was to throw an explosive device at the position and thus draw the soldiers out in a chase after the throwers into the nearby neighborhood and into an ambush. That attack did not succeed because the soldiers did not come out to pursue the throwers of the explosive device.[42] (Spitzen Decl. ¶ 106) (Dkt. 54).

The multiplicity of terror attacks during the year of the cell's existence, and their frequency, along with the desire to raise their level and quality show the cell's determination to attack as many

---

[41] The description is provided by Akram, possibly by way of an interviewing journalist, at this site: https://tinyurl.com/vzs4pc7p./ December 9 was the day that the first intifada broke out. According to the Hamas narrative, it was on the same day, in 1987, that the organization's founder Sheikh Ahmad Yassin assembled seven leaders of the Muslim Brotherhood in the Gaza Strip and decided to establish the Hamas organization. On December 14, the organization that they established published its first public announcement, and that day is considered the day of Hamas' founding. Those two dates, and the weeks surrounding them, have served as target dates for the perpetration of terror attacks by Hamas operatives and by the terror cells of the organization.

[42] Nasr Badawi's indictment, Prosecution File 1379/16, charge 24.

Israeli targets as possible and to cause losses among Israeli civilians and soldiers.[43] (Spitzen Decl. ¶ 107) (Dkt. 54).

The cell members' statements to the police, the indictments, and the verdicts show their determination to kill as many Jews as possible. The verdict for Nasr and Akram Badawi dealt with the prosecution's request to imprison the two for life, although people were not killed in any of the attacks. In their verdict, from November 12, 2017, the president of the military court of Judea, Menachem Lieberman, wrote: "The defendant used lethal standard-issue weapons for the purpose of dealing death to Jews. The defendant used a sniper rifle with a telescopic sight, a weapon which by its nature is intended to afford maximum accuracy, and as a result, to kill. In addition, the defendant attempted at length to commit mass murder, in a large number of attempts which repeated themselves, as emerges from the facts of the indictment as summarized in the plea bargain. The deeds of the defendant were committed consistently in order to bring harm to specific sectors: soldiers, members of the security forces, and particularly Jewish civilians[44]..." (Spitzen Decl. ¶108 ) (Dkt. 54).

The degree of danger from the operations of the Hamas cell, and the degree of its members' determination to cause injury and damage, is evident in the planning of the two terror attacks that

---

[43] Nasr Badawi explained the multiple attack as follows, in his statement to the police from January 26, 2016: The intent was to kill four to six soldiers, because by his experience, as soon as an explosive device was thrown at that position, 4 to 6 soldiers emerged to comb the area for the throwers. Asked why he did not fire at the position, Nasr explained that a gunshot would have wounded one solder at most. "... I wanted to execute a high-level, quality attack and kill the maximum number of soldiers."

[44] This phrasing appears in the sentencing of Nasr Badawi, Case 2551/16, hearing and decision, clause c, from November 12, 2017, and in the sentencing of Akram Badawi, Case 3002/16, hearing and decision, clause c, from November 12, 2017.

it did not manage to execute. In or around April/May 2015, Rumuz contacted someone who offered to sell an RPG anti-tank launcher to the cell together with ten compatible grenades. Feisal Badawi, the father of Nasr and Akram, expressed readiness to fund the purchase, to the amount of fifteen thousand Jordanian dinars (roughly twenty thousand dollars at the time). For technical reasons, the deal was not concluded. The possession of such weaponry could have enabled a Hamas cell to cause extremely severe harm, and the cell members who were party to the planning saw great importance in seizing such an opportunity.[45] (Spitzen Decl. ¶¶ 109, 110) (Dkt. 54).

The cell planned an additional attack in Spring 2015. According to Nasr Badawi's statement to the police, Rumuz suggested kidnapping a Jew from the Etzion area in the Bethlehem district, in order to attempt to have Palestinian prisoners released in return. Akram Badawi, who heard of the plan, suggested hiding the kidnap victim in the family's quarry, where he would prepare a pit for concealing the victim. According to Nasr Badawi, the reason the attack did not come about was that the operation required the purchase of a "legal" vehicle for the kidnapping and there was no funding for such a purchase.[46] A kidnapping attack against an Israeli for the purpose of negotiating freedom for prisoners is very typical of a Hamas cell.[47] (Spitzen Decl. ¶ 111) (Dkt. 54).

---

[45] Police File 483748/2015, Nasr Badawi's statement to the police from February 3, 2015, where Nasr recounts that his father was prepared to make every effort to procure the weapon since he saw in its use a deed that would cause an "earthquake", while Nasr himself saw in the RPG a "strategic weapon that will change the regional balance."

[46] Regarding the planning for the kidnapping attack, see Police File 483748/2015, Nasr Badawi's statement to the police from February 3, 2016.

[47] See for example the kidnapping of three boys from the Alon Shvut junction and their murder, an event of June 12, 2014. That event was planned for the purpose of negotiating the release of Palestinian prisoners.

The tenacity described above, the planning of attacks, and the great quantity of attacks are very typical of terror cells belonging to the operational terror wing of Hamas, and they are known to us from analysis of Hamas cells' operations in other attacks. (Spitzen Decl. ¶ 112) (Dkt. 54).

**Identification by Hamas of the cell members as members of the organization**

On September 28, 2016, the Israel Security Agency (ISA) exposed the arrest of the brothers Nasr and Akram Badawi, their responsibility for the sniper attack in Hebron, and their identity as Hamas operatives.[48] A day later, official Hamas websites, forums associated with Hamas, and the official website of the operational terrorist wing of Hamas, the Izz a-Din al-Qassam Brigades, announced[49] the arrest of the brothers Nasr and Akram Badawi.[50] Rumuz's status as a prisoner from Hamas, included in the list of inmates from Hamas in Israeli prisons, was announced by Hamas websites after his sentencing.[51] (Spitzen Decl. ¶ 113) (Dkt. 54).

The delay from Hamas in acknowledging the terrorist as one of the organization's operatives, lasting until sentencing and sometimes even longer, is a known and semi-official practice of Hamas, intended to protect the terrorist from a more severe sentencing and from the exposure of further recruits who have not yet been captured. (Spitzen Decl. ¶ 114) (Dkt. 54).

---

[48] See the report of September 28 from the Israel Security Agency (ISA), at its official website (Hebrew): https://www.shabak.gov.il/publications/Pages/NewItem290216.aspx/

[49] See the item on the official website of the Izz a-Din al-Qassam Brigades: https://www.alqassam.net/arabic/news/details/9567 and see the reports on the websites and forums identified with Hamas regarding the arrest: https://tinyurl.com/88ychph4; and *see* https://www.paldf.net/forum/showthread.php?t=1183820&page=14&styleid=15

[50] For Akram Badawi as one of the prisoners from the organization see: https://tinyurl.com/mhvjzycz. For Nasr Badawi as one of the prisoners from the organization, see: https://tinyurl.com/52v6x7t3.

[51] https://tinyurl.com/ps48z9fu; *See* Ex. B attached to Spitzen's Declaration.

On February 29, the Hamas-affiliated Paldf web forum tweeted on its Twitter account a poster typical of the Hamas organization, with the words: "The Qassami brothers [that is, members of the Hamas operational terrorist wing, the Izz a-Din al-Qassam Brigades] Nasr and Akram Badawi, carried out a number of sniper attacks against soldiers and settlers during the Al-Aqsa Intifada." At the bottom of the poster, the following was written, inter alia: "The two are fighters of the Islamic Resistance Movement (Hamas) in the city of Hebron."[52] (Spitzen Decl. ¶ 115) (Dkt. 54).

From reading the official websites of Hamas and of its operational terrorist wing the Izz a-Din al-Qassam Brigades, a picture emerges that shows a clear public embrace of the organization's responsibility for the attacks that the cell perpetrated, as well as identifying the perpetrators as Hamas operatives. The fact that all three central members of the cell appear on the list of prisoners from the organization as published on the Hamas and Izz al-Din al-Qassam Brigades websites confirms their organizational affiliation and the acknowledgement that the attacks perpetrated by the cell, including the attack in which Eli Borochov was wounded, were indeed perpetrated by a cell of the Hamas organization, on its behalf, and by its authority. (Spitzen Decl. ¶ 116) (Dkt. 54).

In sum, the shooting attack on November 6, 2015 in which Eli Borochov was wounded was a terror attack planned and executed by members of a Hamas cell as part of the intensive and planned-out terror activity of that cell, a cell founded in September 2014 and active until the arrest of its members by security forces in Israel in January 2016. (Spitzen Decl. ¶¶ 117, 118) (Dkt. 54).

---

[52] https://twitter.com/paldf/status/704359544261107713

## 2.      Bus Terrorist Attack

On December 14, 2015, the 28th anniversary of the founding of Hamas,[53] terrorist Abd al-Muhsin Shaher Hasouna rammed fourteen people who were waiting at a bus station near the main western entrance to the city of Jerusalem, near the Bridge of Strings. The terrorist was killed by a passerby who noticed the attack and who, with his personal weapon, managed to shoot the terrorist.[54] In the car, near the terrorist, a green-painted axe[55] was found which the terrorist had prepared for the purpose of a multiphase attack: first vehicular ramming, and then alighting from the vehicle and trying to kill and injure passersby with the axe.[56] The terrorist's intention to use

---

[53] According to its own account, Hamas was founded by Sheikh Ahmad Yassin in Gaza on December 14, 1987. The anniversary was chosen, apparently not at random but for symbolism's sake, for the terror attack, thus serving to indicate that the terrorist was a Hamas operative. Over the years, Hamas has intentionally perpetrated a number of terror attacks on this same date—for example the stabbing attack in Jaffa on December 14, 1990, and the attack with two car bombs in Gaza on December 14, 1993.

[54] See the testimony of the passerby who killed the terrorist (Mr. Bernstein) in the terror attack's police file of incident details, 539423/2015 pp. 17-18.

[55] A photograph taken of the axe by the Israel Police appeared on the Arabic-language news website "Shouf" on December 14, 2015, under the headline "14 Wounded in Vehicular Attack (in the original, "Operation") by Abd al-Muhsin Hasouna": www.shof.co.il/?mod=articles&ID=20056./ Each of the Palestinian terror organizations is associated with a color—black for Islamic Jihad, red for the Popular Front for the Liberation of Palestine, etc. The color green—mentioned in the Quran (Surat al-Insan, verse 21) as the color of the Muslims' clothes in the Paradise—was used by ancient Islamic rulers and is associated today with Hamas. The flag of Hamas is green, and Hamas operatives' headbands are green. As will be shown later, the terrorist took care to attach symbols of Hamas to the terror attack.

[56] Multiphase terror attacks, with a vehicular ramming followed by exit from the vehicle and an attempt to attack people using a non-firearm weapon, characterized the wave of terror that beset Israel in 2014–2015, and they continued into the recent period. For example, on October 13, 2015 (roughly two months before the subject attack), terrorist Alaa Abu Jamal, from Jabel al-Mukabbar in Jerusalem, perpetrated such an attack killing one man and injuring others; on December 6 (a few days before the attack discussed in this Expert Opinion) a ramming and

this axe in order to complete his attack can be understood from the descriptions of eyewitnesses, who reported that the terrorist was found killed in the driver's compartment with his hand extended toward the axe.[57] The man who shot the terrorist testified that the terrorist tried to exit the vehicle. Apparently, he did so in order to complete the attack as he had planned. (Spitzen Decl. ¶¶ 119, 120) (Dkt. 54).

From the attack's investigation by the security forces, it emerges that the terrorist, Abd al-Muhsin Shaher Abd al-Muhsin Hasouna from the Al-Husseini clan was a resident of the Beit Hanina[58] neighborhood of Jerusalem but was living in Hebron before the terror attack.[59] From Hebron, he apparently reached Jerusalem for the attack,[60] in a vehicle with Israeli license plates,

---

stabbing attack was perpetrated by a Jerusalem resident in which a number of people were wounded; and attacks with ramming and stabbing were also perpetrated at Gush Etzion Junction on November 17, 2017, and at Kochav Yaakov on January 25, 2017.

[57] See the report by police officer Oz Refael, who arrived on the scene of the incident together with his colleagues. They discerned a "man who was sitting inside the vehicle, in the driver's seat, with his face lowered toward the adjacent seat and his hand stretched out toward an axe…"—the police file of terror attack incident details, 539423/2015, p. 16.

[58] The terrorist's personal details have been taken in part from the form, in the above police file, for the cadaver's transfer to the National Center of Forensic Medicine: Abd al-Muhsin Shaher Hasouna, citizen of Israel, pp. 1–2. Note also that his name appears as number 122 in a list naming the terrorists who committed attacks during the wave of Palestinian terror, headed "Detailed study of the Al-Quds Intifada martyrs," on the PALDF online forum (which is identified with Hamas). www.paldf.net/forum/showthread.php?t=1191506./

[59] It appears that the family's life was in fact based in Hebron, since the mourning tent for the terrorist was set up there.

[60] The Walla news site: "The terrorist left Hebron for the vehicular attack in Jerusalem," Yossi Eli and Moshe Steinmetz, December 15, 2015, https://news.walla.co.il/item/2915680/, as well as the following: *News of terrorism and the Israeli-Palestinian conflict (December 9- 15 2015)*, Intelligence and Terrorism Information Center at the Israel Intelligence Heritage and Commemoration Center, December 15, 2015: www.terrorism-info.org.il/en/20923//

driving from the city's southern entrance and crossing the city from south to north (which he could do relatively easily, being a resident of Jerusalem and bearer of a blue Israeli ID card driving in an Israeli-licensed vehicle).[61] *Id.* at ¶ 121.

The terrorist reached the destination he had chosen, a central Jerusalem spot crowded with people and particularly so during rush hour. He found a bus stop where many people were waiting, then accelerated, and sped with force onto the waiting area, injuring the passengers who were waiting for public transportation (including a baby in a carriage, who was severely injured in this attack). From testimony of the passengers at the station, it emerges that the attack occurred very quickly and that they realized what had happened only after the attack was carried out. Traffic examiners from the Israel Police found that the road showed no signs of braking by the vehicle,[62] indicating that this was a preplanned attack intended to hit as many people as possible and to cause death and injury to as many chance victims as possible by running them over. (Spitzen Decl. ¶ 122) (Dkt. 54).

### Preparing the attack

The terrorist's behavior and statements before the attack, indicate prior planning for the perpetration of a terror attack, in which he believed, he would be killed as a *shahid* [a *shahid* is a man, who dies for the sake of Allah]. The terrorist's preparations for the attack and his suggestive statements, described principally in accounts by the terrorist's mother to various news media, were

---

[61] At the entrances to Jerusalem, because of wariness regarding possible terror attacks, there is a relatively strict security check of Palestinian people and vehicles wishing to enter the territory of the State of Israel. The terrorist's smooth entry into Israeli territory, and his unhampered movement inside Jerusalem, were apparently made possible by the Israeli documents identifying him and his vehicle.

[62] The traffic examiner's report in the police file of incident details for the attack, 539423/2015, pp. 11–14.

of an Islamic religious character carrying the doctrine of Islamist terrorist organizations such as Hamas. (Spitzen Decl. ¶ 123) (Dkt. 54).

Shortly before the terror attack, the terrorist hinted by word and deed, per his mother,[63] of his intention to carry out a suicide attack. The day before the attack he spoke[64] of his desire to attain paradise; and on the day of the attack, before leaving, he visited the mosque where he prayed, and there he distributed candies and indicated that he did so to celebrate his "marriage engagement." Death in the cause of religion is considered a marriage engagement according to terrorists from the fundamentalist Islamic organizations (Hamas, Islamic Jihad, et al.), since they believe that black-eyed girls are waiting in Paradise to marry the pious *shahid*.[65] The distribution of candies and the announcement of an engagement before the attack have characterized other terrorist attackers as well. The mother further recounted that a number of days before the attack, he told her that he dreamt he was meeting his grandfather, his grandmother, and other people who had already passed on.[66] Another clear hint of the terrorist's intent to commit a terror attack, and to die doing so, is in the terrorist's words to his mother. The night before the attack, he told her

---

[63] Quoted in a September 8, 2016, article on the Maan news agency's website, which reported the terrorist's funeral in Jerusalem: https://www.maannews.net/Content.aspx?id=866077/

[64] On the Safa website, an article from February 1, 2016: https://tinyurl.com/uzd383t6.

[65] The Quran teaches that upon his arrival in Paradise, the Muslim believer will marry black-eyed women who have awaited him (Surat ad-Dukhan, verse 54). Thus, the terrorist intending to die as a *shahid* plans in advance for his wedding in the afterlife and celebrates the prelude—that is, the engagement—before setting off for the attack. That belief, based on the importance of the shahid's deed as witnessing to the existence and the oneness of Allah, is very widespread among Muslims in general and among perpetrators of terror attacks in particular.

[66] In this connection, a belief exists that a person who ascends to Paradise will meet his relatives there. Thus, for example the terrorist Muhammed al-Harub, also a Hamas operative, who perpetrated the attack at Gush Etzion Junction on November 19, 2015, wrote in the will he left that he hoped to meet his relatives in Paradise.

that he intended to intercede for her into Paradise.[67] The choice of a symbolically significant date for the attack—December 14, 2015, being the 28th anniversary of the founding of Hamas—also indicates prior planning of the attack. (Spitzen Decl. ¶¶ 124, 125) (Dkt. 54).

In the police file for the terror attack, testimonies from the interrogation of passersby and policemen indicate prior planning of the attack's logistics. An axe, painted green (a color associated with Hamas), was found in the terrorist's vehicle and apparently the terrorist intended to use that axe for killing and wounding as many passersby as he could, after he perpetrated the ramming. On the website describing the attack, a comparison to a similar scenario, involving another terrorist, is drawn. In the event, Hasouna was shot and killed before he managed to complete his malevolent plan. (Spitzen Decl. ¶ 126) (Dkt. 54).

Analysis of the terrorist's words and deeds as the attack impended, and of his logistical preparations and choice of a symbolic date for committing the attack, show prior, considered planning of this terror attack. (Spitzen Decl. ¶ 127) (Dkt. 54).

### The connection to Hamas

On the morning of December 15, 2015, the day after the attack, Hamas lauded it with an article glorifying and praising the terrorist's deed of heroism but it did not explicitly note his

---

[67] https://www.maannews.net/Content.aspx?id=866077/. According to Muslim belief, a martyr can recommend the entry of seventy family members into Paradise. This belief is widely expressed in the wills of many suicide terrorists and, after their death, in the words of relatives. It is based on a saying attributed to Prophet Muhammad: "The intercession of a martyr will be accepted for seventy members of his family." https://sunnah.com/abudawud/15/ "How the Advent of Suicide Attacks Put Hamas on the Map and Re-branded Islam", an interview with Prof. Meir Hatina, the head of the Department of Islamic and Middle Eastern Studies, Hebrew University of Jerusalem.   https://www.haaretz.com/israel-news/.premium-how-the-advent-of-suicide-attacks-put-hamas-on-the-map-1.5423684/

organizational affiliation.[68] This Hamas publication termed the attack's victims "settlers."[69] The same day, a Hamas online forum (PALDF) published a poster declaring Hasouna, a son of the Hamas movement, which is to say a Hamas operative.[70] A day earlier, the same forum reported on the terror attack, with details about the terrorist but without claiming responsibility.[71] This behavior—postponing the claim of responsibility until details relating to the terror attack became clear, while taking time to examine whether a claim of responsibility might not harm the interests of the organization, the terrorist, or his relatives—typifies the organizational behavior of Hamas

---

[68] The article appeared on the Hamas website that serves to display the organization's official releases: https://tinyurl.com/4heuebjr.

[69] Hamas, which supported the terror attack, termed the civilians injured in it "settlers." This term generally refers to Jewish Israelis who live in the West Bank. The application of the term to residents of the State of Israel proper is intended to detract from the legitimacy of those Israeli citizens and, in practice, from the State of Israel's right to exist. Hamas extends the term to include those residing anywhere in the State of Israel— in this case, in western Jerusalem— and thus it incites harm to all Israeli citizens irrespective of where they reside. *News of terrorism and the Israeli-Palestinian conflict (December 9–15, 2015),* Intelligence and Terrorism Information Center at the Israel Intelligence Heritage and Commemoration Center, December 15, 2015: www.terrorism-info.org.il//Data/articles/Art_20923/E_226_15_341310105.pdf/

[70] See Facebook page of PALDF, mentioned in "News of Terrorism and the Israeli-Palestinian Conflict December 9 - 15, 2015", The Meir Amit Intelligence and Terrorism Information Center: http://www.terrorism-info.org.il//Data/articles/Art_20923/E_226_15_341310105.pdf/

Other media, unconnected to Hamas (the Voice of Israel website and Times of Israel website) reported that Hamas announced that the terrorist was one of its operatives. https://web.archive.org/web/20151216143954/http://www.iba.org.il/bet/?entity=1133975&type=1; https://tinyurl.com/rrfc8w2

[71] http://www.terrorism-info.org.il//Data/articles/Art_20923/E_226_15_341310105.pdf

with respect to claiming responsibility for terror attacks, especially during the waves of terror attacks that have beset Israel.[72] (Spitzen Decl. ¶ 128) (Dkt. 54).

Hamas in the Hebron area also called the terrorist, in a poster displayed publicly, a "*shahid of the Hamas movement*," which is to say he was an operative of Hamas who was carrying out an operation on the organization's behalf when killed.[73] The Hamas radio station Al-Aqsa Voice noted[74] in a poster published on its website on December 16, 2015, the link between the terrorist's Hamas affiliation and the December 14 date of the terror attack (the anniversary of the founding of Hamas). In this poster, the terrorist Abd al-Muhsin Hasouna is termed *shahid al-Intilaqa,* Arabic for "*Shahid* of the day of founding" or "*Shahid* of the bursting (of Hamas) into the air of the world." The poster thus indicates the symbolism in selecting the founding date of Hamas as the date for the terror attack.[75] This poster shows a picture of the terrorist with a Palestinian flag and a green Hamas flag above him. The same site also refers to the *Shahid* Hasouna as "one of the sons of the Islamic resistance movement Hamas, whose heroic operation, carried out on the 28th anniversary of the founding of the resistance movement, has ensured the continuation of the tradition of resistance, and of actions that the movement has adopted since its founding." The organization to

---

[72] Regarding the Hamas policy on claiming responsibility, see the general chapter discussing that topic.

[73] A tweet from the PALDF forum of Hamas: https://twitter.com/paldf/status/676529360023736322/

[74] Hamas's radio station, Al-Aqsa Voice, published the poster on its website in commemoration of the 28th anniversary of its founding. A copy of the poster's image is attached to Spitzen's Declaration as Ex. C.

[75] Regarding December 14, 1987, as the day Hamas was founded, see for example the following sites, which are known to be Hamas sites: https://www.paldf.net/forum/showthread.php?t=924163/; https://tinyurl.com/ysj3755e. Those sites describe the day of the founding of Hamas in the same terminology as mentioned above.

which the *shahid* belongs "conveyed the message of the resistance and of the Hamas movement on the anniversary of its founding, according to which the response in the face of the occupation's crimes will continue as long as Palestinian land is occupied." (Spitzen Decl. ¶¶ 129, 130) (Dkt. 54).

The presence of the green-painted axe alongside the terrorist, which he intended as the murder weapon, is evidence of his organizational affiliation to Hamas insofar as the color green is a prominent Hamas symbol, and further strengthens the identification of the terrorist as someone operating on behalf of Hamas. (Spitzen Decl. ¶ 131) (Dkt. 54).

In conclusion, Yoav and Rotem Golan were injured in a Hamas terror attack on December 14, 2015 committed by Abd al-Muhsin Hasouna. (Spitzen Decl. ¶¶ 132, 133) (Dkt. 54).

### Hamas General Background

Hamas was founded in Gaza in December 1987, around the time when the violent events known as the 'First Intifada' broke out. The founders of Hamas were Sheikh Ahmad Yassin, who headed the Muslim Brotherhood in the Gaza Strip, and six other members of that organization.[76] (Spitzen Decl. ¶ 19) (Dkt. 54).

The name "Hamas" is an Arabic acronym for "The Islamic Resistance Movement" *(Ḥarakat al-Muqāwamah al-Islāmiyyah).* As a word, "Hamas" in Arabic means zeal (as in battle) or heroism. (Spitzen Decl. ¶ 19) (Dkt. 54).

---

[76] The Muslim Brotherhood is a fundamentalist Islamist organization founded in Egypt in 1928 by Hassan al-Banna. The organization hoped to reconstitute Muslim society in the spirit of ancient Islam and eventually to establish a large Islamic state that would expand Muslim rule into the rest of the world through jihad (holy war). The Muslim Brotherhood's extremist Islamic ideology, along with its physical civil and religious infrastructure, served as the basis for the founding of Hamas in December 1987.

On August 18, 1988, Hamas published its charter, which defines the organization's goals and its ideological identity. In this charter, the organization stated that it saw itself as a branch of the "Muslim Brotherhood" in Palestine. The implementation of the Hamas Charter would mean establishing a fundamentalist Islamic state on the ruins of the State of Israel. In the organization's view, Israel has no right to exist and would inevitably disappear. As soon as Hamas was founded, the organization commenced a campaign of armed terror in pursuit of that goal. (Spitzen Decl. ¶ 20) (Dkt. 54).

Hamas has maintained that stance throughout its history, and its leaders would frequently repeat their goal and ambition to eliminate Israel. For example:

• In December 2012, Hamas leader Khaled Mash'al, during his visit in the Gaza Strip, stated the following: "…Palestine—from the [Jordan] River to the [Mediterranean] Sea, from its north to its south, is our land, our right, and our homeland. There will be no relinquishing and no forsaking even an inch or small part of it… Palestine was, continues to be, and will remain Arab and Islamic". "The true statesman is born from the womb of the rifle and the missile." And he added: "Oh Palestinian statesmen, oh Arab and Muslim statesmen, learn your lesson from Gaza. Anyone who wishes to take the path of diplomacy must take a missile along with him."[77]

• Many senior officials of the Hamas movement who attended the rallies held on December 14, 2014 to mark the 27th anniversary of the founding of Hamas, reiterated that Hamas would never recognize the Zionist entity nor a Palestinian State within the 1967 borders and called for the continuation of jihad and resistance until Palestine is liberated in its entirety, from the river to the sea.[78]

• Mahmoud a-Zahar, a senior Hamas official in the Gaza Strip, said in May 2017 that not an inch should be conceded from the land of Palestine and its holy places.

---

[77] See the video on the MEMRI website: https://www.memri.org/tv/hamas-leader-khaled-mashal-we-will-not-relinquish-inch-palestine-river-sea .

[78] https://www.memri.org/reports/hamas-senior-officials-movements-27th-anniversary-celebrations-we-will-not-recognize-zionist

> According to him, it is compulsory to defend the holy places and to continue efforts toward complete liberation [of Palestine].[79]

(Spitzen Decl. ¶¶ 20-24) (Dkt. 54).

Hamas is a terrorist organization that combines terror activity with political ideology and with wide-ranging social activity. Their goal is to dominate Palestinian society, manage it, and lead it according to the objectives that Hamas has embraced. (Spitzen Decl. ¶ 25) (Dkt. 54).

Today Hamas is the largest and most significant Islamist organization on the Palestinian scene. Since its earliest activity, the organization has seen itself as competing against the PLO for leadership (the PLO is the umbrella organization for the Palestinian factions, but Hamas is not a member of it) and against the Fatah organization in the Palestinian arena, as well as providing an Islamic sociopolitical alternative to those secular elements. (Spitzen Decl. ¶ 26) (Dkt. 54).

As early as the 1990's, Hamas was devoting a special effort to take over the Palestinian arena. Hamas especially, campaigned in elections within various sectors of Palestinian society. At the universities, the effort was directed at taking over the student councils, and Hamas succeeded in most of the West Bank and Gaza universities. For that purpose, it established its student organization, the "Islamic Bloc" *(Al-Kutla al-Islamiya).* That body served to recruit many students to the ranks of Hamas for the execution of terror attacks in the organization's name. (Spitzen Decl. ¶ 27). (Dkt. 54).

In its quest to dominate the Palestinian arena, Hamas also prioritized taking over trade unions, commercial organizations, and the bureaucracies that control Palestinian communications institutions (such as the Palestinian Journalists' Syndicate). Later, after consolidating its control over those targets, the organization increased its efforts, and in the 2000's it similarly took over

---

[79] http://www.alquds.com/articles/1494758400814122900/

many municipalities in the West Bank and the Gaza Strip. In 2006, Hamas won the general Palestinian Authority elections, attaining a parliamentary majority, and in 2007 it seized power in a violent coup in the Gaza Strip. (Spitzen Decl. ¶ 28) (Dkt. 54).

Another avenue by which Hamas has attained dominance over Palestinian society is the formation of a broad infrastructure of civil institutions and charitable bodies to aid the public on the one hand, and on the other hand to strengthen the hold of Hamas over the population and to cast a broader net for potential activists, to be recruited to its ranks. This institutional network also helps the organization raise money for its activities, including terror attacks, above and beyond enhancing its standing in Palestinian public opinion. (Spitzen Decl. ¶ 29) (Dkt. 54).

In order to succeed in that task, Hamas has labored to create an image of reliability, honesty, and attentiveness to public sentiment on the part of the organization and of its leaders. It has zealously cultivated that image over the years, emphasizing the distinction between Hamas and its leaders on the one hand, and on the other hand the image that the PLO and Fatah have acquired power through their leaders' corruption, their unreliability, and their deplorable character which is unresponsive to public sentiment. (Spitzen Decl. ¶ 30) (Dkt. 54).

Hamas did indeed instill the image it desired for itself into the Palestinian public consciousness, and that image contributed to Hamas' success on the way to domination of the governing bodies and the society under the Palestinian Authority. (Spitzen Decl. ¶ 31) (Dkt. 54).

In the early 1990's as Hamas broadened its sociopolitical influence over Palestinian society, it also established its operational terror wing, the Izz a-Din al-Qassam Brigades in two phases; In early 1990, as well as during the second half of 1991 in the Gaza Strip and then in a second stage, toward summer of 1992, in the West Bank. The Izz a-Din al-Qassam Brigades are responsible for many terror attacks and murders, for injuries to thousands of civilians, and for

destruction and ruin in many and varied forms such as suicide bombings, car bombs, explosive devices, shooting from ambush, high-angle fire, and other tactics such as knifing, ramming with vehicles, and petrol bombing. (Spitzen Decl. ¶ 32) (Dkt. 54).

Since its inception, the operational terror wing has always, answered to the Hamas leadership, with its terror activity over the years instigated and directed by the organization's leadership. (Spitzen Decl. ¶ 33) (Dkt. 54).

During its years of existence, Hamas has been supported by Syria and Iran, which furnished a safe location for its leadership, training camps, military knowhow, and weaponry of various kinds, as well as public-relations backing with ideological support.[80] (Spitzen Decl. ¶ 34) (Dkt. 54).

In September 2017, the leader of Hamas in the Gaza Strip, Yahya Sinwar, called journalists to his office and told them that Hamas's relations with Iran were "better than good" and improving further. Iran, according to him, is the top supporter of the military wing (the Izz a-Din al-Qassam Brigades) in terms of money and weapons.[81] (Spitzen Decl. ¶ 35) (Dkt. 54).

Hamas was classified as a Specially Designated Terrorist organization (SDT) by the U.S. Treasury as long ago as 1995, and in 1997 it was classified as a Foreign Terrorist Organization (FTO) by the U.S. State Department.82 (Spitzen Decl. ¶ 36) (Dkt. 54).

---

[80] Abu Ubaida, Hamas's spokesman, thanked Iran in December 2014, for having helped Hamas by supplying money, weapons, and missiles to establish the Al-Qassam army, including the army's many advanced units. http://bit.ly/2AFCf7Q./ See also: http://www.haaretz.com/israel-news/.premium-1.632943/

[81] https://www.amad.ps/ar/?Action=Details&ID=189079/

[82] https://www.treasury.gov/resource-center/sanctions/SDN-List/Documents/sdnew95.txt/; https://www.state.gov/j/ct/rls/other/des/123085.htm/

The Israeli government declared Hamas a terrorist organization in June 1989.[83] (Spitzen Decl. ¶ 37) (Dkt. 54).

### The Hamas policy of claiming responsibility for attacks

Hamas has pursued over the years, and continues to pursue, a calculated and intentional policy of claiming responsibility for its terror attacks. This policy is based on a number of guiding principles that can be understood from the organization's record of announcements over the years based on their timing, reliability, and explicit public statements of various senior Hamas officials revealing, from time to time, a glimpse of the Hamas policy regarding claims of responsibility for attacks. (Spitzen Decl. ¶ 38) (Dkt. 54).

One of the fundamental principles guiding Hamas in its policy of claiming responsibility for attacks is to maintain the organization's credibility, which as noted above is a prime asset of the organization. (Spitzen Decl. ¶ 39) (Dkt. 54).

In order to understand the care and caution that Hamas exercises in claiming responsibility for attacks, it is important to consider that in the West Bank and the Gaza Strip, the Palestinian society lives and functions in social frameworks where the proximity between people is intimate and their ability to keep secrets, certainly over the long term, is limited. Neighbors know one another. Living within a nuclear family, an extended family (or *hamulah),* and a village or urban neighborhood, one has little opportunity to conceal political views or affiliation to organizations or social groups. (Spitzen Decl. ¶ 40) (Dkt. 54).

The phenomenon is particularly obvious when someone is killed in the course of an attack or is arrested for terrorist activity. Generally, when the terrorist's identity becomes known, so does

---

[83] http://www.mod.gov.il/Defence-and-Security/Fighting_terrorism/Pages/default.aspx.

the terrorist's organizational affiliation and, therefore inevitably, the organization's responsibility for the attack committed. (Spitzen Decl. ¶ 41) (Dkt. 54).

If a claim of responsibility is false, it is exposed rather quickly and the long-term damage to the organization's reputation may be severe, involving a cost that the organization would rather not pay in the political and public spheres. (Spitzen Decl. ¶ 42) (Dkt. 54).

This social reality requires the Palestinian terror organizations, including Hamas first and foremost because it greatly values its credibility, to refrain from claiming "credit" for attacks and terror operations for which the organization is not responsible. At the same time, Hamas nonetheless has made, and makes, a practice of praising operatives from other organizations when they mount attacks that suit its ideology. (Spitzen Decl. ¶ 43) (Dkt. 54).

During the period relevant to this terrorist attack, Hamas regularly used a number of methods for claiming responsibility after attacks:

- Spokesmen for Hamas and for the Izz a-Din al-Qassam Brigades published announcements in the media;

- Posters from Hamas and the Izz a-Din al-Qassam Brigades were distributed throughout the territories and on websites;[84]

- Names of terrorists who were killed while mounting attacks, or who were arrested afterward, were at times (but not always) posted on the Hamas and "Brigades" websites;

- Various symbols and other Hamas characteristics were attached to the homes of the terrorists and displayed during their funerals.

(Spitzen Decl. ¶ 44) (Dkt. 54).

---

[84] A number of examples of posters distributed by Hamas saluting terrorist attackers can be seen in a survey published by the Meir Amit Intelligence and Terrorism Information Center in Tel Aviv: http://bit.ly/2jovNya/

For announcing a terrorist's organizational affiliation during the wave of terror that began in 2014, the phrasing Hamas adopted was "the son of the movement" or "the Qassami martyr" (that is, one belonging to the Izz a-Din al-Qassam Brigades). In this way Hamas distinguished the terrorist from others whose deeds found favor with Hamas but who did not belong to the organization. (Spitzen Decl. ¶ 45) (Dkt. 54).

To strengthen the principle of maintaining credibility, Hamas added further rules regarding claims of responsibility. These rules deal mainly with the timing of the actual announcements that claim responsibility, claims that sometimes are delayed for months or even for long years. (Spitzen Decl. ¶ 46) (Dkt. 54).

A press conference in the Gaza Strip on December 25, 2010, is an example that exposed a glimpse of the principles guiding the organization's timing for announcing a claim of responsibility for a terror attack mounted by its activists.[85] The man known as Abu Ubaida, who is considered the official spokesman of the Izz a-Din al-Qassam Brigades, spoke to the press. In the name of the organization, he belatedly took responsibility for the attack mounted at the Merkaz HaRav Yeshiva in Jerusalem some two years before.[86] (Spitzen Decl. ¶ 47) (Dkt. 54).

Abu Ubaida explained the Hamas policy for *belatedly* claiming responsibility. He said that during the years that the "Brigades" have been active against the occupation they have at many times employed a policy of postponing the claim of responsibility for attacks and he cited these reasons: The security conditions with respect to the security of fighters and of operations; the

---

[85] A spokesman for the Izz a-Din al-Qassam Brigades held a press conference in Gaza, and there he spoke his piece at length. The video shows the press conference: https://tinyurl.com/3r9xwdkk; https://tinyurl.com/9baprspk.

[86] The Merkaz HaRav Yeshiva in Jerusalem was attacked on March 6, 2008. The Hamas terrorist, who perpetrated it killed eight people and injured nine more.

protection of those who carried out attacks and who are currently jailed prior to sentencing; and other reasons connected to the continuing campaign of *Jihad* (holy war). In the future, according to him, the Brigades will refrain from announcing information about their attacks before the time is ripe, and on occasion that may mean months or years. (Spitzen Decl. ¶ 48) (Dkt. 54).

The Hamas record of claiming responsibility for attacks includes further examples of refraining from an official claim of responsibility in order not to harm Hamas operatives, especially those who have yet to stand trial. (Spitzen Decl. ¶ 49) (Dkt. 54).

In sum, Hamas, more than other terror organizations, refrains from claiming responsibility for attacks that were not mounted by its activists. Hamas carefully cultivates the image of a reliable organization. They see their image as it appears to the Palestinian public as a primary asset and zealously protect it. Moreover, the unique structure of Palestinian society in the Gaza Strip and the West Bank makes, in the long term, the attribution of an attack to a body that did not commit it impossible, the moment a terrorist's identity is revealed, the Palestinian public in the territories know of the terrorist's exact organizational affiliation. (Spitzen Decl. ¶ 50) (Dkt. 54).

Since its inception, Hamas has always preferred long-term credibility over some brief moments of glory from false attribution of attacks. However, when Hamas finds it appropriate or beneficial to take credit for attacks that its people performed, it does not refrain from doing so. (Spitzen Decl. ¶ 51) (Dkt. 54).

When it weighs claiming responsibility for attacks, Hamas prefers to protect the operational security of its activists and the details regarding its various methods of operation, even at the price of years of concealing its responsibility for attacks. (Spitzen Decl. ¶ 51) (Dkt. 54).

**The 2015–16 wave of Palestinian terrorism in Israel and Judea and Samaria**

Starting in September 2015, Israel, Judea & Samaria were inundated by a wave of terror that lasted until at least the end of 2016. (Spitzen Decl. ¶ 52) (Dkt. 54).

In October 2015, the number and intensity of terror attacks increased significantly against the background of growing incitement from Islamist, elements mainly Hamas and the Islamic Movement in Israel. They accused Israel of offenses related to changing the status quo on the Temple Mount, including harming the mosques on the mount, permitting Jewish prayer there and having a long-term Israeli goal of destroying the Al-Aqsa Mosque and building a Jewish Temple in its place. Islamic religious emotions were similarly enflamed a year earlier as well in 2014. The sharp rise in the number of fatalities was recorded late in 2015 as a result of an escalation of attacks in October.[87] (Spitzen Decl. ¶ 53) (Dkt. 54).

The Jewish high holidays, which are celebrated in September and October, bring an increased presence of Jews in the Temple Mount area. Islamic elements, with Hamas in the lead, exploit this presence in order to stir up emotions and incite attacks with the cry "Al-Aqsa is in danger!" Such accusations gave a religious motivation to the wave of terror that followed, with the objective to imbue the Palestinian-Israeli conflict with a religious character alongside its nationalist character; an objective that is wholly consistent with the Islamist ideology of Hamas and of Palestinian Islamic Jihad. (Spitzen Decl. ¶ 54) (Dkt. 54).

---

[87] More figures about the 2015 attacks may be found in the annual Israel Security Agency survey from that time (Hebrew): https://www.shabak.gov.il/publications/Pages/study/ReportY2015.aspx. According to a recent publication of the Israeli Ministry of Foreign Affairs about the wave of terror, 64 vehicular attacks were perpetrated since the wave started: "Wave of Terror 2015 - 2018", 18 March 2018, Israel Ministry of Foreign Affairs. http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Palestinian/Pages/Wave-of-terror-October-2015.aspx./

In January 2017, for example, after a vehicular attack in Jerusalem, Hamas spokesman Fawzi Barhoum encouraged further terror as he declared that "The noble operation (meaning the attack) was in defense of the holy sites, and particularly of the Al-Aqsa Mosque." He said that Hamas praises the operation. The operation, he declared, shows that the Al-Quds Intifada is continuing, and that Israel's violent aggressive actions will not break the Palestinian will to continue the "resistance."[88] (Spitzen Decl. ¶ 55) (Dkt. 54).

Hamas websites and other websites identified with the organization presented articles, interviews, and remarks inciting the continued perpetration of attacks. (Spitzen Decl. ¶ 56) (Dkt. 54).

A summary of attacks from 2015 was distributed on Paldf.net, the Hamas website. It pointed to a sharp increase in the number of stabbing, vehicular, and shooting attacks from October through December of that year. The terms used to describe the attacks were favorable and supportive of the wave of attacks, noting for example:

> • attacks that *successfully* wounded or killed a Zionist; the *effectiveness* of attacks being measured in terms of fatalities on each side;
> • the term *kill* is relevant to a killed Zionist whereas a Palestinian who is killed is termed *shahid* (*martyr*);
> • attacks being called *operations*; and the terrorists committing them being called *mustash'hidun* ("those who died in sanctification of Allah's name"); and there is, obviously, the heading of the document: "Palestine's *Harvest* of 2015."

(Spitzen Decl. ¶ 57) (Dkt. 54).

All of those statements convey the clear message that Hamas supports and encourages attacks.[89] Senior Hamas leaders made a practice of publicly inciting the Palestinian population to

---

[88] Safa press agency, affiliated with Hamas (January 8, 2017). http://bit.ly/2hwLQcL/

[89] https://www.paldf.net/files/2015/hasad/files/assets/basic-html/index.html#1

mount attacks in the form of stabbings, vehicular ramming attacks,[90] and even gunfire to the extent that the attackers were able. In fact, in February 2016, the leader of Hamas at the time, Khaled Mash'al, encouraged the wave of terror attacks, characterizing them as "heroic operations of the young men and women of the Intifada."[91] (Spitzen Decl. ¶ 58) (Dkt. 54).

Hamas spokesman Sami Abu Zuhri praised the stabbing spree carried out on March 8, 2016, claiming it showed the Intifada would continue until its objectives had been realized and that Israel had failed to suppress it.[92] (Spitzen Decl. ¶ 59) (Dkt. 54).

In the course of that wave of terror, Hamas, implemented a new method of operations alongside its more familiar forms of attack. This is what gave them the ability to quickly mobilize terror operatives in order to mount attacks. Specifically, alongside the usual method of direct instructions from Hamas headquarters that would require a system of approvals, another method was implemented: Overall public calls from the influential political factors to the organization's operatives, as well as to all who identify with the course of violence and terror, to mount attacks. This was accomplished by Hamas leaders sounding praise and encouragement to the terrorists and their activities, using the media outlets at their disposal such as radio, television, newspapers, websites and to an extremely large extent- social networks and social media platforms. Hamas simply introduced, alongside the attacks that require long advance planning, a call to use whatever

---

[90] Cartoons with a clear message in support of the ramming attacks were featured in the Palestinian social media, among them a cartoon that was published on the pro-Hamas "Palestine Now" Facebook page: "Last passenger to Jerusalem" (Facebook.com/paltimes.net, January 8, 2017). See "Following January 8, 2017 Truck-Ramming Attack In Jerusalem", MEMRI, Special Dispatch No. 6732, January 9, 2017. https://www.memri.org/reports/following-january-8-2017-truck-ramming-attack-jerusalem-silence-part-pa-expressions-joy

[91] http://bit.ly/2AFJcpz

[92] Hamas website, March 8, 2016. http://bit.ly/2hrk8KI/

comes to hand for terrorism (knives, vehicles, petrol bombs, guns, makeshift weapons, etc.) as well. (Spitzen Decl. ¶ 60) (Dkt. 54).

Hamas attempted to imbue the wave of terror attacks with the character of an activity sweeping the public into what it calls the "armed struggle" on a large scale. Hamas even called the wave of terror an "*intifada*" or "*the Al-Quds intifada*." In January 2017, Hamas spokesman Hazem Qassem praised a vehicular attack that occurred in Jerusalem, calling it proof that the Palestinian people has chosen the "resistance option" and that the perpetrator had exercised his natural right to resist the occupation. According to Qassem, the operation proved that the "Al-Quds Intifada" is not a passing phenomenon or a wave of popular anger but a Palestinian decision in favor of revolution until the end of occupation (Al-Jihad website, January 8, 2017).[93] (Spitzen Decl. ¶ 61) (Dkt. 54).

Next, having found that the calls fell on responsive ears, Hamas made sure to praise and glorify the attack, as well as call on potential terrorists to emulate the terror attacks and proceed similarly in order to strengthen the wave of terror and murder. (Spitzen Decl. ¶ 62) (Dkt. 54). In June 2016, after a terror attack cost the lives of four Israelis in Tel Aviv, Hamas spokesman Husam Badran promised further "surprises" during the month of Ramadan: "The attack is the first tidings from Ramadan to our people and to the brave resistance, and it is also the first surprise among those awaiting the Zionist enemy during Ramadan. The heroic operation near the Israeli Ministry of Defense is a severe blow to the prestige of the Israeli defense establishment."[94] (Spitzen Decl. ¶ 62) (Dkt. 54).

---

[93] http://www.terrorism-info.org.il//Data/articles/Art_21130/E_010_17_2014417650.pdf.

[94] The quotation appeared on the Hamas website Palinfo.com, June 9, 2016. http://bit.ly/2iU74Od./

The perpetration of terror attacks in emulation of other terrorists is another characteristic of the wave of terror being surveyed here. (Spitzen Decl. ¶ 63) (Dkt. 54). Interrogations by the Israel Security Agency as well as for example, the terrorists' Facebook pages reveal a number of them decided to carry out attacks imitating the terrorists who preceded them. (Spitzen Decl. ¶ 63) (Dkt. 54).

Calling on the public to mount attacks during the wave of terror, Hamas encouraged terrorists, cast them as heroic role models, and embraced the attacks that its activists perpetrated. (Spitzen Decl. ¶ 64) (Dkt. 54). In various Hamas publications, and in posters signed by Hamas, the terrorist was termed "son of the movement" or "*Qassami shahid*" (a martyr of the Izz a-Din al-Qassam Brigades) or, as it was the case in the Bridge of Strings attack, Hamas organization named the terrorist "The Shahid of the Foundation" referring to the foundation day of Hamas which the perpetrator chose to be the day of his attack. (Spitzen Decl. ¶ 64) (Dkt. 54). Hamas also made a point of emphasizing the terrorists' affiliation to the organization in a number of ways, such as arranging terrorists' funerals with Hamas activists attending, raising Hamas flags at the terrorists' homes, and sometimes also including the terrorists' names in the list of Hamas prisoners or *shahids* (martyrs). (Spitzen Decl. ¶ 64) (Dkt. 54).

When the terrorist was not identifiable as organizationally affiliated to Hamas, his actions were praised and glorified with calls to emulate them. Sometimes, when the terrorist clearly belonged to a different organization, Hamas representatives proclaimed appreciation of the man while mentioning his affiliation with the other organization. [95] (Spitzen Decl. ¶ 65) (Dkt. 54).

---

[95] See the Expert Opinion regarding Yehuda Glich. While the terrorist is an Islamic Jihad member, the Hamas Paldf.net website explicitly posted the Islamic Jihad announcement regarding responsibility for the attack.

Another aspect of the Hamas support for perpetrators of terror attacks, and for families of terrorists, is the financial aid bestowed on the terrorist and on the terrorist's family after the attack. The aid is transferred secretly since it amounts to terror financing and the Israeli security authorities constantly work against such use of funds and attempt to confiscate them. (Spitzen Decl. ¶ 66) (Dkt. 54).

Despite efforts to conceal these money transfers and financial aid, the system was exposed in the Israeli media after coordinated campaigns by the Israel Police, the Israel Security Authority, and the Israel Defense Forces. (Spitzen Decl. ¶ 67) (Dkt. 54). Hundreds of thousands of shekels transferred to terrorists and to their families on behalf of Hamas, were confiscated. The money that was confiscated was intended for day-to-day expenses as well as for rebuilding the homes of terrorists and of their families after demolition by Israel.[96] (Spitzen Decl. ¶ 67) (Dkt. 54).

In conclusion, alongside the customary Hamas system of wreaking terror, including via the establishment of cells and their direct deployment by a responsible Hamas headquarters or official, Hamas adopted (as did Islamic Jihad) a parallel system of operations during the 2015–2016 wave of terror, deploying lone terrorists by publicly instructing its operatives to mount attacks. (Spitzen Decl. ¶ 68) (Dkt. 54).

Those who answered the call and mounted attacks received praise from Hamas. When the terrorists came from the Hamas ranks, Hamas emphasized their organizational affiliation, thus claiming responsibility for the attack while simultaneously encouraging others to continue mounting attacks to prevent the terror wave from fading. (Spitzen Decl. ¶ 69) (Dkt. 54).

---

[96] http://www.ynet.co.il/articles/0,7340,L-4918313,00.html,/; http://www.nrg.co.il/online/1/ART2/893/025.html

**Iran and MOIS's Role in Assisting Hamas in Israel**

**Iran as a State Sponsor of Terrorism**

Plaintiffs' expert witness testimony concerning the assistance of Iran and MOIS to Hamas in Israeli is compelling. Iran and MOIS supported Hamas by (1) facilitating recruitment, training, and safe haven, and (2) providing financial assistance. *See* Clawson Decl., Dkt. 32, Levitt Decl., Dkt. 31, in *Force v. The Islamic Rep. of Iran, et al.*, Civ. No. 15-1468.

Iran is now, and since 1984 has been continuously listed, on the U.S. State Department list of state sponsors of terrorism. The CIA has described Iran as "the foremost state sponsor of terrorism." *See Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Clawson Decl. ¶ 27, Dkt. 31, Levitt Decl., ¶ 58 Civ. No. 15-1468.

It has been well-documented for decades that Iran has provided funding, weapons, and training for terrorism operations targeting United States and Israeli citizens, which has included support for Hamas. *See Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Clawson Decl., ¶¶ 30-31, Levitt Decl., Dkt. 31, ¶ 30, Civ. No. 15-1468.

The MOIS, Iran's foreign and domestic intelligence service, is one of the principal organizations Iran has used to carry out its terrorist support activities. *See Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Clawson Decl., ¶ 22, Civ. No. 15-1468.

In providing support to Hamas and other terrorist groups, the MOIS acts as a ministry of the Iranian government whose activities are tightly and carefully controlled by the Iranian government through Iran's Supreme Leader and his representatives. The terrorism training provided to Hamas and other terrorist groups by the MOIS is an official policy of the Iranian government. *Id*. at ¶ 26.

Iran supports anti-Israel terrorism of all sorts. In addition to its support for Hamas, Iran has also offered to support unaffiliated individuals-sometimes referred to as "lone wolves" who attack

Israeli-related targets. For example, in February 2016, Iran's ambassador to Lebanon Mohammad Fathali promised to provide financial support to those killed attacking Israelis, stating "The decision firstly includes giving an amount worth $7,000 (£5,028) to every family of a martyr of the intifada in Jerusalem." *Id*. at ¶ 28.

### Iranian Support for Hamas

The Islamic Resistance Movement (Arabic: Harakat al-Muqawama al-Islamiya), known by the Arabic acronym "Hamas," is a terrorist organization established in December 1987 by Palestinian Sunni Islamist militants opposing the establishment and existence of Israel. The organizing principle of Hamas was advocacy of terrorist attacks on Israeli civilians, with the goal of eliminating the State of Israel and establishing an Islamic state in all the territory that comprises Israel, the West Bank, and the Gaza Strip. *Id*. at ¶¶ 32-33; Levitt Decl. ¶ 19 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

Hamas employs a three-pronged strategy to achieve this goal: (a) social welfare activity that builds grassroots support for the organization; (b) political activity that competes with the secular Palestinian Authority ("PA"), and (c) guerilla and terrorist attacks that target Israeli soldiers and civilians. Levitt Decl. at ¶ 19 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

Since its founding, Hamas has committed countless acts of violence against both military and civilian targets, including bombings, suicide operations, and rocket and mortar attacks directed at Israeli civilian population centers. Hamas terror attacks are indiscriminate in nature because they are intended to terrorize not only the targeted individuals but the general Israeli population and to obtain concessions from the Israeli government. As such, Hamas attacks have killed innocent civilians from around the world, including civilians from the United States, the United

Kingdom, etc. Hamas has purposely targeted many busy civilian venues, including buses, bus and light rail stops, discotheques, restaurants, markets, universities, and even a hotel hosting a Passover Seder. *Id*. at ¶¶ 22-24.

From 2008 through early 2016, Gaza-based Palestinian terrorist groups, including Hamas, fired over 8,500 rockets into Israel. This rocket fire has been indiscriminate, targeting Israeli Jews and Arabs, foreign workers, and tourists alike. *Id*. at ¶¶ 25-26.

Hamas also carries out kidnapping operations for the express purpose of using the victim as leverage in prisoner swaps. *Id*. at ¶ 28.

Hamas also employs and inspires vehicular attacks and in addition to terror attacks it carries out itself, Hamas also actively calls for and incites others to commit violent acts. Hamas celebrates and praises attacks against Israel. *Id*. at ¶¶ 29, 39-40.

Hamas was named by the State Department as a Designated Foreign Terrorist Organization in the original list of such groups issued October 8, 1997. Clawson Decl. at ¶ 63 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Civ. No. 15-1468.

Iran's relationship with Hamas has waxed and waned over the years, but Iran never cut off all its support for Hamas even when the relationship was cool, and when the relationship was warm, Iran provided Hamas substantial financial and military support. *Id*. at ¶ 33.

Without the significant funding it needs to carry out its terrorist, political, and social activities-which are interdependent and mutually reinforcing endeavors-Hamas could not function. Iran plays a critical role in funding, providing material support, arming, and training Hamas operatives. In addition to operational, social support, infrastructure, and other expenses, Hamas also invests significant amounts of money in its radicalization and incitement campaigns. For example, Hamas runs summer camps training children in violence against Israelis, produces

radical textbooks, and operates media production companies and television channels that broadcast constant incitement against Israel. Levitt Decl. at ¶¶ 41, 42-48 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

Iranian state sponsorship of Hamas is critical not only in terms of providing the material and funds with which to carry out terrorist operations, but also the rhetorical support necessary to sustain the pace of such operations and provide legitimacy to acts of terrorism. *Id*. at ¶¶ 49-53.

From about 1993 until the late 1990's, Iran and Hamas became close as a result of Hamas' willingness to perpetrate terrorist activities and bus bombings. Iran urgently desired to disrupt the Middle East peace process, which appeared to be moving forward at the time, and Iran considered terrorist activities a way to do so. Therefore, Iran strongly and publicly encouraged Hamas to carry out such activities. Throughout this period, Hamas operatives received military training in Iran. Clawson Decl. at ¶ 35 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Civ. No. 15-1468.

During this time, Iran gave Hamas millions of dollars, in addition to the hundreds of millions of dollars that Iran spent supporting other terrorist groups. The money, among other things, supported Hamas' terrorist activities, for example, by bringing Hamas into contact with potential terrorist recruits and by providing legitimate front activities behind which Hamas could hide its terrorist activities. Iran typically paid generously for "results," which Hamas provided by committing numerous bombings during this time. *Id*. at ¶ 38.

U.S. Courts have concluded that "Iran provides ongoing terrorist training and economic assistance to Hamas," and found that Iran has "provided material support and resources to Hamas and its operatives, for the specific purpose of carrying out acts of extrajudicial killing." Levitt Decl. at ¶ 67 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

The Iran-Hamas relationship cooled for a brief time but deepened again in 2002. Clawson Decl. at ¶ 39 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Civ. No. 15-1468.

In July 2003, the Israeli Ministry of Foreign Affairs estimated that Iran provided Hamas with $3 million a year. *Id*. at ¶ 40; Levitt Decl. at ¶ 59 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

With a fall-off in Hamas terrorist activities largely due to a fierce Israeli campaign against Hamas, the Iran-Hamas relationship cooled briefly after 2003, but warmed again within a few years. In December 2005, Hamas' leader Khaled Mashal visited Tehran. Clawson Decl. at ¶ 41 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Civ. No. 15-1468.

Iranian support, finances, and arms rose exponentially after Hamas won a plurality in the Palestinian parliament in 2006, and Iran reportedly pledged $250 million to Hamas' Prime Minister Ismail Haniya in 2006 and 2007. Although Egyptian authorities reportedly confiscated some of these funds, large sums of Iranian money flowed into the Gaza Strip earmarked for Hamas. *Id*. at ¶ 42.

In November 2006, Israel's UN Ambassador reported that Iran had contributed $120 million to Hamas, and that 30 tons of weaponry had been smuggled into Gaza in just the past month. Levitt Decl. at ¶ 68 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

The Iran-Hamas relationship grew even closer after Hamas took complete control of the Gaza Strip in a 2007 coup, with Iran providing more money, arms, and training to Hamas. Clawson Decl. at ¶¶ 43-45 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Civ. No. 15-1468.

Iran's provision of substantial military training, arms, and money to Hamas continued throughout 2008 and 2009. Hamas personnel received extensive training in Iran, and many mortar

shells and rockets fired by Hamas at Israel during 2008 were designed and manufactured by Iran. *Id*. at ¶¶ 45-47.

In May 2008, Iran reportedly decided to increase its financial support for Hamas to $150 million for the second half of 2008. In early 2008, Hamas agreed to a ceasefire with Israel, during which time many reports suggest that smuggling-including arms smuggling-by tunnels from Egypt into Hamas-controlled Gaza increased substantially. *Id*. at ¶ 48.

By December 2008, Hamas resumed terror attacks on Israel civilians. Israeli retaliation turned into a substantial three-week military confrontation from December 2008 to early January 2009. Soon after a ceasefire was arranged, Hamas leader Khaled Mashal visited Tehran in February 2009 and thanked Iran for its support during the conflict, calling Iran a "partner in victory." *Id*. at ¶ 49; Levitt Decl. at ¶ 54 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

As part of its weapon supply activities, Iran smuggled weapons through Sudan and Egypt, and Iran designed and provided Hamas rockets that could be fit through tunnels used to smuggled goods from Egypt into Gaza. Clawson Decl. at ¶¶ 50-52 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Civ. No. 15-1468.

The Lebanese-Hezbollah movement is another important intermediary Iran uses for smuggling arms into Gaza. *Id*. at ¶ 54.

In 2010, the seizure by Cyprus of a ship carrying munitions led to a UN Security Council committee to conclude that Iran had violated a Security Council ban on Iranian arms exports. In March 2011, the Israeli Navy intercepted a ship heading towards Egypt with more than 50 tons of weapons from Iran, including advanced anti-ship missiles, mortars, tens of thousands of rounds of ammunition for Kalashnikovs, and instruction manuals in the Persian language. The military supplies weapons on these ships that were believed to be destined to support terror groups in Gaza

to be used against Israel. *Id*. at ¶ 54; Levitt Decl. at ¶ 71 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

Iran's support for Hamas, including military support and weapons training, continued unabated in 2011. Clawson Decl. at ¶ 54 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Civ. No. 15-1468.

The Iranian-Hamas relationship went through a rough spot in 2012, but Iranian funding for Hamas never completely stopped, particularly for Hamas' military wing. *Id*. at ¶ 55; Levitt Decl. at ¶¶ 73-74, 81-83 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

The Iran Hamas relationship improved during Hamas-Israel fighting in November 2012, and Iranian and Hamas officials became much blunter about Iranian support for Hamas rocket attacks on Israel. Clawson Decl. at ¶ 56 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Civ. No. 15-1468.

In November 2012, Iranian Parliament Speaker Ali Larigani told reporters: "We proudly say we support the Palestinians, militarily and financially." IRGC commander Mohammed Ali Jafari proclaimed that missile technology "has been transferred to the resistance, and an unlimited number of these missiles are being built." On November 21, Hamas Political Bureau Chairman Khaled Mashal thanked Iran for "arms and funding." *Id*.; Levitt Decl. at ¶ 72 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

The Iran-Hamas relationship improved further after the Egyptian military's July 2013 overthrow of the Morsi government which has been close to Hamas, leaving Hamas quite dependent on Iranian aid. Clawson Decl. at ¶ 57 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Civ. No. 15-1468.

Hamas-Iranian relations were further strengthened in the course of 2014 as Hamas stepped up its terror activities. After Hamas' June 12, 2014 kidnapping and murder of three teenagers including Naftali Fraenkel, Hamas rocket attacks and Israeli air strikes escalated into an Israeli invasion of Gaza that lasted from July 8 until August 26. Iran issued statements strongly supporting Hamas' activities during this time and in the aftermath. On September 29, 2014, Major General Ghola Ali Rashid of Iran's Armed Forces General Staff Headquarters stated, "Today some of our commanders are providing advisory assistance to Iraq and its army, in addition to the resistance in Lebanon, Hezbollah, and the Palestinian resistance movement." Iran's Supreme Leader Khamenei stated on November 25, 2014: "The Islamic Rep. of Iran, with divine grace, has not become prisoner of sectarian limitations and divisions. Just as it aids Shi's Hizbollah in Lebanon, it aids Hamas and Islamic Jihad [PIJ] and other Sunni groups in Palestine." *Id*. at ¶ 58.

On December 14, 2014, Abu Obeida, the spokesman for Hamas' military wing, the Izz ad-Din al-Qassam Brigades, expressed his thanks to Iran for supporting Hamas with money and weapons and providing it with rockets and anti-tank missiles. *Id*. at 59; Levitt Decl. at ¶ 57 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

In 2015, the Hamas-Iran relationship was strained as Iran's relationship with the oil-rich monarchies of the Persian Gulf deteriorated during that year. However, that by no means meant an end to Iranian material support for Hamas, which reportedly included tens of millions of dollars transferred to Hamas' Izz al-Din a-Qassam Brigades for training, military diving gear, advanced weaponry, and electronic equipment. *Id*. at ¶¶ 87-88; Clawson Decl. at ¶ 60 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 32, Civ. No. 15-1468.

Quite a few Hamas officials visited Tehran in 2017. The high point was an October 2017 visit by a Hamas delegation led by Hamas Political Bureau deputy head, Saleh Al Arouri, which

met with Iranian Parliament Speaker Ali Larijani, Iran's Supreme National Security Council Secretary Admiral Ali Shamkhani, and Advisor to the Leader of the Islamic Revolution in Iran, Ali Akbar Velayati. Velayati stated: "We are proud of supporting the Palestinian resistance and Hamas Movement. The Iranian leadership and our people will continue to support the resistance led by Hamas and Islamic Jihad [PIJ]." *Id*.

The Court accepts and adopts Dr. Clawson's expert opinion that Iran has supplied substantial material support to Hamas, including in the period 2008-2017. *Id*. at ¶ 61.

The Court accepts and adopts Dr. Levitt's expert opinion that Iran has supplied substantial material support to Hamas, including before and after 2012. *See Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, ¶ 128, Civ. No. 15-1468.

### Impact of FSIA Terrorism Judgments Against Iran

Even though Iranian leaders pay close attention to civil terrorism suits, Iran has so far not been dissuaded from providing financial support for terrorism. Nevertheless, the financial pressure of past court judgments remains an element in Iran's calculation about whether and how to support terrorism. Levitt Decl. at ¶¶ 71-74 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 31, Civ. No. 15-1468.

Iran has recently taken a more active stance in some terrorism-related cases. After years in which Iran has not contested such actions, Iran has engaged lawyers in several recent suits. Even so, Iran has not decreased its support for terrorism, but has dramatically increased and widened its support for terrorists, terrorist organizations, and terrorist activities throughout the world. *Id.* at ¶¶ 75-80.

Iranian officials pay extremely close attention to what the outside world has to say about the Iranian government and its policies, and they generally assume that whatever is written about

Iran reflects a unified government policy of the country from which a comment originates. Iranian officials have shown themselves to be sensitive to the damages levied against Iran, and they are well aware that such damages have been a common feature in actions against Iran for its support of terrorism against Americans. *Id.* at ¶ 81.

Were this Court not to impose damages for a spectacular terrorist act, Iranian government officials would interpret that as indicating a significant weakening of U.S. pressure on Iran to end its support for terrorism against Americans. *Id.*

On the other hand, were this Court to impose substantial damages, Iranian officials would interpret that as indicating that U.S. policy remains firmly opposed to Iranian support for terrorism against Americans. *Id.*

### Syria's Role in Assisting Hamas in Israel

Plaintiffs' expert witness testimony concerning Syria's assistance to Hamas in Israel is also compelling. Syria has supported Hamas by (1) facilitating the recruitment and training of Hamas, providing a safe haven and affording political credibility, and (2) providing financial assistance.

Syria's relationship with Hamas has been useful to Syria in asserting its role as the 'champion of Palestinian resistance.' Syria was aligned with Hamas in opposing the Oslo Accords. Thus, Syria intensified its support for Hamas, particularly for engagement in terrorism, with the view that terrorism would help Syria fight the peace process and manipulate its own peace negotiations with Israel. The tactic of terrorism had the dual goal of harming Israel and its citizens and undermining the Palestinian Authority's influence among Palestinians. By leveraging Pan-Arab and anti-Israeli sentiments along with championing Palestinian rights, Syria was able to gain regional status and legitimacy. Declaration of Benedetta Berti ("Berti Decl.") ¶¶ 18-23 in *Force v.*

*The Islamic Rep. of Iran, et al.*, Dkt. 29, Civ. No. 15-1468; Declaration of Marius Deeb ("Deeb Decl.") ¶17 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 30, Civ. No. 15-1468.

After 1993, Syria also became the de facto political and communication base of all the main factions—secular and religious—that opposed Fatah and the Oslo Accords. Syria sponsored the creation of the Alliance of Palestinian Forces (APF), an umbrella group that included ten anti-Oslo factions, Hamas and the PIJ being the two Islamist, non-secular members. Berti Decl. at ¶ 24 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 29, Civ. No. 15-1468.

Syria's relationship with Hamas developed in the early 1990's when Hamas opened an office in Damascus. Its military wing, known as the Izsz al-Din al-Qassam Brigades, established an operational headquarters. Hamas military leaders in Syria worked closely with Syrian intelligence. Hamas gradually boosted its presence in Syria, a process that culminated in Hamas' decision to move its Political Bureau to Damascus in 2000. The relationship grew throughout the 2000's, becoming even stronger after Hamas' takeover of the Gaza strip in 2007. *Id.* at ¶¶ 25, 27.

From 2000-2012 the safe haven provided by Syria to the Hamas and its senior leadership strengthened it as an organization. The leader of Hamas, Khalid Mash'Al, moved permanently to Damascus in 2003 and Syria provided Hamas with a safe base from which to conduct its foreign relations, communicate to the world, host its military leaders and at times plan its violent operations and fundraise. It was a center for Hamas's terrorist functions –from strategic planning to command and control. In no other regional capital has Hamas had so much freedom to maneuver. In fact, the Syrian government facilitated the group's political role organizing, for example, meetings in Damascus with Iranian President Mohammad Khatami and other high-level Iranian officials. Deeb Decl. at ¶¶ 15, 18 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 30, Civ.

No. 15-1468; Berti Decl. at ¶ 47 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 29, Civ. No. 15-1468.

The support which Syria provided to Hamas, by giving the organization and its leaders safe haven, allowing it to operate its military headquarters in Damascus and giving it access to other resources such as unrestrained access to funding, weapons, travel, communications, military training, intelligence, and strategy proved significant for the terror organization's overall operational infrastructure. Hamas's external leadership based in Damascus grew so powerful that it was able to control and direct operational decisions. The resources provided by Syria enable Hamas to develop into a more sophisticated organization. Deeb Decl. at ¶ 19 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 30, Civ. No. 15-1468.

Damascus provided safe operational space to not only Khaled Mash'al, but to Musa Abu Marzouq, and Imad al-Alami, another of Hamas's historical leaders who, from Damascus oversaw Hamas's relationship with external allies, including Iran and Syria, as well as military activities. To put this in perspective, these individuals were all designated as Specially Designated Global Terrorists (SDGTs) in 2003 by the United States Department of the Treasury. The fact that three out of the top six Hamas figures so designated in 2003 were based in Damascus is powerful evidence of how central Syria was in terms of providing safe haven for Hamas. *Id.* at ¶ 15, Berti Decl. at 34 (3) in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 29, Civ. No. 15-1468.

Syria's support for Hamas, including the safe haven it provided and the unrestrained access to funding, weapons, travel, communications, military training, intelligence, and strategy was also a factor in the success of Hamas terrorist operations during the Second Intifada which was launched in September of 2000. At its peak, between 2000 and 2002 some of the most lethal suicide attacks against restaurants, night clubs and Universities in Israel were linked to operatives residing

in Syria. *Id.* at ¶ 20, Berti Decl. at ¶ 41 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 29, Civ. No. 15-1468.

In the years after the end of the Second Intifada in 2005, and despite the dismantling of all Israeli communities in Gaza, Hamas continued its terrorist activities against Israel. Decisions at the highest level, concerning both military and political activities, including armed operations in the West Bank were directed from its Damascus headquarters. This included, orchestrating the kidnapping of Israeli soldier Gilad Schalit in 2006, orchestrating the Hamas takeover of Gaza in 2007, and the provocation that led to the 2008-2009 conflict in Gaza. During the war, all Syrian cell phones received continuous updates calling for their support as if it was a surrogate Syrian war. In January 2010, Hamas leader Khalid Mash'al delivered a speech in Beirut in which he stated that it was Syrian support during that conflict that made it possible for Hamas to win the war. Deeb Decl. at ¶ 21 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 30, Civ. No. 15-1468.

Military activities planned and organized from Damascus were not forcefully or systematically cracked down by the Syrian regime. To the contrary, Syria remained supportive of Hamas's militant activities. Berti Decl. at ¶ 45 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 29, Civ. No. 15-1468.

Syria has served as a conduit to channel money to finance Hamas's military operations and terrorist attacks. As an example, Jamal Muhammad Farah al-Tawil—Hamas military commander in the West Bank—is reported to have received money for the group's attacks from Hamas leaders in both Damascus and Beirut. They were reportedly transferred through the ad-hoc charity the Al-Islah Charitable Society. *Id.* at ¶ 52.

Weapons shipments originating from Iran are reported to have been transferred on several occasions through Syria (and from there to Gaza, passing through Sudan/Sinai)—with Syria being

a key channel through which to smuggle and obtain weapons. Hamas's rocket and missile arsenal has grown through the use of parts thought to originate in Syria or Iran and smuggled in through tunnels from Egypt. *Id.* at ¶ 53-54.

Syrian support waned starting in 2012 when Hamas's support for rebel forces in the Syrian civil war caused a rift between Hamas and Syria. Deeb Decl. ¶ 22, Berti Decl. ¶ 56 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 29, Civ. No. 15-1468.

Despite this, Hamas continues to enjoy the benefits of Syria's widespread support it received prior to 2012. The substantial organizational support, military and terrorist capabilities, strategies and training Syria provided to Hamas strengthened and legitimized the group while helping it to develop into a major player in the Palestinian political and military scene. Hamas's capabilities as they stand today are a product of the past support given by the Syrian regime. Syrian support was a major force multiplier for Hamas. Hamas continues to benefit from the effects of this support to this day. Deeb Decl. ¶¶ 22-24 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 30, Civ. No. 15-1468); Berti Decl. ¶¶ 59-60 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 29, Civ. No. 15-1468.

The effects of Syria's support for Hamas will continue to be relevant for years to come. Berti Decl. ¶ 60 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 29, Civ. No. 15-1468.

The Court accepts and adopts Dr. Berti's expert opinion that Syria has supplied substantial material support to Hamas, and that the continuous support which Syria provided to Hamas in the previous years contributed to giving the group the military edge and sophistication it needed to be able to carry out successful violent operations to this day. "In plain terms, without Syria's significant support, Hamas would not be the powerful, deadly organization it is today." Berti Decl. ¶ 66 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 29, Civ. No. 15-1468.

The court also accepts and adopts Dr. Deeb's expert opinion that the tactical know how which Hamas gained while under Syrian protection is directly responsible for the Hamas terrorist attacks seen today. The terrorist operations at issue in this case were all possible because of this Syrian role. Deeb Decl. ¶ 24 in *Force v. The Islamic Rep. of Iran, et al.*, Dkt. 30, Civ. No. 15-1468.

## III.
## CONCLUSIONS OF LAW

### A.      Burden of Proof

The FSIA specifies that a court cannot enter a default judgment against a foreign state, or a political subdivision thereof, "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Roeder v. Islamic Rep. of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief.").[97] Section 1608(e) provides protection to foreign states from unfounded default judgments rendered solely upon a procedural default. *See Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 950-51 (11th Cir. 1996). Although a court receives evidence from only the plaintiff when a foreign sovereign defendant has defaulted, § 1608(e) does not require a court to demand more or different evidence than it would ordinarily receive in order to render a decision. *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). In evaluating the plaintiff's proofs, a court may "accept as true the plaintiff's uncontroverted evidence," *Estate of Botvin v. Islamic Rep.*

---

[97] This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(d). Fed. R. Civ. P. 55(d) ("A default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfied the court."); *see also Hill v. Rep. of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (a FSIA default winner must prove damages like any other default winner).

*of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007); *see also Elahi v. Islamic Rep. of Iran, 124 F.* Supp. 2d 97, 100 (D.D.C. 2000), and a plaintiff may establish proof by affidavit. *See Weinstein v. Islamic Rep. of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002). While a plaintiff needs to demonstrate a *prima facie* case to obtain a judgment of liability in a FSIA case, a plaintiff must show entitlement to punitive damages by clear and convincing evidence. *See Peterson v. Islamic Rep. of Iran*, 264 F. Supp. 2d 46, 48 (D.D.C. 2003).

Thus, to prevail on their FSIA claims, Plaintiffs must demonstrate a *prima facie* case of liability. By their failure to appear and defend themselves, Iran and Syria put themselves at risk that the Plaintiffs' uncontroverted evidence would be satisfactory to the Court to prove its allegations. In fact, the Court finds that Plaintiffs have presented satisfactory evidence to prove liability and damages, including punitive damages against the Defendants.

### **Service**

Service under the FSIA is governed by 28 U.S.C. § 1608. Subsection (a) provides for service on a foreign state and subsection (b) provides for service on an agency or instrumentality of a foreign state. To determine whether a foreign entity should be treated as the state itself or as an agency or instrumentality, courts apply the core functions test: if the core functions of the entity are governmental, it is treated as the state itself; and if the core functions are commercial, it is treated as an agency or instrumentality. *Roeder*, 333 F.3d at 234.

In this case, service upon Defendants was perfected under § 1608(a), which governs service on foreign states. Obviously, Iran and Syria are foreign states. Specifically, service upon Syria was attempted via 28 U.S.C. § 1608(a)(3) through delivery of the required documents (translated into Arabic) to its agent via international courier service. (Dkt. 7, 8, 12). Service upon Iran was attempted via 28 U.S.C. § 1608(a)(3) through delivery of the required documents (translated into

Farsi). (Dkt. 7, 8, 12). Subsequently, service via 28 U.S.C. § 1608(a)(4) through diplomatic channels was attempted on Iran on August 19, 2020 and on Syria on August 10, 2020. (Dkt. 10, 11, 18). The diplomatic notes provide appropriate proof of service as to Iran and Syria. (Dkt. 15, 18).

### Jurisdiction

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in *the courts of this country." Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Accordingly, this Court lacks jurisdiction over Iran and Syria unless one of the FSIA's enumerated exceptions applies. Here, the state-sponsored terrorism exception to sovereign immunity applies. 28 U.S.C. § 1605A(a). Additionally, the FSIA was amended in 2008 to provide a private cause of action by which a foreign state that sponsors terrorism can be held liable for certain enumerated damages arising from terrorist activities: economic damages, solatium, pain and suffering, and punitive damages. *Id.* § 1605A(c).

Section 1605A(a) provides that a foreign state shall not be immune from the jurisdiction of U.S. courts in cases where plaintiffs seek money damages for personal injury or death that:

> was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). A U.S. court will hear a claim under FSIA if: (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred, or was so designated as a result of such act"; (2) "the claimant or the victim was, at the time the act . . . occurred" a national of the United States, a member of the armed forces, or "otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States

Government, acting within the scope of the employee's employment"; and (3) if the act occurred

in the foreign state against which the claim has been brought, the foreign state has been afforded

"a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules

of arbitration." *Id.* § 1605A(a)(2)(A).

Section 1605A(c) also provides a private right of action to recover damages for state-

sponsored terrorism:

> Private Right of Action.—A foreign state that is or was a state sponsor of terrorism
> . . . shall be liable to—
>
>> (1) a national of the United States,
>>
>> (2) a member of the armed forces,
>>
>> (3) an employee of the Government of the United States, or of an individual
>> performing a contract awarded by the United States Government, acting within the
>> scope of the employee's employment, or
>>
>> (4) the legal representative of a person described in paragraph (1), (2), or
>> (3), for personal injury or death caused by acts described in subsection (a)(1) [i.e.,
>> the provision of material support or resources for hostage taking, torture, or
>> extrajudicial killing] . . . . In any such action, damages may include economic
>> damages, solatium, pain and suffering, and punitive damages. In any such action, a
>> foreign state shall be vicariously liable for the acts of its officials, employees, or
>> agents.

28 U.S.C. § 1605A(c). For persons covered by the private right of action in § 1605A(c) state law

claims are not actionable.

Under § 1605A(c), U.S. citizens who are victims of state-sponsored terrorism can sue a

responsible foreign state directly. Significantly, the law of a plaintiff's U.S. state no longer controls

the nature of the liability and damages that may be sought when a foreign government is sued:

Congress has provided the "specific source of law" for recovery. *See Acree v. Rep. of Iraq*, 370

F.3d 41, 59 (D.C. Cir. 2004).[98] By providing for a private right of action and precisely enumerating the types of damages recoverable, Congress has eliminated the inconsistencies that arise in cases decided under state law. *Compare Jackovich v. Gen. Adjustment Bureau, Inc.*, 326 N.W.2d 458, 464 (Mich. Ct. App. 1982) (under Michigan law, exemplary damages are available but punitive damages are not) *with Todd v. Byrd*, 640 S.E.2d 652, 661 (Ga. Ct. App. 2006) (citing OCGA § 51-12-5.1(b), noting that punitive damages are available under Georgia law); *see Flatow v. Islamic Rep. of Iran*, 999 F. Supp. 1, 29-30 (D.D.C. 1998) (noting many differences in the law of solatium among the states).

Because the injured victims of each of the terror attacks in this case except Rotem Golan were United States nationals,[99] § 1605A(a)(2)(A)(ii)(I) provides that the sovereign immunity of Iran and Syria is waived, and these victims' and their families' claims can be heard. *See* U.S. Passport of Eli Borochov and Certificate of Citizenship for Yoav Golan. (Dkt. 30, Ex. A, J).

Plaintiffs Devora Sue Borochov, mother of Eli Borochov, Shari Mayer, wife of Eli Borochov, Josef S. Borochov, brother of Eli Borochov, Shira Nechama Borochov, sister of Eli Borochov, Avraham Borochov, brother of Eli Borochov, Yehudit Golan, mother of Yoav Golan and Matan Gyaer Golan, brother of Yoav Golan, are United States citizens and, therefore, liability and damages are assessed under § 1605A(c), providing a private right of action for U.S. nationals. *See* U.S. Passports or Certificates of U.S. Citizenship. (Dkt. 30, Ex. B-I).

---

[98] Further, federal courts look to the Restatement (Second) of Torts, and not state law, to provide content to Congress's express intentions. *See, e.g., Bettis v. Islamic Rep. of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (accepting the Restatement (Second) of Torts as "delineat[ing] the controlling substantive law" for intentional infliction of emotional distress "as a proxy for state common law").

[99] Under the FSIA, a U.S. national is defined as "a citizen of the United States." *See* 28 U.S.C. § 1605A(h)(5) (citing 8 U.S.C. § 1101(a)(22)).

The following Plaintiffs are not U.S. nationals: Rotem Golan, wife of Yoav Golan, Raphael Golan, father of Yoav Golan, Yael Golan Inbar, sister of Yoav Golan, Nadav Golan, brother of Yoav Golan, Shai Fishfeder, father of Rotem Golan, Efrat Fishfeder, mother of Rotem Golan, Ohad Fishfeder, brother of Rotem Golan, Omer Fishfeder, brother of Rotem Golan and Shiri Fishfeder, sister of Rotem Golan. Although these non-U.S. nationals do not have a private right of action under § 1605A(c), nevertheless, jurisdiction and waiver of sovereign immunity are satisfied as to these Plaintiffs because their injured family members were U.S. citizens as required under § 1605(a)(2)(A)(ii)(I). *See Worely v. Islamic Rep. of Iran*, 75 F. Supp. 3d 311, 326-327 (D.D.C. 2014) (citing *Leibovitch v. Islamic Rep. of Iran*, 697 F.3d 561 572 (7th Cir. 2012)).

### **Liability to U.S. Citizen Plaintiffs**

The five elements necessary to establish liability under FSIA's state-sponsored terrorism exception are:

> (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or agent of the foreign state, and the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages."

*Bodoff v. Islamic Rep. of Iran*, 907 F. Supp. 2d 93, 101 (D.D.C. 2012) (quoting 28 U.S.C. § 1605A(a)(1), (c). The third and fourth elements are satisfied when a plaintiff proves a theory of liability and justifies the damages s/he seeks, generally "through the lens of civil tort liability." *Rimkus v. Islamic Rep. of Iran*, 750 F. Supp. 2d 163, 176 (D.D.C. 2010); *see also Roth v. Islamic Rep. of Iran*, 78 F. Supp. 3d 379, 399-401 (D.D.C. 2015).

Section 1605A(h)(3) defines "material support or resources" to have "the meaning given that term in section 2339A of title 18." Section 2339A provides:

> "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel..., and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). To determine whether a defendant sovereign has provided material support to terrorism, courts consider first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act. *See e.g., Ben Rafael v. Islamic Rep. of Iran*, 540 F. Supp. 2d 39, 46 (D.D.C. 2008). The types of support that have been identified as "material" have included, for example, financing and running camps that provided military and other training to terrorist operatives, *see, e.g.*, *Wachsman ex rel. Wachsman v. Islamic Rep. of Iran*, 537 F. Supp. 2d 85, 90 (D.D.C. 2008); *Sisso v. Islamic Rep. of Iran*, No. 05-0394, 2007 WL 2007582, at *5-6 (D.D.C. July 5, 2007); allowing terrorist groups to use its banking institutions to launder money, *see, e.g., Rux v. Rep. of Sudan*, 495 F. Supp. 2d 541, 549-50 (E.D. Va. 2007); and allowing terrorist groups to use its territory as a meeting place and safe haven,[100] *see, e.g., Id.* Such support has been found to have contributed to the actual terrorist act that resulted in a plaintiff's damages when experts testify that the terrorist acts could not have occurred without such support, *see, e.g., Ben-Rafael*, 540 F. Supp. 2d at 47; that a particular act exhibited a level of sophistication in planning and execution that was consistent with the advanced training that had been supplied by the defendant state, *see, e.g., Sisso*, 2007 WL

---

[100] *See Owens v. Rep. of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006) (finding that insofar as the Sudan "affirmatively allowed and/or encouraged al Qaeda and Hizbollah to operate their terrorist enterprises within its borders," it provided a safe haven).

2007582, at *6; or when the support facilitated the terrorist group's development of the expertise, networks, military training, munitions, and/or financial resources necessary to plan and carry out the attack, *see, e.g., Rux*, 495 F. Supp. 2d at 553 (expert testimony that the "attack might have been possible, but it would not have been as easy" without defendant's support).[101]

---

[101] In cases regarding the state-sponsored terrorism exception to the FSIA such as this one, courts rely extensively on expert testimony. *See, e.g., Ben-Rafael*, 540 F. Supp. 2d at 44 (in a FSIA case against Iran concerning a bombing at the Israeli embassy in Argentina by the terrorist group Hezbollah, the court relied on the testimony of an expert from the Washington Institute for Near East Policy and found that "Iran exercised control over Hezbollah through its intelligence agency"); *Wachsman*, 537 F. Supp. 2d at 90 (in a suit against Iran concerning the execution of a U.S. citizen in Israel by Hamas, the court relied on the testimony of an "expert in Islamic terrorism" and found that Iran provided military and terrorist training for approximately 400 Hamas operatives through its Revolutionary Guard); *Sisso*, 2007 WL 2007582, at *5 (in a suit against Iran concerning a Hamas suicide bombing in Israel, the court relied on testimony from two experts associated with the Washington Institute for Near East Policy in finding, "Iran has financed and run camps that provide military and other training to Hamas operatives," and "Iran further supports Hamas's terrorist activities with direct funding"); *Valore v. Islamic Rep. of Iran*, 478 F. Supp. 2d 101, 105 (D.D.C. 2007) (in a case against Iran regarding a Hezbollah bombing of a U.S. military barracks in Lebanon, the court relied on testimony of "a renowned expert on Iranian affairs" and an expert working for the Project for the Research of Islamist Movements and The International Policy Institute for Counterterrorism, finding that "Hezbollah was a creature of the Iranian government, acting almost entirely under the order of the Iranians and being financed almost entirely by the Iranians"). This Court notes and accepts those findings as consistent with, and supportive of, the findings in this matter.

The U.S. citizen Plaintiffs have presented evidence satisfactory to the Court in support of all elements of a claim under § 1605A against Iran and Syria. Iran[102] and Syria[103] are state sponsors of terrorism, and these Plaintiffs are U.S. citizens. The critical issue in this case is whether Iran and Syria, and its officials acting within the scope of their employment, provided material support and resources to Hamas in Israel.

Iran and Syria did provide material support and resources to Hamas in Israel, which contributed to the two terror attacks in this case. Plaintiffs provided satisfactory evidence that Defendants are legally responsible for each of these terror attacks due to the longstanding material support provided by Iran and Syria to Hamas that allowed this group to grow and flourish into a terrorist organization. The evidence demonstrated that each of the victims in these attacks were

---

[102] The term "state sponsor of terrorism" is defined in § 1605A as: a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. [§] 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. [§] 2371), section 40 of the Arms Export Control Act (22 U.S.C. [§] 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism. 28 U.S.C. § 1605A(h)(6). Iran has been designated by the U.S. Department of State as a state sponsor of terrorism continuously since January 19, 1984, *see* U.S. Department of State, State Sponsors of Terrorism, available at https://www.state.gov/j/ct/list/c14151.htm (last visited 09/09/2019), and its continued designation as such was noted in the State Department's annual Country Reports on Terrorism in 2015, *see* U.S. Department of State, State Sponsors of Terrorism Overview, available at https://www.state.gov/j/ct/rls/crt/2015/257520.htm (last visited 09/09/2019).

[103] Syria has been designated by the U.S. Department of State as a state sponsor of terrorism continuously since December 29, 1979, *see* U.S. Department of State, State Sponsors of Terrorism, available at https://www.state.gov/j/ct/list/c14151.htm (last visited 09/09/2019), and its continued designation as such was noted in the State Department's annual Country Reports on Terrorism in 2015, *see* U.S. Department of State, State Sponsors of Terrorism Overview, available at https://www.state.gov/j/ct/rls/crt/2015/257520.htm (last visited 09/09/2019).

injured as part of an intentional Hamas plan to injure or murder citizens in order to intimidate a civilian population and/or affect government policies.

Further, Hamas is an agent of Iran and Syria due to the material support provided by Iran and Syria in furtherance of Hamas's mission to disrupt the Israeli-Palestinian peace process. The evidence demonstrates that during the time leading up to the terror attacks in this case, Iran supported Hamas by:

(1)     Providing political and ideological support for Hamas through public statements in support of its mission and terrorist activities, specifically with respect to Israel;

(2)     Providing monetary support totaling hundreds of millions of dollars;

(3)     Providing support in the form of weapons intended for use in the West Bank and Gaza Strip. One attempted delivery of weapons was the on the Klos-C ship, which was intercepted by the Israeli Navy; and

(4)     Providing support through weapons smuggled to Hamas.

See *Force v. Islamic Rep. of Iran, et al.*, Dkt. 31, 32, Civ. No. 16-1468, for Levitt and Clawson Declarations.

The evidence also demonstrates that during the time leading up to the terror attacks in this case, Syria supported Hamas by:

(1)     Providing a safe haven for Hamas and locations for headquarters in Damascus, where they can engage in open meetings and fundraising;

(2)     Training Hamas members in the use of terrorist tactics;

(3)     Providing a location where Hamas could openly recruit members;

(4)     Providing a public political platform and legitimacy due to Hamas's presence in Damascus;

(5)     Providing financial support directly through funds transmitted to the Hamas headquarters in Damascus; and

(6)     Assisting in funneling weapons shipments by allowing them to be

transported through Syria.

*See Force v. Islamic Rep. of Iran, et al.*, Dkt. 29, 30, Civ. No. 16-1468, for Bert. Decl. and Deeb Decl.

The foreign policy of both the Iranian and Syrian governments have been to support Hamas in Israel in order to disrupt the Israeli-Palestinian peace process. Both Iran and Syria supported Hamas due to their animosity toward Israel and provided funds and weapons to allow Hamas to carry out their missions. It was foreseeable, therefore, that Hamas would use the training, money, and weapons provided by Iran and Syria to carry out terrorist attacks against civilians in Israel, such as Eli Borochov, Yoav Golan and Rotem Golan, to injure them. Although no evidence has been provided directly linking a weapon or dollar provided by Iran and Syria to these two specific terror attacks, both Iran and Syria knew of Hamas's tactics and ideological goals and supported those efforts. Each of the terror attacks and resulting injuries were foreseeable consequences of Iran and Syria's aid and support to Hamas in Israel.

In sum, jurisdiction over Iran and Syria is consistent with § 1605A(a), the state-sponsored terrorism exception to sovereign immunity, and the U.S. citizen Plaintiffs have provided evidence satisfactory to the Court in support of their private cause of action for damages under § 1605A(c).

## E.     Liability to Non-U.S. Citizen Plaintiffs

The Court must apply District of Columbia choice of law rules to determine which jurisdiction's substantive law governs.

> The FSIA does not contain an express choice-of-law provision [for plaintiffs not covered by § 1605A(c)]. FSIA § 1606 does, however, provide that a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. This section ensures that, if an FSIA exception abrogates immunity, plaintiffs [not covered by § 1605A(c)] may bring state [or foreign] law claims that they could have brought if the defendant were a private individual.

-68-

*Oveissi v. Islamic Rep. of Iran*, 573 F. Supp. 3d 835, 841 (D.C. Cir. 2009) (applying D.C. choice of law principles); *see also Thuneibat v. Sryian Arab Rep.*, 167 F. Supp. 3d 22, 42-44 (D.D.C. 2016) (discussing D.C. conflict of law rules). The District of Columbia applies a blend of "governmental interests analysis" (i.e., which jurisdiction's policies would be most advanced by having its law applied) and the "most significant relationship test" (looking to the factors in the Restatement (Second) of Conflict of Laws). *Oveissi*, 573 F. Supp. 3d at 842.

> The four Restatement factors are: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place where the relationship, if any, between the parties is centered."

*Id.* (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)). In *Oveissi*, the court concluded that French law applied to the claims of the American-citizen grandchild of an Iranian citizen assassinated in France. *Id.* In *Thuneibat* the court held that Jordanian law applied to the claims of non-American family members of an American citizen killed in a suicide bombing in Jordan. 167 F. Supp. 3d at 44.

Here, the injuries occurred in Israel; the conduct causing the injuries occurred in Israel, Iran, and Syria; the non-U.S. citizen Plaintiffs are and always have been Israeli citizens; and there is no legal relationship between any of the non-U.S. citizen Plaintiffs and any of the Defendants or Hamas. Accordingly, the Court finds that Israel has the greatest interest in having its laws apply and the most significant relationship to the events. Israeli law will therefore apply to the claims of the non-U.S. citizen Plaintiffs.

In determining the scope of applicable foreign tort law, a court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; *see also Thuneibat*, 167 F. Supp. 3d at 44. Plaintiffs submitted the Declaration of Dr. Boaz Shnoor, an attorney and law professor in Israel.

*See* Declaration of Boaz Shnoor ("Shnoor Decl.") (Dkt. 34) in *Force v. Islamic Rep. of Iran, et al.,* Civ. No. 16-cv-1468. Additionally, another court in this district has evaluated the requirements for negligence under Israeli law. *See Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010).

The Israeli civil tort of negligence is codified in the Civil Wrongs Ordinance (CWO) at § 35, 2 LSI (New Version) 14-15 (1972); *see also Wultz*, 755 F. Supp. 2d at 57-58. Negligence requires a finding of the same elements as U.S. law: duty, breach, causation, and injury. Shnoor Decl. ¶ 15 (Dkt. 34) in *Force v. Islamic Rep. of Iran, et al.*, Civ. No. 16-cv-1468; *Wultz*, 755 F. Supp. 2d at 57-58. Duty under Israeli law is divided into "duty in fact and notional duty." *Wultz*, 755 F. Supp. 2d at 58. "[E]very person owes a duty to all persons whom . . . a reasonable person ought in the circumstances to have contemplated as likely in the usual course of things to be affected by an act, or failure to do an act." CWO § 36, 2 LSI (New Version) 15 (1972). A court asks if a reasonable person could have foreseen the likelihood of damage when determining duty-in-fact. *See Wultz*, 755 F. Supp. 2d at 58. Furthermore, if a duty-in-fact exists but the risk of harm as it occurred was already "taken into account by normal society when engaged in a particular action," a defendant will not be liable under the tort of negligence. *Id.* at 58-59. Normative duty considers "whether a reasonable person ought, as a matter of policy, to have foreseen the occurrence of the particular damage." *CA 145/80 Vaknin v. Beit Shemesh Local Council 37(1) PD 113, 125-26 (1982) (Isr.); see also Wultz*, 755 F. Supp. 2d at 59.

The Court finds that the non-U.S. citizen Plaintiffs have demonstrated Defendants were under a duty to the victims because, as discussed above, the injury and killing of the victims were foreseeable consequences of providing material support for Hamas and supporting Hamas's efforts to disrupt the Israeli-Palestinian peace process. For the same reasons that the Court finds sufficient evidence to tie Iran and Syria to terrorist actions by Hamas above, it finds that a duty existed

between Iran and Syria and the Plaintiffs and their families because their injuries were foreseeable consequences of the aid and support.

A breach of the duty of care occurs when a party with a duty fails to take "reasonable precautionary measures." *Vaknin*, 37(1) PD at 131. Reasonable precautions are determined by balancing the interests of the plaintiff with that of the tortfeasor and considering the public interest in the continuation or cessation of the alleged tortious actions. *See Wultz*, 755 F. Supp. 2d at 62. The Court finds Iran and Syria breached their duty of care to the Plaintiffs by engaging in the continuous support and financing of Hamas, despite knowledge of Hamas's terrorist actions in Israel.

The Non-U.S. citizen Plaintiffs have adequately demonstrated that but for the support provided by Iran and Syria, Hamas would not have been able to develop into the cohesive, organized, and deadly organizations that they are today. And, as discussed with duty, the terror attacks that injured the victims in this case were a foreseeable consequence of the provision of support by Iran and Syria. The non-U.S. citizen Plaintiffs have established negligence and aiding and abetting of Hamas by Iran and Syria under Israeli law.

### Damages for U.S. Citizen Plaintiffs

Damages for a private action for proven acts of terrorism by foreign states under FSIA § 1605A(c) may include economic damages, pain, and suffering, solatium, and punitive damages. 28 U.S.C. § 1605A(c). Accordingly, those who survived an attack may recover damages for their pain and suffering, as well as any other economic losses caused by their injuries; estates of those who did not survive can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages. *Valore*, 700 F. Supp. 2d at 82-83. For victims who "suffered severe emotional

injury without physical injury, this Court has typically awarded the victim $1.5 million. *Harrison v. Rep. of Sudan*, 882 F. Supp. 2d 23, 49 (D.D. C. 2012) (citing *Valore*, 700 F. Supp. 2d at 85).

### Pain and Suffering

Determining the appropriate amount of pain and suffering damages depends upon myriad factors, such as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *O'Brien v. Islamic Rep. of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012). Courts have awarded varying amounts of pain and suffering damages, depending upon the length of the suffering. *See, e.g., Braun v. Islamic Rep. of Iran*, No. 15-1136, 2017 WL 79937, at *12 (D.D.C. Jan. 9, 2017) (awarding $1,000,000 for pain and suffering lasting two hours); *Peterson v. Islamic Rep. of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) (finding the baseline award for individuals who suffered severe injuries in terrorist attacks are entitled to $5 million in compensatory damages); *Stern v. Islamic Rep. of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003) (citing authorities awarding $1,000,000 for pain and suffering lasting between thirty seconds and several hours).

### Eli M. Borochov

Plaintiffs presented the declarations of Dr. Rael Strous and Dr. Alan Friedman, as well as the sworn declaration of Eli Borochov regarding the physical, psychological, and emotional trauma he suffered as a result of the Hebron Terrorist Attack. (Dkt. 32, Dkt. 50, Ex. 5, Dkt. 53, Exhibit B).

Eli reports in November 2015, he was on a trip with his father, Ronen, and brother, Josef, to Israel to visit the Cave of the Patriarchs for a special Sabbath. (Dkt. 32, Dkt. 50, Ex. 5). As Eli was walking up the stairs to the Cave of the Patriarchs, he recalls falling to the floor in pain. (Dkt. 50, Ex. 5). Eli did not know what happened but observed blood on him. (Dkt. 32, Dkt. 50, Ex. 5).

Eli was in a lot of pain and unable to ask for help. Ronen ran over and saw Eli was covered in blood and in pain, so he ran for help from nearby soldiers. (Dkt. 50, Ex. 5). The soldiers realized Eli had been shot and carried him to a triage tent where it was learned that a bullet had pierced Eli's scrotum and damaged his testicles. (Dkt. 50, Ex. 5). The medics also realized the bullet had pierced Eli's upper thigh. (Dkt. 50, Ex. 5). Eli was transported by ambulance to Shaare Tzedek hospital in Jerusalem for surgery. (Dkt. 50, Ex. 5). Eli experienced tremendous pain from the time he was shot until the surgery. (Dkt. 32, Dkt. 50, Ex. 5). Post-op, Eli woke up in pain and needed the nurses to carry him to the bathroom. (Dkt. 32, Dkt. 50, Ex. 5). It was "extremely difficult" for Eli to go to the bathroom due to his testicle injury. (Dkt. 50, Ex. 5). While in the hospital the nurses wanted to help Eli shower post-op, but he wanted to do it to have some sense of control. (Dkt. 50, Ex. 5). While showering sitting on the floor of the shower, Eli watched the blood on his skin wash off and go into the shower drain. (Dkt. 32, Dkt. 50, Ex. 5). Eli was able for the first time to see the severity of his wounds from the terrorist attack. (Dkt. 50 Ex. 5). Two days after the attack, the doctors asked Eli to try to walk again. (Dkt. 50, Ex. 5). During the months following the terrorist attack, Eli had trouble returning to a normal routine as basic tasks such as going to the bathroom, getting dressed and navigating stairs were difficult. (Dkt. 32, Dkt. 50, Ex. 5). Eli was unable to leave his house for months. (Dkt. 50, Ex. 5). Once Eli began to heal, he was able to leave his house, but unable to commute to school. (Dkt. 50, Ex. 5). When Eli did return to school, he was unable to sit or stand for extended periods of time comfortably. (Dkt. 50, Ex. 5). During that time, Eli had to be driven around to places so he could not be left alone for lengthy periods of time. (Dkt. 50, Ex. 5).

The stitches Eli received in Israel on his scrotum did not stay in place and had fluids draining from the injury. (Dkt. 50, Ex. 5). Therefore, Eli had to have replacement stiches placed

on his scrotum several times. (Dkt. 50, Ex. 5). The doctors were worried about an infection and Eli had to visit with a urologist and specialist for check-ups. (Dkt. 32, Dkt. 50, Ex. 5). With each stitch replacement for the scrotum injury, Eli's healing was slowed, and the pain became more severe. (Dkt. 32, Dkt. 50, Ex. 5). Due to constant limping, Eli developed back pain that required him to attend physical therapy. (Dkt. 32, Dkt. 50, Ex. 5). Despite physical therapy, the back pain became worse, and Eli switched to seeing a chiropractor three times a week. (Dkt. 50, Ex. 5). Eli has incurred nearly $5,000 in out-of-pocket medical expenses due to his injuries from the terrorist attack and provided receipts for medical expenses in the amount of $1,495. (Dkt. 32, Ex. B). Eli still has complications from his scrotum injury as the removal of part of his testicles still causes a lot of pain and it is difficult for Eli to get dressed. (Dkt. 32, Dkt. 50, Ex. 5). Eli's leg wound area is still sensitive and limits his ability to be active. (Dkt. 32, Dkt. 50, Ex. 5). Due to the attack, Eli missed three months of college. (Dkt. 32, Dkt. 50, Ex. 5). Eli found the transition back to school to be difficult and he continues to live with fear and anxiety as a result of the terrorist attack. (Dkt. 32, Dkt. 50, Ex. 5). Due to the pain in Eli's testicle and leg injuries, Eli works from home since he is unable to sit for long periods of time. (Dkt. 50, Ex. 5). Eli feels anxious when in large crowds and he scans the crowds for anything suspicious. (Dkt. 32, Dkt. 50, Ex. 5). The injuries Eli sustained physically and emotionally have affected his entire life, including the way he perceives the world and the way he will parent his children. (Dkt. 32, Dkt. 50, Ex. 5).

Dr. Strous is of the opinion that Eli Borochov suffers from adjustment disorder with anxiety symptoms due to the Hebron Terrorist Attack on him and that Eli's emotional issues affect several areas of his life and will continue to do so for a long period of time. (Dkt. 50, Ex. 5).

On February 9, 2020, Dr. Friedman met with and evaluated Eli Borochov. (Dkt. 53, Exhibit B). Dr. Friedman indicated that Eli was shot in the upper right thigh and the bullet travelled into

the right testicle and "clipped" his penis. (Dkt. 53, Exhibit B). He was evacuated from the local triage tent to Shaare Zedek Hospital. (Dkt. 53, Exhibit B). In Shaare Zedek Hospital, Eli was diagnosed with a 1.5 cm right upper thigh injury, 1 cm superficial wound of the distal central shaft of the penis, and a bullet exit wound from the left testicle. (Dkt. 53, Exhibit B). Eli underwent an orchiectomy of most of the right testicle and debrided the bullet wound site in the right thigh. (Dkt. 53, Exhibit B). A urology evaluation was performed, and the impression was that he would be able to urinate, ejaculate, and be fertile. (Dkt. 53, Exhibit B). On November 8, 2015, Eli was discharged from the hospital, and returned to the United States. (Dkt. 53, Exhibit B).

Eli was unable to walk for approximately two months after the terrorist attack on him due to right thigh pain and severe pain in the scrotal area from the sutures. (Dkt. 53, Exhibit B). Currently, Eli has daily pain in the scrotum and penis, as well as pain from chafing of the genital region against his underwear and clothes. (Dkt. 53, Exhibit B). Eli also reported tingling in the right thigh and right scrotum. (Dkt. 53, Exhibit B). As for Eli's back, he has lumbar pain which started as a result of his limping following the injury. (Dkt. 53, Exhibit B). Eli is unable to run as fast as he used to and cannot put much pressure on the right leg. (Dkt. 53, Exhibit B). Eli has been receiving chiropractic treatments twice a week since November 2019. (Dkt. 53, Exhibit B). Dr. Friedman examined Eli and observed a small - less than 1 cm - area of the medial proximal right thigh over which he could feel a small indentation that was tender to touch. (Dkt. 53, Exhibit B). There was a small scar over the right testicle. (Dkt. 53, Exhibit B). After reviewing Eli's medical records and examining him, Dr. Friedman's diagnoses are post gunshot wound to the right thigh with exit from the right testicle, post partial right orchiectomy, low back pain and pain postoperative and continuing in the genital region. (Dkt. 53, Exhibit B). The pain in the genital region is likely to continue for a long time into the future. (Dkt. 53, Exhibit B). It is Dr. Friedman's

opinion that Eli's symptoms were caused by the injuries sustained in the terrorist attack on him on November 6, 2015. (Dkt. 53, Exhibit B).

Accordingly, the court will award the baseline amount of $5,000,000 to Eli Borochov.

### Ronen Steven Borochov

Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Ronen Borochov regarding the pain and suffering he suffered as a result of the Hebron Terrorist Attack. (Dkt. 35, Dkt. 50, Ex. 7).

On the day of the terrorist attack on his son, Eli, Ronen was with Eli and his other son, Josef, in Hebron to visit the Cave of the Patriarchs and they were walking up the steps to pray in a crowd when they heard a boom. (Dkt. 50, Ex. 7). Eli fell down right next to Ronen and blood poured out of Eli's pants. (Dkt. 50, Ex. 7). A solider approached and another loud noise occurred. (Dkt. 50, Ex. 7). Soldiers took Eli to a military tent nearby. (Dkt. 50, Ex. 7). Ronen feared Eli would die and he also feared for his life and the life of his other son as there was an active shooter. (Dkt. 50, Ex. 7).

Accordingly, the court will award the baseline amount of $1,500,000 to Ronen Borochov in accordance with *Harrison* for severe emotional injury without physical harm.

### Josef S. Borochov

Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Josef Borochov regarding the pain and suffering he suffered as a result of the Hebron Terrorist Attack. (Dkt. 34, Dkt. 50, Ex. 6).

Josef recalls the day of the terror attack on his brother, Eli. (Dkt. 34). He was in Israel visiting the Cave of the Patriarchs in Hebron, Israel. (Dkt. 34). He was walking with his father and Eli to the location in order to pray. (Dkt. 50, Ex. 6). After climbing stairs, Josef remembers hearing

a loud noise. (Dkt. 50, Ex. 6). While he did not know what the loud sound was and where it came from, he saw his brother lying on the ground. (Dkt. 50, Ex. 6). Soldiers came running. (Dkt. 50, Ex. 6). Eli was screaming on the ground from pain. (Dkt. 50, Ex. 6). There was blood all around him. (Dkt. 50, Ex. 6). Josef thought his brother was going to die and he knew that he could have died as well as a result of the shooting. (Dkt. 50, Ex. 6). Josef recalls being pulled into a nearby tent by the police who rushed to the scene. (Dkt. 50, Ex. 6). His brother was attended to by medics. (Dkt. 50, Ex. 6). After he received immediate medical care and stabilized, Eli was rushed to the hospital. (Dkt. 50, Ex. 6). Josef thought over the next few hours that his brother was dead. (Dkt. 50, Ex. 6). Due to it being Sabbath, Josef had no news until the next night. (Dkt. 50, Ex. 6). After the end of Sabbath, Joseph went to the hospital to see if Eli was still alive. (Dkt. 50, Ex. 6).

Accordingly, the court will award the baseline amount of $1,500,000 to Josef Borochov, pursuant to *Harrison*.

### Yoav Golan

Plaintiffs presented the declarations of Dr. Strous and Dr. Friedman, as well as the sworn declaration of Yoav Golan regarding the psychological, physical, and emotional trauma he suffered as a result of the Bus Terrorist Attack. (Dkt. 38, Dkt. 51, Ex. 14, Dkt. 53, Exhibit C).

Yoav Golan reports on December 14, 2015, as part of his studies, he travelled to Jerusalem. (Dkt. 38, Dkt. 51, Ex. 14). On his way back home, he waited for his wife, Rotem, and together they planned to travel home to Eli to pick up their baby from daycare. (Dkt. 38, Dkt. 51, Ex. 14). He met up with his wife and together they waited at a bus stop near the entrance of Jerusalem for the bus that would take them home. (Dkt. 38, Dkt. 51, Ex. 14). Yoav recalls a white car approaching and coming close to the bus stop at a fast speed. (Dkt. 38, Dkt. 51, Ex. 14). The car then went up onto the sidewalk and Yoav heard a loud noise. (Dkt. 38, Dkt. 51, Ex. 14). Yoav

remembers being thrown into the air and then into the wall of the bus stop. (Dkt. 38, Dkt. 51, Ex. 14). Yoav looked for Rotem and found her. (Dkt. 51, Ex. 14). Yoav lifted her up and told her that there had been a terror attack and that they needed to run away. (Dkt. 51, Ex. 14). Both Yoav and Rotem had shattered glass from the bus stop all over them. (Dkt. 51, Ex. 14). Yoav ran a few meters with Rotem and then heard shooting. (Dkt. 51, Ex. 14). Yoav looked around and saw a man standing by the car and shooting at someone in the car. (Dkt. 38, Dkt. 51, Ex. 14). Yoav then told Rotem not to run anymore. (Dkt. 51, Ex. 14). Yoav did not want them to be too far from the ambulances arriving at the scene in order to get the medical help they needed. (Dkt. 51, Ex. 14).

Yoav started feeling pain in his right leg and left arm. (Dkt. 51, Ex. 14). He also saw that his shoe was torn and broken and that this was the source of his intense foot pain. (Dkt. 51, Ex. 14). He saw a "hole" in his leg and a lot of blood pooling around him. (Dkt. 51, Ex. 14). Yoav was also unable to move his arm or injured leg. (Dkt. 51, Ex. 14). The police and ambulance then arrived, and he called them for help. (Dkt. 51, Ex. 14). Yoav called his mother to tell her that they were injured, and he also called the supervisor of the childcare where his baby was and told him that they had been injured in a terror attack and that he needed to continue watching their child. (Dkt. 38, Dkt. 51, Ex. 14). Yoav recalls how his body, especially his arms were shaking. (Dkt. 51, Ex. 14). Yoav recalls being rushed to the hospital by ambulance. (Dkt. 51, Ex. 14).

Yoav spent one night in the hospital after which he was discharged home. (Dkt. 51, Ex. 14). Yoav and his family had to move in with his in-laws after the attack because Yoav's house had stairs and Yoav was wheelchair bound for a month following the attack. (Dkt. 38, Dkt. 51, Ex. 14). The pain from his shoulder, leg and foot injuries caused Yoav sleeping difficulties and he had to rely on other people to help him function. (Dkt. 38, Dkt. 51, Ex. 14). Yoav needed help with bathing from his father-in-law. (Dkt. 38, Dkt. 51, Ex. 14). Yoav had to stop his studies and lost a

semester of learning. (Dkt. 38, Dkt. 51, Ex. 14). When Yoav left the house after the attack, he needed someone else to take him places. (Dkt. 51, Ex. 14). The very thought of leaving his in-laws house and getting into a car was stressful for Yoav. (Dkt. 51, Ex. 14). To this day, Yoav is afraid of getting into a vehicle because he fears someone is going to finish the terrorist attack, and he has to force himself to do so. (Dkt. 38, Dkt. 51, Ex. 14).

Due to the attack, Yoav is hyper vigilant when he has to go outside. (Dkt. 51, Ex. 14 ). Yoav feels constantly tense when outside. (Dkt. 51, Ex. 14). Due to the terrorist attack, Yoav sleeps a lot less due to nightmares and fear. (Dkt. 51, Ex. 14). Yoav avoids watching or reading the news. (Dkt. 51, Ex. 14). Yoav experiences flashbacks of the attack and he no longer travels as frequently. (Dkt. 51, Ex. 14). When Yoav has a memory of the attack or is asked to talk about it, Yoav has a physical reaction, including sweating and shaking. (Dkt. 51, Ex. 14). For example, someone recently knocked on a window outside the room where Yoav was sitting. (Dkt. 51, Ex. 14). Yoav immediately started crying, and experienced palpitations, shaking, sweating and poor concentration for about an hour. (Dkt. 51, Ex. 14). Yoav could not function and had to come home at which time he collapsed on his bed. (Dkt. 51, Ex. 14). Socially, Yoav feels disconnected from his friends since the terrorist attack as he feels his friends do not understand him. (Dkt. 51, Ex. 14). Because of the attack, Yoav has come to expect the worst, and this fuels more anxiety. (Dkt. 51, Ex. 14). Yoav did attend psychotherapy with a psychologist, Dr. Ayelet Ben Tal, due to the terrorist attack. (Dkt. 51, Ex. 14). He initially attended once a week which lasted for about a year. (Dkt. 51, Ex. 14). He then lessened the frequency to once every two weeks. (Dkt. 51, Ex. 14). Thereafter, Yoav attended therapy with Rotem. (Dkt. 51, Ex. 14).

Even now at the end of a work day Yoav has pain in his leg and when he gets home, he needs to rest and is unable to help with household chores and the family. (Dkt. 51, Ex. 14). Yoav's

foot hurts when he drives. (Dkt. 51, Ex. 14). While working with clients and in other areas of his life Yoav's concentration is disrupted by itching in areas of his leg due to his injury. (Dkt. 51, Ex. 14). Because of his leg injury, Yoav could not run for four years after the attack. (Dkt. 51, Ex. 14). Yoav has resumed sports activities, but after a sport his foot really hurts. (Dkt. 51, Ex. 14). Yoav is no longer an easy going and happy person because of the attack. (Dkt. 51, Ex. 14). Yoav and his family moved to a different city to avoid inter-city roads. (Dkt. 51, Ex. 14). Yoav and Rotem used to enjoy walks around their neighborhood but since the attack they do not take such walks as a couple because they are afraid of being terrorist victims again and because Yoav's foot hurts. (Dkt. 51, Ex. 14). Yoav avoids the center of Jerusalem and no longer visits the Old City of Jerusalem. (Dkt. 51, Ex. 14).

Dr. Strous is of the opinion that Yoav Golan suffers from post-traumatic stress disorder, other specified anxiety disorder and that he was the victim of terrorism. (Dkt. 51, Ex. 14). Yoav's anxiety due to being the victim of terrorism is not short-term and his anxiety will continue on a long-term basis. (Dkt. 51, Ex. 14).

On May 20, 2020, Dr. Friedman evaluated Yoav Golan. (Dkt. 53, Exhibit C). Due to COVID-19 restrictions, Dr. Friedman was unable to perform an in-person evaluation. (Dkt. 53, Exhibit C). Yoav was injured on December 14, 2015 in a motor vehicle ramming terrorist attack. (Dkt. 53, Exhibit C). Dr. Friedman reviewed Yoav's medical records for his treatment from the terrorist attack. (Dkt. 53, Exhibit C). An EMG from December 7, 2017 revealed damage to the right plantar nerve at Yoav's right ankle. (Dkt. 53, Exhibit C). Yoav's medical records indicate he sustained a contusion to the right foot and a closed dislocation of the left shoulder that was relocated and placed in a sling in the hospital. (Dkt. 53, Exhibit C). A CT scan of the right leg at the hospital revealed a hematoma. (Dkt. 53, Exhibit C). A left shoulder x-ray revealed a fragment

in the mid-humerus and suspicion of a Bankart lesion. (Dkt. 53, Exhibit C). Yoav had physical therapy for the left shoulder and right ankle. (Dkt. 53, Exhibit C). There was right ankle sensory loss from the injury based on the medical records. (Dkt. 53, Exhibit C).

For a month after the attack Yoav had to use a wheelchair and his arm was in a sling and bandaged. (Dkt. 53, Exhibit C). Yoav had to take pain medication following the attack. (Dkt. 53, Exhibit C). Yoav started physical therapy in February 2016 and continued it for eleven months. (Dkt. 53, Exhibit C). Currently, Yoav has mild left shoulder pain with mild decreased range of motion with extension and right foot pain that increases with standing and walking. (Dkt. 53, Exhibit C). Yoav has a small scar from the right foot skin necrosis. (Dkt. 53, Exhibit C). Yoav reported to Dr. Friedman right ankle numbness in the medial right heel that ascends to the mid-malleolar level. (Dkt. 53, Exhibit C). There is visible redness in a triangular shape in this distribution. (Dkt. 53, Exhibit C). Yoav has intermittent swelling in the right ankle and right ankle pain that has been steady for the past two years, including with plantar flexion. (Dkt. 53, Exhibit C). Yoav has a scar over the medial heel. (Dkt. 53, Exhibit C).

According to Dr. Friedman, Yoav Golan's symptoms were caused by the December 14, 2015 injury. (Dkt. 53, Exhibit C). Dr. Friedman's diagnoses are contusion right foot, closed dislocation of the left shoulder, relocation of left shoulder, right medial calcaneal nerve neuropathy and chronic pain. (Dkt. 53, Exhibit C). Dr. Friedman's impression is that Yoav suffered a left shoulder dislocation, which was relocated in the emergency room. (Dkt. 53, Exhibit C). However, it required a prolonged period of physical therapy and remains painful with minimal loss of extension to this day. (Dkt. 53, Exhibit C). Yoav also suffers from chronic right foot and ankle pain. (Dkt. 53, Exhibit C). There is damage to the right plantar nerve, but Dr. Friedman suspects a

right medial calcaneal nerve neuropathy may be present. (Dkt. 53, Exhibit C). Dr. Friedman does not expect additional improvement at this time. (Dkt. 53, Exhibit C).

Accordingly, the court will award the baseline amount of $5,000,000 to Yoav Golan.

**Solatium**

The legal term "solatium" is a Latin word for "solace" and is defined as "[c]ompensation; esp. damages for hurt feelings or grief, as distinguished from damages for physical injury." Black's Law Dictionary 1426 (8th ed. 2004). *Flatow*, 999 F. Supp. at 30-31. Damages for solatium are awarded to close family members. *Id*. at 30-31.

This District has developed a commonly accepted standardized framework for awarding solatium damages to family members of deceased victims, known as the Heiser damages framework. *See Estate of Heiser,* 466 F. Supp. 2d 229, 269; *See also, e.g., Acosta v. Islamic Rep. of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008) ("This Court has previously set out a general framework for compensatory awards for family members of victims who were killed as a result of terrorist activity consisting of $8 million to spouses of deceased victims, $5 million to parents and children of deceased victims, and $2.5 million to siblings of deceased victims."); *Thuneibat,* 167 F. Supp. 3d at 51 (applying Heiser damages framework).

In accordance with this framework, solatium awards in terrorism cases are to "be determined [primarily] by the nature of the relationship and the severity and duration of the pain suffered by the family member and the severity and duration of the pain suffered by the family member." *Brewer v. Iran,* 664 F. Supp. 2d 43, 55 (D.D.C. 2009) (Huvelle, *J.*) (quoting ). *See Haim v. Islamic Rep. of Iran,* 425 F. Supp. 2d 56 (D.D.C. 2006); *Wultz v. Iran,* 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (Lamberth, *C.J.*). Courts award half these amounts to family members of persons who are injured rather than killed. *Id*.

This formula, the foundation of the so-called "*Heiser* framework," merely supplies the baseline and may be subject to upward or downward adjustments as appropriate under the circumstances. Upward adjustments from the *Heiser* baseline are appropriate given 1) "evidence establishing an especially close relationship between the plaintiff and decedent," 2) "medical proof of severe pain, grief or suffering," or 3) "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Braun*, 228 F. Supp. 3d at 85.

Specifically, "[w]here the victim does not die, but instead only suffers injury,…[s]pouses receive $4 million, parents receive $2.5 million, and siblings receive $1.25 million." *Moradi v. Islamic Rep. of Iran*,[104] 77 F. Supp. 3d 57, 72 (D.D.C. 2015); *Cohen v. Islamic Rep. of Iran*, 268 F. Supp. 3d 19, 26 (D.D.C. 2017) (same); *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) (same); *Bluth*, 203 F. Supp. 3d at 24 (same); *Worley v. Islamic Rep. of Iran*, 177 F. Supp. 3d 283, 287 (D.D.C. 2016) (same); *Owens v. Rep. of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014) (same); *Spencer v. Islamic Rep. of Iran*, 71 F. Supp. 3d 23, 27-28 (D.D.C. 2014) (same); *Opati v. Rep. of Sudan*, 60 F. Supp. 3d 68, 79 (D.D.C. 2014) (same); *Mwila v. Islamic Rep. of Iran*, 33 F. Supp. 3d 36, 44 (D.D.C. 2014) (same); *Khaliq v. Rep. of Sudan*, 33 F. Supp. 3d 29, 34 (D.D.C. 2014) (same); *Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, 2013 WL 351546 at *29 (D.D.C. Jan. 29, 2013) (same), *amended* on other grounds 2013 WL 653921 (D.D.C. Mar. 13, 2013); *Reed v. Islamic Rep. of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (same); *Wyatt v. Syrian Arab Rep.*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) (same); *Taylor v. Islamic Rep. of Iran*, 881 F. Supp. 2d 19, 23 (D.D.C. 2012) (same); *Fain v. Islamic Rep. of Iran*, 885 F. Supp. 2d 78, 82 (D.D.C. 2012) (same); *Wultz*, 864 F. Supp. 2d 24, 39 (same); *Davis v. Islamic Rep. of Iran*, 882 F. Supp. 2d 7, 14 (D.D.C. 2012) (same); *O'Brien v. Islamic Rep. of Iran*,

[104] For ease of reading, the named plaintiff in each case in this string cite is **boldfaced**.

853 F. Supp. 2d 44, 47 (D.D.C. 2012) (same); *Anderson v. Islamic Rep. of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012) (same); *Reed v. Islamic Rep. of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Estate of Bland v. Islamic Rep. of Iran*, 831 F. Supp. 2d 150, 157 (D.D.C. 2011) (same); *Estate of Brown v. Islamic Rep. of Iran*, 872 F. Supp. 2d 37, 42 (D.D.C. 2012) (same); *Oveissi v. Islamic Rep. of Iran*, 768 F. Supp. 2d 16, 26 n.10 (D.D.C. 2011) (same); *Valencia v. Islamic Rep. of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010) (same); *Valore*, 700 F. Supp. 2d 52, 85 (same); *Murphy v. Islamic Rep. of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010) (same); *Acosta*, 574 F. Supp. 2d 15, 30 (same); *Peterson*, 515 F. Supp. 2d 25, 51 (same); *see also* *Leibovitch v. Syrian Arab Rep.*, 25 F. Supp. 3d 1071, 1087 (N.D. Ill. 2014) (same).

### Borochov Family

The Borochov family members claiming solatium who are U.S. citizens are Ronen Borochov, Devora Borochov, Shari Mayer, Josef Borochov, Shira Borochov and Avraham Borochov. (Dkt. 30, Ex. B-G). Their claims are supported by their sworn declarations, that describe each of their experiences and struggles coping with the terrorist shooting of Eli Borochov, as well as individual psychiatric evaluations and diagnoses provided by Dr. Strous. (Dkt. 31, Dkt. 33-37, Dkt. 50, Ex. 3-4, 6-9).

What became known as the Hebron Terrorist Attack where Eli Borochov was brutally shot left a profound effect on his close family. In their declarations Ronen, Devora, Shari, Josef, Shira and Avraham describe the circumstances surrounding the attack on Eli and its effect on their lives.

The evidence presented establishes that the violent circumstances surrounding the attack, and the trauma of Eli's subsequent hospitalization for his injuries continues to cause the family severe grief and pain affecting their daily lives, their health, and their relationships. The family has

been traumatized by the brutal terrorist attack on Eli while waiting to enter a place of worship. (Dkt. 31-32, Exhibits A, C-G, Dkt. 33-37, Dkt. 53, Exhibit B).

**Ronen Steven Borochov:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Ronen Borochov regarding the psychological and emotional trauma he suffered as a result of the Hebron Terrorist Attack. (Dkt. 35, Dkt. 50, Ex. 7).

On the day of the terrorist attack on his son, Eli, Ronen was with Eli and Josef in Hebron to pray and were walking up steps in a crowd when they heard a boom. (Dkt. 50, Ex. 7). Eli fell down right next to Ronen and blood poured out of Eli's pants. (Dkt. 50, Ex. 7). A solider approached and another loud noise occurred. (Dkt. 50, Ex. 7). Soldiers took Eli to a military tent nearby. (Dkt. 35). Ronen and his other son had to wait outside the military tent. (Dkt. 50, Ex. 7). Ronen rode in the ambulance to the hospital with Eli. (Dkt. 50, Ex. 7). The medics in the ambulance accidentally punctured an artery in Eli's arm when the ambulance went over a bump. (Dkt. 50, Ex. 7). The medics had to direct their attention to the blood gushing out of Eli's arm and stop working on the gunshot wounds. (Dkt. 50, Ex. 7). After arriving at the hospital, while Eli was being evaluated, Ronen was crying hysterically as he truly thought Eli was going to die. (Dkt. 50, Ex. 7). After Eli was evaluated, Ronen was told that Eli was shot in the testicles and might not be able to have children. (Dkt. 50, Ex. 7). While Eli was going to have surgery, Ronen was glad to know Eli would survive but was concerned Eli might not be able to have children. (Dkt. 50, Ex. 7). After Eli had surgery, Ronen stayed with him in the hospital. (Dkt. 50, Ex. 7). It was difficult for Ronen to call his wife to tell her that Eli had been shot and he broke down and cried while telling Devora that Eli had been shot. (Dkt. 50, Ex. 7). He did not tell Devora initially that Eli had been shot in the testicles and might not be able to have children. (Dkt. 50, Ex. 7). Devora was hysterical upon hearing that Eli had been shot. (Dkt. 50, Ex. 7). Ronen purchased a first- class airline ticket for Eli

when they returned home from Israel on the Monday following the attack so Eli could lay down during the flight. (Dkt. 35). A copy of the receipt for the first-class ticket for Eli that cost over $7,000 is attached to Ronen's declaration. (Dkt. 35, Ex. 1).

In the weeks following the terrorist attack on Eli, Ronen had nightmares, difficulty sleeping, and he ate a lot to cope with nearly losing a child. (Dkt. 50, Ex. 7). As a result of Eli being shot, Ronen gained weight, missed a lot of work and his work productivity went down significantly because he had difficulty concentrating on work. (Dkt. 50, Ex. 7). Ronen states that Devora stayed home from work to take care of Eli and take him to medical appointments. (Dkt. 50, Ex. 7). Ronen spent a significant amount of time taking Eli to physicians. (Dkt. 50, Ex. 7). It took Ronen about a year to return to nearly his functional level he was at before the terrorist attack on Eli. (Dkt. 50, Ex. 7). Because of Eli's shooting, Ronen is unable to relax and enjoy life. (Dkt. 50, Ex. 7). He worries about his children and keeps tabs on where they are because of the terrorist attack on Eli. (Dkt. 50, Ex. 7). To this day, it is too emotional for Ronen to discuss the terrorist attack on Eli. (Dkt. 50, Ex. 7). His trust in God since Eli's shooting has been compromised. (Dkt. 50, Ex. 7).

Dr. Strous is of the opinion that Ronen Borochov suffers from post-traumatic stress disorder and other specified anxiety disorder due to the Hebron Terrorist Attack on his son and that Ronen's emotional issues affect several areas of life and will continue to do so for a long period of time. (Dkt. 50, Ex. 7).

**Devora Sue Borochov:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Devora Borochov regarding the psychological and emotional trauma she suffered as a result of the Hebron Terrorist Attack. (Dkt. 31, Dkt. 50, Ex. 4).

Devora Borochov was getting her hair cut before the Sabbath when an unknown telephone number kept calling her cell phone. (Dkt. 50, Ex. 4). Devora eventually answered the phone call and her husband, Ronen, was on the phone. (Dkt. 50, Ex. 4). Ronen was in Israel with two of their sons. Because it was the Sabbath in Israel, Devora knew there was something wrong when Devora heard her husband's voice on the other side of the call. (Dkt. 50, Ex. 4). Ronen told her that Eli had been shot in the leg but was okay. (Dkt. 50, Ex. 4). While Ronen told her Eli was okay, her husband was crying, which was unusual for him. (Dkt. 50, Ex. 4). Devora was worried for Eli and went to a neighbor's after leaving the hair salon and cried hysterically. (Dkt. 50, Ex. 4). Devora could not sleep, and she had to sleep at a friend's house for support until Eli returned home. (Dkt. 50, Ex. 4). It was only subsequently that Devora learned that Eli had been shot in his testicles and had an artery in his arm accidentally punctured while in the ambulance. (Dkt. 50, Ex. 4).

When Eli returned home, Devora was devastated that Eli was in a wheelchair. (Dkt. 50, Ex. 4). Even after Eli returned home, Devora had difficulty sleeping and would stay up at night when the rest of the family went to sleep and cried to relieve stress from the trauma of a son being shot by a terrorist. (Dkt. 50, Ex. 4). While friends, community and politicians visited the family, Devora found the barge of people coming in and out of their house to be stressful. (Dkt. 50, Ex. 4). Because of the terrorist attack on Eli, Devora became an overprotective parent. (Dkt. 50, Ex. 4). Specifically, she requires now that all her children check in with her when they get to where they were supposed to be. (Dkt. 50, Ex. 4). When one of Devora's sons went to study in Israel, she ensured she could track him for four hours a day by his cell phone. (Dkt. 50, Ex. 4). Devora experienced nightmares for a month following Eli's terrorist attack. (Dkt. 31). Due to Eli's attack, Devora avoids crowds and gets anxious whenever anyone she knows, especially her family, is in

the Hebron area. (Dkt. 50, Ex. 4). Due to the injury to Eli's testicle area, Devora was afraid Eli would not be able to have children until his wife conceived a child. (Dkt. 50, Ex. 4).

Dr. Strous is of the opinion that Devora Borochov suffers from post-traumatic stress disorder (partial) and other specified anxiety disorder due to the Hebron Terrorist Attack on her son and that Devora's anxiety affects several areas of her life and will continue to do so for a long period of time. (Dkt. 50, Ex. 4).

**Shari Mayer:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Shari Mayer, Eli's wife, regarding the psychological and emotional trauma she suffered as a result of the Hebron Terrorist Attack. (Dkt. 36, Dkt. 50, Ex. 8).

Shari Mayer reports that Eli could not bear to tell her about the terrorist attack on him at first, but when he did tell her about the attack, he cried the entire time he was telling her about it. (Dkt. 50, Ex. 8). Shari has difficulty sleeping at night as she fears what happened to her husband could happen again. (Dkt. 50, Ex. 8). It breaks Shari's heart to see how negatively the terrorist attack has affected Eli. (Dkt. 50, Ex. 8). Eli experiences severe pain in his leg and back. (Dkt. 50, Ex. 8). The pain in Eli's leg forces him to sit down for periods of time. (Dkt. 50, Ex. 8). Eli requires physical therapy for his back. (Dkt. 50, Ex. 8). Eli and Shari did not know if Eli's scrotum injury would affect their fertility. (Dkt. 50, Ex. 8). Because of the terrorist attack Eli has become paranoid as he becomes nervous when he hears loud noises. (Dkt. 50, Ex. 8). Eli tries to make an annual trip to Israel but being in Israel is difficult. (Dkt. 50, Ex. 8). During such trips, Eli is very anxious. (Dkt. 50, Ex. 8). On such a trip, Shari witnessed Eli break out in sweat and he was constantly looking over his shoulder on the trip. (Dkt. 50, Ex. 8). According to Shari, Eli's mood shifts when he is "triggered" by the terrorist attack in Hebron on him. (Dkt. 50, Ex. 8).

Dr. Strous is of the opinion that Shari Mayer suffers from adjustment disorder with anxiety symptoms due to the Hebron Terrorist Attack on her husband and that Shari's emotional issues affect several areas of her life and will continue to do so for a long period of time. (Dkt. 50, Ex. 8).

**Josef S. Borochov:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Josef Borochov regarding the psychological and emotional trauma he suffered as a result of the Hebron Terrorist Attack. (Dkt. 34, Ex. 50, Ex. 6).

On the day of the terror attack Josef was in Israel with Ronen and Eli visiting the Cave of the Patriarchs in Hebron, Israel. (Dkt. 50, Ex. 6). After climbing stairs, Josef heard a loud noise and saw his brother lying on the ground. (Dkt. 50, Ex. 6). Eli was screaming on the ground from pain and there was blood all around him. (Dkt. 50, Ex. 6). Josef was pulled into a nearby tent by the police who rushed to the scene. (Dkt. 50, Ex. 6). Eli was attended to by medics and then rushed to the hospital. (Dkt. 50, Ex. 6). Due to it being Sabbath, Josef had no news until the next night. (Dkt. 50, Ex. 6). The next night they returned to the United States. (Dkt. 50, Ex. 6).

Josef was unable to sleep in the weeks following the terrorist attack. (Dkt. 50, Ex. 6). Josef reported experiencing nightmares, flashbacks, fear of public places, sensitivity to loud noises and physical reactions when discussing the terrorist attack, including sweating, crying and palpitations. (Dkt. 50, Ex. 6). Before the terrorist attack, Josef was a carefree teenager but since the attack he lives in fear and is anxious. (Dkt. 50, Ex. 6). He missed school for a period of time and was feeling down for a time following Eli's attack. (Dkt. 50, Ex. 6). When they got home, Josef felt so sad that he stayed in bed for a few days. (Dkt. 50, Ex. 6). Because of the terrorist attack, Josef no longer wants to live in Israel because he feels he would not be able to live in a relaxed manner there. (Dkt. 50, Ex. 6).

Dr. Strous is of the opinion that Josef Borochov suffers from post-traumatic stress disorder due to the Hebron Terrorist Attack on his brother and that Josef's emotional issues affect several areas of his life and will continue to do so for a long period of time. (Dkt. 50, Ex. 6).

**Shira Nechama Borochov:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Shira Nechama Borochov regarding the psychological and emotional trauma she suffered as a result of the Hebron Terrorist Attack. (Dkt. 37, Dkt. 50, Ex. 9).

Shira reports that she knew on the day of the terrorist attack on her brother that her mother was upset, but that she did not learn that her brother, Eli, had been shot until the next night. (Dkt. 50, Ex. 9). When Shira learned a terrorist shot Eli, she was shocked. (Dkt. 50, Ex. 9). When Eli returned home from Israel, he was in a wheelchair. (Dkt. 50, Ex. 9). Seeing Eli in a wheelchair caused Shira great distress. (Dkt. 37). Shira missed a period of time from school to support Eli's recovery and rehabilitation. (Dkt. 50, Ex. 9). Shira returned to school but left school again for some time because her friends and classmates were focused on Eli's terrorist attack. (Dkt. 50, Ex. 9). Shira indicated she lost focus on her own life and developing her own identity after Eli's terrorist attack as his attack consumed her thoughts. (Dkt. 50, Ex. 9). Dr. Strous noted that Shira has anxiety over Eli's terrorist attack and dealt with his attack by closing herself off. Shira is supersensitive to loud noises. (Dkt. 50, Ex. 9).

Dr. Strous is of the opinion that Shira Borochov suffers from adjustment disorder and post-traumatic stress syndrome that is partially in remission due to the Hebron Terrorist Attack on her brother and that Shira's anxiety affects several areas of her life and will continue to do so for a long period of time. (Dkt. 50, Ex. 9).

**Avraham M. Borochov:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Avraham Borochov regarding the psychological and emotional trauma he suffered as a result of the Hebron Terrorist Attack. (Dkt. 33, Dkt. 50, Ex. 4).

Avraham reports that he took the news of his older brother's terrorist attack hard because he was close with Eli. (Dkt. 50, Ex. 4). Avraham was supposed to go on the trip to Israel but did not go because he had school. (Dkt. 50, Ex. 4). Avraham was afraid Eli would not be able to walk again after being shot in the leg. (Dkt. 50, Ex. 4). Avraham had nightmares about what happened to Eli and difficulty sleeping. (Dkt. 50, Ex. 4). He missed weeks of school following Eli's attack and had difficulty concentrating on his school work when he returned to school. (Dkt. 50, Ex. 4). Initially, Avraham did not discuss his fear following his brother's terrorist attack with his friends, but subsequently did so. (Dkt. 50, Ex. 4). Avraham reported being hypersensitive to loud noises and he is hesitant to be in public places due to the terrorist attack on Eli. (Dkt. 50, Ex. 4). Avraham indicated that while the family takes trips to Israel, he is anxious while there because of what happened to Eli. (Dkt. 50, Ex. 4).

Dr. Strous is of the opinion that Avraham Borochov suffers from adjustment disorder with anxiety symptoms due to the Hebron Terrorist Attack on his brother and that Avraham's anxiety and loss of security affect several areas of his life and will continue to do so for a long period of time. (Dkt. 50, Ex. 4).

The severe emotional and psychological effects on each of these members of Eli Borochov's family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

Based upon the foregoing, the Court orders that Defendants shall pay in line with *Heiser* $2,500,000 in solatium damages to Ronen Borochov, $2,500,000 in solatium damages to Devora

Sue Borochov, $1,250,000 in solatium damages to Shira Borochov, $1,250,000 in solatium damages to Josef Borochov and $1,250,000 in solatium damages to Avraham Borochov but will adjust downward an award to Shari Mayer Borochov of solatium damages from $4,000,000 to $2,500,000 because she married Eli Borochov shortly after the terrorist attack on him.

### Golan Family

The Golan family members claiming solatium who are U.S. citizens are Yehudit Golan and Matan Golan. Their claims are supported by their sworn affidavits that describe their experiences and struggles coping with the terrorist attack on Yoav and its adverse and long-lasting effects on their lives, as well as individual psychiatric evaluations and diagnoses provided by Dr. Strous. (Dkt. 30, Ex. H, I; Dkt. 43, Dkt. 48, Dkt. 51, Ex. 4, 13).

**Yehudit Golan:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Yehudit Golan regarding the psychological and emotional trauma she suffered as a result of the Bus Terrorist Attack. (Dkt. 48, Dkt. 51, Ex. 13).

Yehudit Golan reports that she was at work when she received a call from Yoav informing her that he and Rotem were in a terrorist attack. (Dkt. 51, Ex. 13). Yehudit could hear the chaos and confusion in the background of the phone call. (Dkt. 51, Ex. 13). The phone call was disconnected before Yehudit could learn which hospital Yoav and Rotem were being taken to for medical treatment. (Dkt. 51, Ex. 13). It took thirty minutes to learn which hospital Yoav and Rotem were at and in those thirty minutes Yehudit was so worried for Yoav and Rotem. (Dkt. 51, Ex. 13). Once Yoav learned of the hospital's name, she went to the hospital and she, along with Yoav and Rotem, were highly emotional. Yehudit called her husband, Raphael, from the hospital and he left work to rush to the hospital. (Dkt. 51, Ex. 13). Yoav and Rotem were concerned for their six-month old baby so Raphael called Rotem's parents, and they picked the baby up from care and

brought the baby to the hospital. (Dkt. 51, Ex. 13). Yehudit and Raphael brought the baby home with them and left Yoav and Rotem in the hospital. (Dkt. 51, Ex. 13). That night the baby and Yehudit did not sleep. (Dkt. 30). The baby was still nursing and refused to take a bottle from Yehudit. The next day, Yehudit missed work and helped Yoav and Rotem at the hospital. (Dkt. 51, Ex. 13). Upon discharge from the hospital, Yoav and Rotem moved in with Rotem's parents because they needed help due to their injuries. (Dkt. 51, Ex. 13).

During Yoav and Rotem's recovery from their physical injuries, Yehudit often left work early and drove one hour to Rotem's parents house to help Yoav and Rotem out for months after the attack. (Dkt. 51, Ex. 13). Yehudit would take Yoav to medical appointments. (Dkt. 51, Ex. 13). The driving an hour to Rotem's parents house and then another hour back meant Yehudit had to spend more money than normal on gas. (Dkt. 51, Ex. 13). Because Yoav and Rotem were unable to work for some time after the attack due to their physical injuries, Yehudit and Raphael would often financially help Yoav and Rotem out by buying things they needed such as diapers and clothes for their baby. (Dkt. 51, Ex. 13). Yehudit experienced sleeping difficulty after the attack for some time because she had nightmares about the attack. (Dkt. 51, Ex. 13). Yehudit does not enjoy life as she used to do before the attack and worries for the safety of her children if a child is late or does not answer his or her phone when she calls. (Dkt. 51, Ex. 13). Waiting for a bus at a bus stop produces tension and anxiety for Yehudit and she often is on the look at for someone who wants to harm her and her family. (Dkt. 51, Ex. 13).

Dr. Strous is of the opinion that Yehudit Golan suffers from adjustment disorder with anxiety symptoms due to the Bus Terrorist Attack on her son and that Yehudit's emotional issues affect several areas of her life and will continue to do so for a long period of time. (Dkt. 51, Ex. 13).

**Matan Golan:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Matan Golan regarding the psychological and emotional trauma he suffered as a result of the Bus Terrorist Attack. (Dkt. 43, Dkt. 51, Ex. 4).

Matan Golan reports that he was at the beach when his father, Raphael, called to tell him his brother Yoav and his wife, Rotem, had been victims in the terrorist attack in Jerusalem. (Dkt. 51, Ex. 4). When he saw Yoav in the hospital that day, it was very unsettling for Matan to see Yoav in such pain and discomfort. (Dkt. 51, Ex. 4). Yoav had just come out of surgery for a dislocated shoulder and had a cast on his leg. (Dkt. 51, Ex. 4). As the brother of Yoav he was chosen to stay overnight with Yoav. (Dkt. 51, Ex. 4). Matan tried to sleep on the ground that night but he could not because of Yoav's pain and discomfort. (Dkt. 51, Ex. 4).

Matan was wheeling Yoav into a synagogue shortly after the terrorist attack and a car went by and Yoav screamed for Matan to stop immediately. (Dkt. 51, Ex. 4). This was very upsetting for Matan to see Yoav so emotionally disturbed by a car driving by them. (Dkt. 51, Ex. 4). It was also difficult for Matan to see Yoav in a wheelchair. (Dkt. 51, Ex. 4). For a month after Yoav's attack Matan had difficulty sleeping and did not like all the questions about the attack from his friends. (Dkt. 51, Ex. 4). Matan watched Yoav's baby while he went with Rotem to see a psychologist for their emotional injuries from the terrorist attack. (Dkt. 51, Ex. 4). Yoav's anxiety due to the terrorist attack prevented Yoav from going on a trip oversees Matan had planned for them. Before the terrorist attack, Yoav would have traveled overseas. (Dkt. 51, Ex. 4). After the terrorist's attack, Matan became hyper vigilant about any cars near him, and he feels anxious when he hears about other terrorist attacks. (Dkt. 51, Ex. 4). Because of the terrorist attack, Matan feels fatalist about life, and he is still bothered by the fact that Yoav still lives with physical and

psychological injuries from the terrorist attack. (Dkt. 51, Ex. 4). Matan still has intermittent flashbacks to seeing the trauma to Yoav and Rotem in the emergency room. (Dkt. 51, Ex. 4).

Dr. Strous is of the opinion that Matan Golan suffers from post-traumatic stress disorder (partial in remission) and other specified anxiety disorder due to the Bus Terrorist Attack on his brother and that Matan's anxiety issues affect several areas of his life and will continue to do so for a long period of time. (Dkt. 51, Ex. 4).

Yehudit Golan and Matan Golan describe the circumstances surrounding the Bus Terrorist Attack and the effects of the attack on their lives. (Dkt. 43, Dkt. 48). The evidence presented establishes that the Bus Terrorist Attack caused and continues to cause Yehudit Golan and Matan Golan psychological trauma affecting their daily lives, their health, and their relationships.

The severe emotional and psychological effects on each of these members of the Golan family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

Based upon the foregoing, the Court orders in line with *Heiser* that Defendants shall pay $2,500,000 in solatium damages to Yehudit Golan and $1,250,000 in solatium damages to Matan Golan in solatium damages.

## **Punitive Damages**

The FSIA specifically allows an award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism. 28 U.S.C. § 1605A(c). The purpose of punitive damages is two-fold: to punish those who engage in outrageous conduct and to deter others from similar conduct in the future. *See Eisenfeld v. Islamic Rep. of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000). "This cost functions both as a direct deterrent, and also as a disabling mechanism: if several

large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed." *Flatow*, 999 F. Supp. 1, 33 (D.D.C. 1998).

Considering the factors detailed in the Memorandum of Law, the Court finds an award of punitive damages is warranted. First, support for Hamas's terrorist activities is horrific and condemnable. Second, Defendants clearly intended to cause significant harm in multiple ways when they provided material support to Hamas, a known terrorist organization that routinely carry out brutal attacks on innocent civilians. Third, prior damages have been awarded to deter Iran and Syria from related actions against civilians.

As detailed in the Memorandum of Law, different courts calculate punitive damages using a variety of methods. Here, Plaintiffs submit the conduct of the Defendants more closely resembles the conduct in cases awarding $150 million per family.

### Borochov Family

Eli Borochov was on his way up the steps to the Cave of the Patriarchs when he was shot. He was an innocent civilian exercising his right to religious worship when he was gunned down. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

### Golan Family

The plowing down of innocent civilians waiting at a bus stop near Jerusalem was senseless. Ever since the attempt on the lives of Yoav and Rotem Golan, the lives of their family, as well as Yoav and Rotem's lives, have never been the same. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

**Damages for Non-U.S. Citizen Plaintiffs**

Because the non-U.S. citizen Plaintiffs do not have a direct cause of action under 28 U.S.C. § 1605A(c), their entitlement to compensatory damages depends on Israeli law. As Dr. Shnoor explains, Israeli law provides that an immediate family member of a principal tort victim is entitled to compensatory damages for psychological and emotional harm resulting from the tort to the primary victim. *See* Shnoor Decl. at ¶ 59 (Dkt. 34) in *Force v. Islamic Rep. of Iran, et al.*, Civ. No. 16-cv-0468. The harm suffered by a secondary victim, such as the non-U.S. citizen Plaintiffs in this case, is compensable if (1) the family member witnessed the event or its consequences, (2) there is a time and space proximity between the two harms, and (3) the secondary victim suffers severe harm that disrupts daily function. *Id.* As described by Plaintiffs' expert, Dr. Shnoor, the Court understands that Israeli law does not allow damages to secondary victims unless the harm is so severe that is disrupts daily function. Shnoor Decl. ¶ 59 (Dkt. 34) in *Force v. Islamic Rep. of Iran, et al.*, Civ. No. 16-cv-0468; *see also Estate of Botvin*, 873 F. Supp. 2d at 245; *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 423 (E.D.N.Y. 2009) ("Under Israeli law emotional injury suffered as a result of the death of a loved one is generally not compensable unless it manifests as a psychiatric illness.").

**Golan Family**

The non-U.S. citizen family members of Yoav Golan's family claiming damages are as follows: Rotem Shoshana Golan, Yoav's wife, Raphael Golan, father of Yoav Golan, Yael Golan Inbar, sister of Yoav Golan, Nadav Golan, brother of Yoav Golan, Shai Fishfeder, father of Rotem Golan, Efrat Fishfeder, mother of Rotem Golan, Ohad Fishfeder, brother of Rotem Golan, Omer Fishfeder, brother of Rotem Golan and Shiri Fishfeder, sister of Rotem Golan. Each of the above referenced non-U.S. citizen Plaintiffs support their claims with affidavits, which describe the close

family relationship between them and Yoav and Rotem Golan before the terrorist attack on Yoav and Rotem Golan and the devastation to their lives the terror attack has had and will continue to have for the rest of their lives. In addition, Plaintiffs have provided the expert reports of Dr. Strous, which detail the psychiatric evaluations and diagnoses of each of the above referenced non-U.S. citizen family members of Yoav Golan and Rotem Shoshana Golan. (Dkt. 51, Ex. 3, 5-12).

**Rotem Shoshana Golan:** Plaintiffs presented the declarations of Dr. Strous and Dr. Friedman, as well as the sworn declaration of Rotem Shoshana Golan regarding the psychological, physical, and emotional trauma she suffered as a result of the Bus Terrorist Attack. (Dkt. 46, Dkt. 51, Ex. 9, Dkt. 53, Exhibit D).

Rotem reports on December 14, 2015, she missed her last class for the day at college so she could meet up with her husband at the bus stop in order to travel home together to pick up their child from the babysitting service. (Dkt. 46, Dkt. 51, Ex. 9). Rotem indicated she rarely travelled with her husband on a bus due to their fear of a terror attack. (Dkt. 51, Ex. 9). She remembers meeting up and taking out an apple to eat as they were waiting for the bus. (Dkt. 51, Ex. 9). Rotem recalls hearing a "boom" and felt a slap to her face. (Dkt. 51, Ex. 9). She fell to the ground and there was smoke all around. (Dkt. 46). Her husband Yoav picked her up and shouted to "run, run!" (Dkt. 51, Ex. 9). He told her that there is a terror attack going on. (Dkt. 51, Ex. 9). Rotem remembers running barefoot with no head covering which had been thrown off in the commotion. (Dkt. 51, Ex. 9). She then heard 3 shots. (Dkt. 51, Ex. 9). Yoav told her to stop running and they sat down. (Dkt. 51, Ex. 9). Her immediate thought was for her baby. (Dkt. 51, Ex. 9). Rotem felt scared that she may not see him again. (Dkt. 51, Ex. 9). Then the adrenalin "kicked in" and she felt her whole body shaking. (Dkt. 51, Ex. 9). When the terrorist rammed into them with a motor vehicle, Rotem and Yoav were thrown into the glass wall of the bus stop and had shattered glass

all over them. (Dkt. 51, Ex. 9). Rotem had an injury to her knee and pain in her back, as well as a burning sensation in her knees. (Dkt. 51, Ex. 9).

Rotem and Yoav were put in an ambulance and rushed to the hospital. (Dkt. 51, Ex. 9). In the hospital Rotem received treatment for her injuries, including 8 sutures in her knee and an injury to her back. (Dkt. 51, Ex. 9). Rotem was kept in the hospital overnight because she felt physically weak and was overwhelmed from an emotional perspective. (Dkt. 51, Ex. 9). Rotem recalls vomiting at the hospital. (Dkt. 51, Ex. 9). Rotem indicated she sustained a sprained MCL and was unable to bend that knee for some time. (Dkt. 51, Ex. 9). Rotem's injured knee was bandaged for two weeks after the attack. (Dkt. 51, Ex. 9). It took about ten months for Rotem to recover physically from her injuries and to this day Rotem still at times experiences itching, burning and pain at the scar sites of her injuries. (Dkt. 51, Ex. 9).

Rotem indicates that in the short term she was overwhelmed and affected by the terror attack. (Dkt. 51, Ex. 9). Rotem and Yoav had to move in with Rotem's parents because they could not function due to their injuries. (Dkt. 51, Ex. 9). Rotem and Yoav's baby was still nursing and due to her injuries, Rotem could not even pick up her baby. (Dkt. 51, Ex. 9). Instead, family members had to bring the baby to Rotem for nursing. (Dkt. 51, Ex. 9). For the first few months, Rotem had recurring obsessive thoughts of the terror car-ramming attack. (Dkt. 51, Ex. 9). She also had frequent nightmares related to the event in some form. (Dkt. 51, Ex. 9). Memories of the terror attack also included the recurring thought that she may have lost her baby if he had been with them. (Dkt. 51, Ex. 9). This is because she was sure that she would have been holding him and that the car would have flung him out her arms into the street. (Dkt. 51, Ex. 9). This is a very painful recurring thought for her even though she knows it is irrational to think obsessively about this situation for so many years. (Dkt. 51, Ex. 9). There was a baby in a baby carriage behind them

at the bus stop when the attack occurred that was badly injured in the attack and had to have a foot amputated. (Dkt. 51, Ex. 9).

Some of Rotem's pain is also related to her loss of dignity after the terror attack. (Dkt. 51, Ex. 9). She felt exposed in several situations including losing her head covering required for religious reasons, being undressed in the hospital and being in pajamas for some time after the event at her parents' home. (Dkt. 51, Ex. 9). Following the terror attack, Rotem would not leave the house unless she had to leave. (Dkt. 51, Ex. 9). Since the terror attack, Rotem experiences a lot of anxiety when traveling on buses. (Dkt. 51, Ex. 9). Rotem and Yoav will leave events before it gets dark because they are afraid of a terrorist attack at night while traveling home. (Dkt. 51, Ex. 9).

Rotem told Dr. Strous that about a month after the attack she was referred for psychotherapy in order to help her deal with the psychological trauma in the aftermath of the terror attack. (Dkt. 51, Ex. 9). She recalls that the therapy was also to assist her deal with her strong feelings of loss of personal safety. (Dkt. 51, Ex. 9). Rotem felt that she had no more confidence in the "world outside" and that her fear was very deep. (Dkt. 51, Ex. 9). She feels that this loss of personal safety is permanent. (Dkt. 51, Ex. 9). This is expressed in various ways including her fear of traveling. (Dkt. 51, Ex. 9).

After two months of partially recuperating physically and psychologically, Rotem did return to their home in Eli. (Dkt. 51, Ex. 9). However, she struggled to function due to the aftermath of the terror attack. (Dkt. 51, Ex. 9). She felt fearful to go out on to the porch of their house. (Dkt. 51, Ex. 9). Rotem recalls becoming withdrawn and always locked up in their home. (Dkt. 51, Ex. 9). The travel to and from the town reflected her most prominent ongoing functional difficulty and was most anxiety provoking for her. (Dkt. 51, Ex. 9). Whenever she travelled, she constantly felt

on guard and unsafe. (Dkt. 51, Ex. 9). This was never the case before the terror event. (Dkt. 51, Ex. 51). She reported a general feeling of being unsafe – thinking that anytime someone could enter their home and attack her. (Dkt. 51, Ex. 9). This fear was expressed in a manner to the extent that she would hide any knives in her home just in case someone would break into their home and use the knives on her and her family. (Dkt. 51, Ex. 9).

Rotem tried hard to fight her fear and overcome it. (Dkt. 51, Ex. 9). However, even with psychotherapy, her fears remained. (Dkt. 51, Ex. 9). After some time, Rotem felt that she was not able to manage her fears and thought that leaving Eli may assist her even in some small way to cope with her fears. (Dkt. 51, Ex. 9). This is despite previously being happy living there and where she had many friends. (Dkt. 51, Ex. 9). She felt that traveling to Eli was not safe. (Dkt. 46). Rotem and Yoav therefore relocated. (Dkt. 51, Ex. 9).

Rotem reports that since the terror attack, she has become much less "free flowing" and much more anxious in general. (Dkt. 51, Ex. 9). Other problems that arose during this period included poor concentration and inability to relax. (Dkt. 51, Ex. 9). This was never the case before the terror event and is difficult for her. (Dkt. 51, Ex. 9). Rotem feels that the extent of her trauma and resultant anxiety was very intense and long lasting. (Dkt. 51, Ex. 9). Rotem feels that no one can really understand the difficulties she experienced after the event and which continue to trouble her to this day. (Dkt. 51, Ex. 9). The loss of her feeling of safety and confidence is what bothers her the most in the long term. (Dkt. 51, Ex. 9).

Rotem avoids the location of the attack. (Dkt. 51, Ex. 9). When Rotem is exposed in some way to a reminder of the terrorist attack, she experiences palpitations and body shivers. (Dkt. 51, Ex. 9). Since the attack, Rotem has become hypervigilant, especially when traveling on roads. (Dkt. 51, Ex. 9). Rotem also experiences flashbacks of the terrorist attack. (Dkt. 51, Ex. 9). While

Rotem attended psychiatric sessions to help her deal with the trauma, she declined to take psychiatric medication, despite her psychiatrist recommended she do so. (Dkt. 51, Ex. 9).

Dr. Strous is of the opinion that Rotem Golan suffers from post-traumatic stress disorder, other specified anxiety disorder and is a victim of terrorism. (Dkt. 51, Ex. 9). Rotem's emotional issues affect several areas of her life and will continue to do so for a long period of time. (Dkt. 51, Ex. 9).

On May 20, 2020, Dr. Friedman evaluated Rotem Golan. (Dkt. 53, Exhibit D). Due to COVID-19 restrictions, Dr. Friedman was unable to perform an in-person evaluation. (Dkt. 53, Exhibit D). Rotem was injured on December 14, 2015 in a motor vehicle ramming terrorist attack. (Dkt. 53, Exhibit D). Dr. Friedman reviewed Rotem's medical records for her treatment from the terrorist attack. (Dkt. 53, Exhibit D). Rotem's medical records indicate she sustained a back contusion, bilateral knee contusion and traumatic laceration of the right leg. (Dkt. 53, Exhibit D). The hospital records from December 14, 2015 indicate "[T]errorism involving other means. MVA." (Dkt. 53, Exhibit D). The right knee laceration was sutured and Rotem was discharged from the hospital the next day. (Dkt. 53, Exhibit D). While in the hospital, Rotem complained of pain in her right pelvis and pain in both knees. (Dkt. 53, Exhibit D). Rotem was prescribed physical therapy for a MCL tear Grade 1/2 and right knee lacerations. (Dkt. 53, Exhibit D). Rotem recalls vomiting in the hospital on December 14, 2105 and that she "felt shockey." (Dkt. 53, Exhibit D). Rotem was unable to drive for a month after the attack and she was unable to return to her studies for 2.5 months following the attack. (Dkt. 53, Exhibit D). Rotem and Yoav had to move in with Rotem's family so they could have help with their baby and with their recovery. (Dkt. 53, Exhibit D). Rotem attended physical therapy for three months and she had to take antibiotics for a short

period of time. (Dkt. 53, Exhibit D). Rotem's right knee has a well-healed scar on it. (Dkt. 53, Exhibit D).

According to Dr. Friedman, Rotem Golan's symptoms were caused by the December 14, 2015 injury. (Dkt. 53, Exhibit D). Dr. Friedman's impression is that Rotem suffered bilateral knee contusions, lumbar contusion, pelvis contusion and traumatic laceration of the right leg. (Dkt. 53, Exhibit D). Rotem was hit by a motor vehicle on December 14, 2015 and suffered bilateral leg pain which required analgesics and physical therapy. (Dkt. 53, Exhibit D). Dr. Friedman does not expect additional improvement at this time. (Dkt. 53, Exhibit D).

**Raphael Golan:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Raphael Golan regarding the psychological and emotional trauma he suffered as a result of the Bus Terrorist Attack. (Dkt. 45, Dkt. 51, Ex. 8).

Raphael told Dr. Strous about the terrorist attack on his son, Yoav, and daughter-in-law, Rotem, that he read about on the internet while at work. (Dkt. 51, Ex. 8). Raphael's wife called him at work and told him that Yoav and Rotem had been victims in the terrorist attack. (Dkt. 51, Ex. 8). While Raphael's wife tried to assure Raphael that Yoav and Rotem would be alright, Raphael was in shock and rushed to the hospital. (Dkt. 51, Ex. 8). It was very painful for Raphael to see Yoav and Rotem in the hospital with their injuries, especially because Yoav had lots of bandages on him as his injuries were more serious than Rotem's. (Dkt. 51, Ex. 8). It was so painful for Raphael to hear Yoav recount the motor vehicle traveling at a high-speed ram into them. (Dkt. 51, Ex. 8). Raphael missed time from work after the terrorist attack because he spent many hours helping Yoav and Rotem during their recovery from their physical injuries, including helping Yoav shower. (Dkt. 51, Ex. 8).

Since the terrorist attack, Raphael worries about his family, which he did not do before the attack. (Dkt. 51, Ex. 8). Post-attack Raphael has become hypervigilant when he travels outside his home and he feels fearful when he goes outside at night. (Dkt. 51, Ex. 8). For a year after the attack Raphael experienced nightmares related to the attack and when he has to travel near the attack site, he experiences flashbacks to the attack. (Dkt. 51, Ex. 8). Raphael since the attack tries to avoid going out on the streets unless he has to do so. (Dkt. 51, Ex. 8). Since the attack, Raphael does not jog outside as much as he used to before the attack. (Dkt. 51, Ex. 8). It is painful for Raphael to see that to this day Yoav still has pain in his ankle, especially since the doctors have not been able to alleviate the pain in Yoav's ankle. (Dkt. 51, Ex. 8). Overall, Raphael told Dr. Strous that his level of happiness since the terrorist attack has decreased. (Dkt. 51, Ex. 8).

Dr. Strous' opinion is that Raphael Golan suffers from post-traumatic stress disorder (partial, in remission), persistent depressive disorder; mild severity, late onset and other specified anxiety disorder due to the terrorist attack on Yoav and Rotem. (Dkt. 51, Ex. 8). Dr. Strous does not expect Raphael's low mood and anxiety that affect various areas of his functioning to resolve in the short-term and such issues will affect him for a long time. (Dkt. 51, Ex. 8).

**Yael Inbar:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Yael Inbar regarding the psychological and emotional trauma she suffered as a result of the Bus Terrorist Attack. (Dkt. 47, Dkt. 51, Ex. 12).

Yael recalled the terrorist attack on December 14, 2015 on her brother, Yoav, and sister-in-law, Rotem, to Dr. Strous. (Dkt. 51, Ex. 12). Yael was driving near the site of the attack with her children in her motor vehicle when she received a call from her mother informing her that Yoav and Rotem were in the terrorist attack. (Dkt. 51, Ex. 12). Yael was feeling a lot of anxiety and was shaking. (Dkt. 51, Ex. 12). Yael was told not to go to the hospital that night so she drove

home, but she could not sleep that night. (Dkt. 51, Ex. 12). Yael was shaking that night and went to the hospital first thing the next day to help Yoav and Rotem as much as she could with their recovery. (Dkt. 51, Ex. 12). Yael's anxiety after the attack only increased as time passed as she went from living a safe life to a life riddled with feeling insecure. (Dkt. 51, Ex. 12). Yael required psychological treatment due to the level of anxiety she developed because of the terrorist attack. (Dkt. 51, Ex. 12). Yael feels her ability to deal with stress and fear have been diminished since the terrorist attack. (Dkt. 51, Ex. 12). Yael is close with Yoav and visited him frequently while he was recovering from his injuries. (Dkt. 51, Ex. 12). Seeing Yoav during his recovery was painful for Yael and affected her mood negatively even to this day. (Dkt. 51, Ex. 12).

Yael since the attack has become hypervigilant when motor vehicles come close, and she has a high anxiety reaction to such an occurrence. (Dkt. 51, Ex. 12). The attack on Yoav and Rotem has caused Yael to become tense and on guard when speaking to friends in public. (Dkt. 51, Ex. 12). Yael was unable to sleep for five nights post-attack and had nightmares for a few weeks after the attack. (Dkt. 51, Ex. 12). Because of the attack, Yael tries to avoid places with large groups of people and when in such places she looks for a place to exit right away in case there is a terrorist attack. (Dkt. 51, Ex. 12). Yael has flashbacks to the terror attack based on the details Yoav told her and flashbacks to how she felt when she was told about the attack. (Dkt. 51, Ex. 12). Yael worries when she is outside that a similar terrorist attack could happen to her and her family. (Dkt. 51, Ex. 12).

Dr. Strous is of the opinion that Yael suffers from post-traumatic stress disorder and other specified anxiety disorder. (Dkt. 51, Ex. 12). Yael's anxiety is not anticipated to resolve in the short-term and will continue to affect her in many ways for a long time. (Dkt. 51, Ex. 12).

**Nadav Golan:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Nadav Golan regarding the psychological and emotional trauma he suffered as a result of the Bus Terrorist Attack. (Dkt. 44, Dkt. 51, Ex. 5).

Nadav recalls on the day of the terrorist attack he was at medical school when he received a telephone call from his father informing him that Yoav and Rotem had been injured in a car ramming terrorist attack. (Dkt. 51, Ex. 5). While he was told that Yoav and Rotem's injuries were minor in nature, Nadav was in shock and knew as someone with some medical experience that minor terrorist injuries can turn into something not so minor. (Dkt. 51, Ex. 5). Nadav rushed to the hospital and when he arrived at the hospital, he observed Yoav and Rotem in pain from their injuries. (Dkt. 51, Ex. 5). Nadav had difficulty sleeping for a few weeks after the terrorist attack and felt his concentration at medical school for a few weeks after the terrorist attack was also affected negatively. (Dkt. 51, Ex. 5).

Long term, Nadav was unable to stand near bus stops as he feared he would be a terror target and he declined to participate in certain activities and events because he was scared of traveling. (Dkt. 51, Ex. 5). Since the terrorist attack Nadav has become hypervigilant and avoids bus stops when he can do so. (Dkt. 51, Ex. 5). Since the terrorist attack, Nadav has become much more anxious when in public places and he has become anxious and feels on edge even went out with friends. (Dkt. 51, Ex. 5). Nadav experiences flashbacks when he hears of other terrorist attacks. (Dkt. 51, Ex. 5). The flashbacks cause a physical reaction, including sweating and muscle tension. (Dkt. 51, Ex. 5).

Dr. Strous' impression is that Nadav suffers from adjustment disorder with anxiety symptoms and post-traumatic stress disorder due to the terrorist attack on Yoav and Rotem. (Dkt. 51, Ex. 5). According to Dr. Strous, it is not expected that Nadav's feelings of anxiety and loss of

security affecting several areas of his life will resolve in the short term, and they will continue to affect him for a long time to come. (Dkt. 51, Ex. 5).

**Shai Fishfeder:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Shai Fishfeder regarding the psychological and emotional trauma he suffered as a result of the Bus Terrorist Attack. (Dkt. 49, Dkt. 51, Ex. 10).

Shai told Dr. Strous his wife called him at work to let him know that their daughter, Rotem, and son-in-law, Yoav, had been injured in a terrorist attack. (Dkt. 51, Ex. 10). Shai was shocked and froze. (Dkt. 51, Ex. 10). His wife had to get him out of being frozen and get him home so they could pick up their grandson before going to the hospital because their grandson was still nursing. (Dkt. 51, Ex. 10). When they got to the hospital Shai recalls that it was emotional to see Rotem hurt from the shattered glass. (Dkt. 51, Ex. 10). Rotem was in pain and kept recounting how she saw an empty baby carriage and how she kept thinking how easily it could have been her son that was injured or killed in the terror attack if he had been with her and Yoav at the time. (Dkt. 51, Ex. 10). Yoav and Rotem had to stay with Shai and Efrat because they needed help due to their injuries, including with bathing, preparing food and follow-up medical appointments. (Dkt. 51, Ex. 10).

For a month Shai was unable to work because he had to help Yoav and Rotem so much, including bringing their baby to them at night for comforting and feedings. (Dkt. 51, Ex. 10). Shai had sleeping difficulties for weeks after the terrorist attack. Since the terrorist attack on such close family members, Shai feels he has lost control of his life and worries what will happen next to his family. (Dkt. 51, Ex. 10). Shai felt Yoav and Rotem's recovery was on his shoulders and he sought out help for them from a social worker and medical specialists. (Dkt. 51, Ex. 10). Shai had difficulty for months after the terrorist attack with his focus at work. (Dkt. 51, Ex. 10). Because of

the terrorist attack Shai has become a much more sensitive person and feels he lost his personal sense of safety. (Dkt. 51, Ex. 10). Shai experiences flashbacks to Yoav and Rotem in the hospital and in wheelchairs and of the details of the attack on them when he is near the attack site. (Dkt. 51, Ex. 10).

Dr. Strous is of the opinion that Shai suffers from post-traumatic stress disorder and adjustment disorder with anxiety symptoms due to the terrorist attack on Yoav and Rotem. (Dkt. 51, Ex. 10). It is not expected that his anxious and dysthymic response affecting many areas of his personal and interpersonal functions will resolve in the short term, and they will continue to affect him for a long time to come. (Dkt. 51, Ex. 10).

**Efrat Fishfeder:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Efrat Fishfeder regarding the psychological and emotional trauma she suffered as a result of the Bus Terrorist Attack. (Dkt. 39, Dkt. 51, Ex. 3).

On December 14, 2015, Efrat received a call from her daughter, Rotem, while at home. (Dkt. 51, Ex. 3). Rotem told Efrat that she and Yoav had been injured in the car ramming terrorist attack that day and would be okay. (Dkt. 39). Efrat was "floored" and was worried for Rotem and Yoav because they were in an ambulance on their way to the hospital. (Dkt. 51, Ex. 3). Efrat called her husband, Shai, and he picked her up and on their way to the hospital they picked up Rotem's baby who was still nursing. (Dkt. 51, Ex. 3). When they arrived at the hospital with Rotem and Yoav's baby Rotem and Yoav started crying. (Dkt. 51, Ex. 3). It was very traumatic and emotional for Efrat to see Rotem and Yoav injured and in pain, especially because Rotem was fainting from the emotional stress and had sutures from her injuries. (Dkt. 51, Ex. 3). Efrat felt so bad for Rotem and Yoav as they were a young couple with lots of hopes and dreams. (Dkt. 51, Ex. 3).

Due to their physical limitations from their injuries, Rotem and Yoav, along with their baby, moved in with Efrat and Shai for two months so Efrat and Shai could help them out with their recovery and the baby. (Dkt. 51, Ex. 3). Efrat became physically and emotionally drained from taking care of Rotem and Yoav. (Dkt. 51, Ex. 3). Efrat and Shai also still had three of their own children living with them to take care of during the time Rotem and Yoav stayed with them after the terrorist attack. (Dkt. 51, Ex. 3). Efrat and Shai also had to try their best to continue with their work commitments even though Rotem and Yoav needed care following their injuries. (Dkt. 51, Ex. 3). Yoav fell apart emotionally more than Rotem and Efrat provided emotional support to both of them. (Dkt. 51, Ex. 3). Efrat had to take Rotem and Yoav for follow-up medical visits and had to host people that came to visit Rotem and Yoav, including Yoav's parents who stayed over often. (Dkt. 51, Ex. 3). Efrat developed tinnitus that lasted for two months following the terrorist attack. (Dkt. 51, Ex. 3). Since the attack on Rotem and Yoav, Efrat has become a big worrier and she no longer has a sense of personal safety. (Dkt. 51, Ex. 3). She feels on edge and has become hypervigilant when out in public places since the attack. (Dkt. 51, Ex. 3). Because of the terrorist attack on Rotem and Yoav, Efrat is now fearful of foreign travel and avoids traveling even within Israel to certain areas that she does not deem safe. (Dkt. 51, Ex. 3).

According to Dr. Strous, Efrat suffers from adjustment disorder with anxiety symptoms and other specified anxiety disorder due to the terrorist attack on Rotem and Yoav. (Dkt. 51, Ex. 3). Dr. Strous does not expect Efrat's anxiety that affects many areas of her personal and interpersonal functioning will resolve in the short term and that such anxiety will be present in the long term. (Dkt. 51, Ex. 3).

**Ohad Fishfeder:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Ohad Fishfeder regarding the psychological and emotional trauma she suffered as a result of the Bus Terrorist Attack. (Dkt. 40, Dkt. 51, Ex. 8).

Ohad recalled to Dr. Strous that his father, Shai, tried to call him to advise him about the motor vehicle ramming terrorist attack that injured his sister, Rotem, and Yoav, but he was out in the field in a military exercise the day of the terrorist attack. (Dkt. 51, Ex. 8). Therefore, Ohad returned Shai's call the day after the attack and when Ohad learned about the attack he cried deeply and was in a state of shock. (Dkt. 51, Ex. 8). Ohad had to be calmed down by a friend in the military and he was shaking and unable to sleep that night. (Dkt. 51, Ex. 8). Ohad was in such a confused state that he asked for permission to leave the military base to visit Rotem and Yoav. (Dkt. 51, Ex. 8). It took Ohad a full day to reach his parents' home and when he did, he saw Rotem and Yoav were in pain and unable to move. (Dkt. 51, Ex. 8). Since Ohad was young and strong, he was the one to help Rotem and Yoav move and help cleanse them. (Dkt. 51, Ex. 8).

Because Ohad was in a sensitive military unit, his commander required that he return to the base to work very quickly after visiting Rotem and Yoav. (Dkt. 51, Ex. 8). Ohad was angry that he had to return to the military because his family really needed him during this difficult time. (Dkt. 51, Ex. 8). When he returned to the military base, the commander made Ohad describe the attack, which was difficult for him to do. (Dkt. 51, Ex. 8). While describing the attack to commander, the commander interrupted Ohad to make jokes about the attack and even said that Rotem and Yoav were probably faking their injuries and were lazy for laying on the couch. (Dkt. 51, Ex. 8). This made Ohad angry at his commander, as well as the fact that Ohad's commander lied to him when he said all soldiers would be at the base on that weekend for military exercises. (Dkt. 51, Ex. 8). Some soldiers were allowed to leave for the weekend for family gatherings. (Dkt.

51, Ex. 8). Before the attack on Rotem and Yoav, Ohad was able to fall asleep quickly after a day of work in the military but after the attack on Rotem and Yoav no matter how physical his work was in the military he was unable to sleep, and this negatively impacted him at work the next day. (Dkt. 51, Ex. 8). Because of the attack on Rotem and Yoav, Ohad has realized that the world is an insecure place. (Dkt. 51, Ex. 8). The terrorist attack caused a negative impact on Ohad's mood for a while, and he had a lot of anxiety for some time after the attack. (Dkt. 51, Ex. 8).

Ohad long-term experiences flashbacks to the call he received from his father informing him about the car ramming terrorist attack that injured Rotem and Yoav and he avoids bus stops. (Dkt. 51, Ex. 8). Ohad tenses up when family and friends are at or near bus stops and he also is very tense when he has to travel. (Dkt. 51, Ex. 8). When he speaks about the terrorist attack Ohad tenses up and sweats. (Dkt. 51, Ex. 8).

Dr. Strous has indicated that Ohad suffers from post-stress traumatic disorder (partial) and adjustment disorder with anxiety symptoms. (Dkt. 51, Ex. 8). Dr. Strous does not expect that Ohad's feelings of anxiety and loss of security affecting several areas of his life will resolve in the short term, and they will continue to affect him for a long time to come. (Dkt. 51, Ex. 8).

**Omer Fishfeder:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Omer Fishfeder regarding the psychological and emotional trauma he suffered as a result of the Bus Terrorist Attack. (Dkt. 41, Dkt. 51, Ex. 7).

Omer recalls on the day of the terrorist attack he was home watching the news of the terrorist attack but did not think much of it until Rotem called and told him that she and Yoav were in the attack. (Dkt. 51, Ex. 7). Rotem was hysterical and Omer could hear ambulance sirens in the background. (Dkt. 51, Ex. 7). Omer woke his mother up and had to tell her what happened before putting her on the telephone with Rotem. (Dkt. 51, Ex. 7). Omer and Rotem's mother, Efrat,

became hysterical so Omer tried to hold it together for his mother and Rotem. Efrat and Omer drove to pick up Rotem's baby, per Rotem's request, so Rotem could nurse the baby since the baby did not take a bottle. (Dkt. 51, Ex. 7). When they arrived at the hospital, Omer saw Rotem in severe pain and she was hysterical. (Dkt. 51, Ex. 7). It was very traumatic for Omer to see his sister in such a vulnerable state and unable to do anything. Rotem and Yoav moved in with Omer and his parents when they were released from the hospital. (Dkt. 51, Ex. 7). Omer helped Rotem and Yoav out during their physical recoveries, but it was very draining on him. (Dkt. 51, Ex. 7).

Long-term, Omer has become hypervigilant when he travels or is in public areas and he tries to avoid bus stops. (Dkt. 51, Ex. 7). Omer has flashbacks to having to tell his mom about the attack. (Dkt. 51, Ex. 7). The first few weeks after the attack Omer had nightmares with sleep disruptions. (Dkt. 51, Ex. 7). After the attack, Omer had less focus at school, and he feels this negatively impacted his grades. (Dkt. 51, Ex. 7). Because of the terrorist attack, Omer lost his sense of security and feels he lost a sense of enjoyment and personal growth during his adolescent years. (Dkt. 51, Ex. 7). Since the attack, Omer feels he is less confident, anxious, more on guard and lives in constant fear. (Dkt. 51, Ex. 7). Because of the terrorist attack, Omer is training in the Israeli army to become a combat solider so he can protect others in Israeli from terrorist attacks. (Dkt. 51, Ex. 7).

Dr. Strous is of the opinion that Omer suffers from post-stress traumatic disorder (partial) and adjustment disorder with anxiety symptoms. (Dkt. 51, Ex. 7). Dr. Strous does not expect that Omer's feelings of anxiety and loss of security affecting several areas of his life will resolve in the short term, and they will continue to affect him for a long time to come. (Dkt. 51, Ex. 7).

**Shiri Fishfeder:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Shiri Fishfeder regarding the psychological and emotional trauma she suffered as a result of the Bus Terrorist Attack. (Dkt. 42, Dkt. 51, Ex. 11).

On the night of the terrorist attack on Rotem and Yoav, Shiri was at a Chanukah production with her cousin and grandmother. (Dkt. 51, Ex. 11). Shiri thought her grandmother was tense and her grandmother eventually that night informed her about the terrorist attack. (Dkt. 51, Ex. 11). While Shiri was only eleven years old, Shiri understood what injured in a terrorist attack meant. (Dkt. 51, Ex. 11). Shiri was in shock and was shaking that night from the news. (Dkt. 51, Ex. 11). Shiri recalled to Dr. Strous that it was very frightening for her to see the site of the terrorist attack on the news. (Dkt. 51, Ex. 11). Her sister, Rotem, and Yoav moved in with Shiri and her parents for a couple of months. (Dkt. 51, Ex. 11). Shiri had to wheel Rotem and Yoav around in the house and outside and she helped brush their teeth amongst other things. (Dkt. 51, Ex. 11). It was painful for Shiri to see how much help Rotem and Yoav needed. (Dkt. 51, Ex. 11). Shiri returned to school a few days after the attack, but her focus was lacking in school because her mind was on Rotem and Yoav. (Dkt. 51, Ex. 11). Shiri also felt disconnected from her friends because they could not relate to having a family member being a victim of a terrorist attack. (Dkt. 51, Ex. 11).

Because of the terrorist attack, Shiri has become a tense and anxious person. (Dkt. 51, Ex. 11). Since the terrorist attack, Shiri has experienced nightmares and she tries to avoid watching movies and hearing stories that involve violence. (Dkt. 51, Ex. 11). When she hears about or has to talk about the terrorist attack, Shiri tenses up. (Dkt. 51, Ex. 11).

Dr. Strous is of the opinion that Shiri suffers from post-stress traumatic disorder (partial) and adjustment disorder with anxiety symptoms. (Dkt. 51, Ex. 11). Dr. Strous does not expect that

Shiri's feelings of anxiety affecting several areas of her life will resolve in the short term, and they will continue to affect her for a long time to come. (Dkt. 51, Ex. 11).

Yoav Golan and Rotem Shoshana Golan were deliberately run down at a bus stop during rush hour evening traffic by a terrorist with the intent to murder them. While Yoav and Rotem's families did not witness the murder attempt, they witnessed its consequences first-hand and experienced the negative and long-lasting effects on them and their family.

Based upon the foregoing, the Court orders in line with *Heiser* that Defendants pay $5,000,000 in damages to Rotem Golan, $2,500,000 in damages to Raphael Golan, $1,250,000 in damages to Yael Golan Inbar, $1,250,000 in damages to Nadav Golan, $1,250,000 in damages to Shai Fishfeder, $1,250,000 in damages to Efrat Fishfeder, $1,250,000 in damages to Ohad Fishfeder, $1,250,000 in damages to Omer Fishfeder and $1,250,000 in damages to Shiri Fishfeder.

## IV.
## CONCLUSION

The serious injuries suffered by Eli Borochov were due to a senseless and traumatic event for which money can never fully compensate him or his family. Eli was shot on his way up the steps to the Cave of the Patriarchs and missed the rest of the semester at college due to the serious injuries he sustained in the attempt to take his life.

Yoav Golan and Rotem Golan were among those that were deliberately plowed down by a terrorist by using a motor vehicle as a weapon while waiting at a bus stop for a bus.

Each of the above referenced terrorist attacks were not only a trauma for the injured victims, but the attacks also forever changed their families with severe and long-lasting effects. The Court finds that Iran and Syria provided material support to Hamas and facilitated the November 6, 2015 Hebron Terrorist Attack that injured Eli Borochov and facilitated the July 15,

2016 Bus Terrorist Attack that injured Yoav Golan and Rotem Golan. Damages will be awarded in accordance with these findings.

_____
U.S.D.J.                                    Dated

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date indicated below a true copy of the foregoing was served via ECF on all counsel of record herein.

Dated:   Brooklyn, New York
         April 9, 2021

_____
Robert J. Tolchin